Slip Op. 17-39

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| JACOBI CARBONS AB AND JACOBI CARBONS, INC.,<br><br>      Plaintiffs,<br><br>NINGXIA HUAHUI ACTIVATED CARBON CO., LTD., NINGXIA GUANGHUA CHERISHMET ACTIVATED CARBON CO., LTD., BEIJING PACIFIC ACTIVATED CARBON PRODS. CO., LTD., DATONG MUNICIPAL YUNGUANG ACTIVATED CARBON CO., LTD., CARBON ACTIVATED TIANJIN CO., LTD., JILIN BRIGHT FUTURE CHEMICALS CO., LTD., NINGXIA MINERAL AND CHEMICAL LTD., SHANXI DMD CORP., SHANXI INDUSTRY TECH. TRADING CO., LTD., SHANXI SINCERE INDUSTRIAL CO., LTD., TANCARB ACTIVATED CARBON CO., LTD., TIANJIN MAIJIN INDUSTRIES CO., LTD., AND CHERISHMET INC.,<br><br>      Plaintiff-Intervenors,<br><br>      v.<br><br>UNITED STATES,<br><br>      Defendant, and<br><br>CALGON CARBON CORP. AND CABOT NORIT AM., INC.,<br><br>      Defendant-Intervenors. | Before: Mark A. Barnett, Judge<br><br>Consol. Court No. 15-00286 |

<u>OPINION</u>

[Plaintiffs' motions for judgment on the agency record are granted in part, and the determination is remanded to the Department of Commerce.  Plaintiffs' motion to supplement the administrative record is denied.]

Dated:  April 7, 2017

<u>Daniel L. Porter</u>, Curtis, Mallet-Prevost, Colt & Mosle LLP, of Washington, DC, argued for Plaintiffs.  With him on the brief were <u>James P. Durling</u>, <u>Claudia D. Hartleben</u>, and <u>Tung Nguyen</u>.

<u>Gregory S. Menegaz</u>, DeKieffer & Horgan PLLC, of Washington, DC, argued for Plaintiff-Intervenors Carbon Activated Tianjin Co., Ltd., Jilin Bright Future Chemicals Co., Ltd., Ningxia Mineral and Chemical Ltd., Shanxi DMD Corp., Shanxi Industry Technology Trading Co., Ltd., Shanxi Sincere Industrial Co., Ltd., Tancarb Activated Carbon Co., Ltd., and Tianjin Maijin Industries Co., Ltd.  With him on the brief were <u>J. Kevin Horgan</u>, <u>Alexandra H. Salzman</u>, and <u>Judith L. Holdsworth</u>.

<u>Jeffrey S. Grimson</u>, <u>Kristin H. Mowry</u>, <u>Jill A. Cramer</u>, <u>Sarah M. Wyss</u>, <u>Yuzhe Pengling</u>, and <u>James C. Beaty</u>, Mowry & Grimson, PLLC, of Washington, DC, for Plaintiff-Intervenor Ningxia Huahui Activated Carbon Co., Ltd.

<u>Francis J. Sailor</u> and <u>Dharmendra N. Choudhary</u>, Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt LLP, of Washington, DC, for Plaintiff-Intervenors Ningxia Guanghua Cherishmet Activated Carbon Co., Ltd, Beijing Pacific Activated Carbon Products Co., Ltd., Datong Municipal Yunguang Activated Carbon Co., Ltd, and Cherishmet Inc.

<u>Antonia R. Soares</u>, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, argued for Defendant.  With her on the brief were <u>Benjamin C. Mizer</u>, Principal Deputy Assistant Attorney General, <u>Jeanne E. Davidson</u>, Director, and <u>Reginald T. Blades, Jr.</u>, Assistant Director.  Of counsel on the brief was <u>Heather Doherty</u>, Attorney-International, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, DC.

<u>Melissa M. Brewer</u>, Kelley Drye & Warren LLP, of Washington, DC, argued for Defendant-Intervenors Calgon Carbon Corp. and Cabot Norit Americas, Inc.  With her on the brief were <u>John M. Herrmann</u>, <u>David A. Hartquist</u>, and <u>R. Alan Luberda</u>.

Barnett, Judge:  Plaintiffs Jacobi Carbons AB and Jacobi Carbons, Inc. (together, "Jacobi"), and Plaintiff-Intervenors[1] (collectively, with Jacobi, "Plaintiffs"), move, pursuant to United States Court of International Trade ("USCIT") Rule 56.2, for judgment on the agency record, challenging the United States Department of Commerce's ("Defendant" or "Commerce") *Final Results* in the seventh administrative review ("AR7") of the antidumping duty order on certain activated carbon from the People's Republic of China ("PRC").[2]  *See Certain Activated Carbon from the People's Republic of China*, 80 Fed. Reg. 61,172 (Dep't Commerce Oct. 9, 2015) (final results of antidumping duty administrative review; 2013-2014) ("*Final Results*"), PJA Tab 42, PR 414, ECF No. 85-4, and accompanying *Issues and Decision Memorandum*, A-570-904 (Oct. 2, 2015) ("*Final I&D Mem.*"), PJA Tab 39, PR 407, ECF No. 85-4.

---

[1] Plaintiff-Intervenors include: Ningxia Huahui Activated Carbon Co., Ltd. ("Huahui"); Carbon Activated Tianjin Co., Ltd., Jilin Bright Future Chemicals Company, Ltd., Ningxia Mineral and Chemical Limited, Shanxi DMD Corporation, Shanxi Industry Technology Trading Co., Ltd., Shanxi Sincere Industrial Co., Ltd., Tancarb Activated Co., Ltd., and Tianjin Maijin Industries Co., Ltd. (collectively, "CATC"); and Ningxia Guanghua Cherishmet Activated Carbon Co., Ltd., Beijing Pacific Activated Carbon Products Co., Ltd, Cherishmet Inc., and Datong Municipal Yunguang Activated Carbon Co., Ltd., (collectively, "the GDLSK companies").

[2] The administrative record is divided into a Public Administrative Record ("PR"), ECF No. 37-1, and a Confidential Administrative Record ("CR"), ECF No. 37-2.  Parties submitted joint appendices containing all record documents cited in their briefs.  *See* Public Joint App. ("PJA"), ECF Nos. 85, 85-1 to 85-4; Confidential Joint App. ("CJA"), ECF No. 86.  There is an inconsistency in Parties' citations to record documents; in particular, Parties cite to different administrative record numbers.  *See* CJA at 2 (preamble to the CJA).  Defendants relied on the record indices filed with the court; Plaintiffs relied on record indices Commerce prepared for the purpose of litigation.  *See Id.*  For ease of reference, the court cites to the administrative record (and the corresponding document numbers) filed with the court.  The court references the confidential versions of the relevant record documents, if applicable, throughout this opinion, unless otherwise specified.

Plaintiffs argue that Commerce erred in (1) rejecting the Philippines and selecting

Thailand as the primary surrogate country, (2) using Thai import data as the surrogate

value for carbonized material, and (3) reducing Jacobi's constructed export price

("CEP") by an amount for Chinese value added tax ("VAT").  *See generally* Confidential

Pls. Jacobi Carbons AB and Jacobi Carbons, Inc.'s Mot. for J. on the Agency R. and

Pls.' Br. in Supp. of their Mot. for J. on the Agency R. ("Jacobi Mem."), ECF No. 51; Pls.

Carbon Activated Tianjin Co., Ltd., Jilin Bright Future Chemicals Company, Ltd., Ningxia

Mineral and Chemical Limited, Shanxi DMD Corporation, Shanxi Industry Technology

Trading Co., Ltd., Shanxi Sincere Industrial Co., Ltd., Tancarb Activated Co., Ltd., and

Tianjin Maijin Industries Co., Ltd. Mot. for J. on the Agency R., ECF No. 59; Pls. Carbon

Activated Tianjin Co., Ltd., Jilin Bright Future Chemicals Company, Ltd., Ningxia Mineral

and Chemical Limited, Shanxi DMD Corporation, Shanxi Industry Technology Trading

Co., Ltd., Shanxi Sincere Industrial Co., Ltd., Tancarb Activated Co., Ltd., and Tianjin

Maijin Industries Co., Ltd. Mem. in Supp. of Mot. for J. on the Agency R. ("CATC

Mem."), ECF No. 59-2 (incorporating Jacobi's arguments and providing additional

arguments on all issues); Pl.-Intervenor Ningxia Huahui Activated Carbon Co., Ltd.'s

Rule 56.2 Mot. for J. on the Agency R. ("Huahui Mem."), ECF No. 58 (incorporating

Jacobi's arguments regarding surrogate country and surrogate value selection, adopting

Jacobi's arguments regarding VAT and making additional arguments thereto); Mot. of

GDLSK Pl.-Intervenors for J. on the Agency R. under USCIT Rule 56.2 and Mem. of

Law in Supp. of GDLSK Pls.' Rule 56.2 Mot. for J. on the Agency R. ("GDLSK Mem."),

ECF No. 60 (adopting all arguments made by Jacobi and providing additional argument

regarding the VAT).[3]  For the following reasons, the court remands the determination to

Commerce to clarify and, if necessary, revise its findings on the issues of the economic

comparability and significant production of Thailand, and the irrecoverable VAT

calculation.  The court defers ruling on Plaintiffs' challenges to Commerce's surrogate

value selections pending the results of the redetermination.

BACKGROUND

## I.      Preliminary Proceedings

On May 29, 2014, Commerce initiated AR7 on certain activated carbon from

China for the period of review ("POR") April 1, 2013 to March 1, 2014.  *Initiation of*

*Antidumping and Countervailing Duty Administrative Reviews*, 79 Fed. Reg. 30,809

(Dep't Commerce May 29, 2014), PJA Tab 6, PR 18, ECF No. 85-1.[4]   Commerce

selected Jacobi and Datong Juqiang Activated Carbon Co., Ltd. ("DJAC") as mandatory

respondents for individual examination for AR7 "because they constitute the PRC

exporters accounting for the largest volume of U.S. imports of subject merchandise that

can reasonably be examined."  Selection of Respondents for Individual Review (June

26, 2014) at 1, CJA Tab 10, CR 5, ECF No. 86.

---

[3] Plaintiffs Huahui, CATC, and the GDLSK companies also seek recalculation of the
separate rate assigned to non-mandatory respondents in accordance with any remand.
CATC Mem. at 23; Huahui Mem. at 1; GDLSK Mem. at 5-7.

[4] The scope of the antidumping duty order includes "all forms of activated carbon that
are activated by steam or [carbon dioxide], regardless of the raw material, grade,
mixture, additives, further washing or post-activation chemical treatment . . ., or product
form."  *Final I&D Mem.* at 2.  "Unless specifically excluded, the scope of the order
covers all physical forms of certain activated carbon . . . ."  *Id.*  Chemically activated
carbons, reactivated carbons, and activated carbon cloth are excluded from the scope
of the order.  *Id.* at 2-3.

On July 25, 2014, Commerce invited interested parties to comment on surrogate country selection and surrogate value data.  *See* Request for Surrogate Country and Surrogate Value Comments and Information (July 25, 2014) ("Commerce SC Letter"), PJA Tab 43, PR 64, ECF No. 85-4.  Commerce provided interested parties with a "non-exhaustive list of countries" that, based on 2012 per capita gross national income ("GNI"), Commerce's Office of Policy ("OP") considered economically comparable to the PRC.  *Id*. at 1; *see also id*., Attach. 1 ("OP SC List for AR7") (listing South Africa, Colombia, Bulgaria, Thailand, Ecuador, and Indonesia as economically comparable countries).  Commerce invited interested parties to propose additional countries.  *Id*. at 1.

On November 12, 2014, Jacobi submitted surrogate country comments.  *See* Jacobi's Initial Comments on Surrogate County Selection (Nov. 12, 2014) ("Jacobi SC Comments"), PJA Tab 4, PR 178, ECF No. 85-1.  Jacobi urged Commerce to rely on 2013 GNI data from the World Bank's "World Development Indicators Database," and asserted that data therein demonstrates the Philippines' economic comparability to China.  *Id*. at 3.  On March 31, 2015, DJAC submitted surrogate value information proposing Thai Harmonized System ("HS") code 4402.90.1000, "Of Coconut Shell," to value carbonized material.  Second Surrogate Value Submission by Datong Juqiang Activated Carbon Co., Ltd. (March 31, 2015) ("DJAC Second SV Submission"), Ex. 2A ("Thai Import Statistics"), PJA Tab 15, PR 322, ECF No. 85-3.

On May 5, 2015, Commerce published its *Preliminary Results*.  *See Certain Activated Carbon from the People's Republic of China*, 80 Fed. Reg. 25,669 (Dep't Commerce May 5, 2015) (prelim. results of antidumping duty admin. review: 2013-2014)

("*Prelim. Results*"), PJA Tab 23, PR 351, ECF No. 85-3, and accompanying *Issues and

Decision Memorandum*, A-570-904 (Apr. 29, 2015) ("*Prelim. I&D Mem.*"), PJA Tab 17,

PR 335, ECF No. 85-3.  Commerce selected Thailand as the primary surrogate country.

*Id*. at 17.  Commerce explained that Bulgaria, Ecuador, Romania, South Africa,

Thailand, and Ukraine are economically comparable to the PRC on the basis of 2013

GNI data; the Philippines are Indonesia are not.  *Id*. at 14-15.  Of the economically

comparable countries, Commerce relied on Global Trade Atlas export data to find that

Ecuador, Thailand, and South Africa are significant producers of comparable

merchandise.  *Id*. at 16; *see also* Surrogate Values for the Preliminary Results (Apr. 29,

2015) ("Prelim. SV Mem."), Attach. 1 ("Global Trade Atlas Reporting Country Export

Statistics"), PJA Tab 18, PR 336-39, ECF No. 85-3.

　　　　Interested parties had placed Indonesian, Thai, Philippine, and Ukrainian

surrogate value data on the record for Commerce's consideration.  *Prelim. I&D Mem*. at

16.  Commerce rejected the Philippine and Indonesian data because it did not find

those countries to be economically comparable, and it determined it had "sufficiently

reliable and useable [surrogate value] data" from a comparable country, Thailand.  *Id*. at

16-17, 27.  Relevant here, Commerce selected the 2010 audited financial statement of

Carbokarn Co., Ltd. ("Carbokarn"), a Thai activated carbon company, to value factory

overhead, selling, general, and administrative expenses, and profit.  *Id*. at 26.[5]

---

[5] Commerce rejected Carbokarn's 2013 financial statement because it lacked sufficient
detail.  *Prelim. I&D Mem*. at 26.  Commerce also rejected the 2013 financial statement
of C. Gigantic Carbon Co., Ltd. ("Gigantic") because it reflected "an exemption from
corporate income tax under the [Thai] Investment Promotion Act," which Commerce had
determined was a countervailable subsidy.  *Id*. at 27; *see also* Pet'rs' Final Pre-Prelim.
Submission of Surrogate Value Information (March 31, 2015), Attach. 3 ("2013 Gigantic
Fin. Stmt."), PJA Tab 14, PR 321, ECF No. 85-3 (accrued income tax listed as "-").

Commerce selected Thai HS code 4402.90.9000, "Wood Charcoal (Including Shell Or

Nut Charcoal), Excluding That Of Bamboo, Other," to value carbonized material.

Prelim. SV Mem. at 5, Attach. 3a (Global Trade Atlas surrogate values for AR7); *see*

*also Prelim I&D Mem.* at 24 (noting Commerce's reliance on Thai import data to value

raw materials).

Finally, Commerce noted that, in nonmarket economy ("NME") cases, its practice

"is to subtract from [export price] or the [constructed export price] the amount of any un-

refunded (*i.e.*, irrecoverable) VAT ["Value Added Tax"]".  *Prelim. I&D Mem*. at 23.  After

considering the Chinese VAT regulation placed on the record, Commerce reduced

Jacobi's U.S. sales price "by the irrecoverable VAT rate of 17[%] of entered value."  *Id*.

at 23.  Commerce calculated an estimated weighted-average dumping margin of 0.0

USD/kg for DJAC and a 0.53 USD/kg margin for Jacobi.  *Prelim. Results*, 80 Fed. Reg.

at 25,669.  As the only non-zero or non-*de minimis* dumping margin, Commerce

assigned Jacobi's rate to the separate rate-eligible companies.  *Id.*; *Prelim. I&D Mem*. at

11.

## II.    Post-Preliminary Proceedings

In light of *Dupont Teijin Films v. United States*, 37 CIT ___, 931 F. Supp. 2d

1297 (2013),[6] and Jacobi's placement of 2013 GNI data on the record of this

proceeding, Commerce placed on the record surrogate country lists from other

proceedings using 2013 per capita GNI data.  *Id*. at 13-14 (citing Prelim. SV Mem.).

Commerce gave interested parties additional time to comment on the surrogate country

---

[6] In *Dupont Teijin Films*, the court remanded the final results of an administrative review to Commerce for consideration of more recent GNI data which had been placed on the record.  931 F. Supp. 2d at 1298-99, 1307.

lists and submit additional surrogate value data for consideration.  *Id.* at 13-14; *see also*

Clarification of Deadline to Submit SV Information (June 3, 2015), PJA 31, PR 372, ECF

No. 85-4.

## III.    Final Results

On October 9, 2015, Commerce published the *Final Results*.  *See Final Results*.

Commerce affirmed its preliminary selection of Thailand as the primary surrogate

country.  *Final I&D Mem*. at 5-8.  Commerce selected Carbokarn's 2011 financial

statement to value financial ratios, which had been placed on the record during post-

preliminary proceedings and which was more contemporaneous with the relevant POR

than the 2010 Carbokarn statement used in the *Preliminary Results*.  *Final I&D Mem*. at

13.  Commerce selected Thai HS code 4402.90.1000 ("Of Coconut Shell") as the

surrogate value for carbonized material because it is more specific to Jacobi's inputs

than is Thai HS 4402.9000 ("Wood Charcoal").  *Id*. at 25, 26.  As it did in the *Preliminary*

*Results*, Commerce deducted 17 percent irrecoverable VAT from the U.S. price of

Jacobi's CEP sales.  *Id*. at 16-20.  Commerce calculated a weighted-average dumping

margin of $1.05 USD/kg for Jacobi and $0.00 USD/kg for DJAC.  *Final Results*, 80 Fed.

Reg. at 61,174.  Because Jacobi's rate is not zero, *de minimis*, or based on facts

available, it was assigned to the separate rate companies.  *Id*.

Before this court is Plaintiffs' challenge to Commerce's *Final Results*.  The

arguments are fully briefed, and the court heard oral argument on December 21, 2016.

*See* Docket Entry, ECF No. 93.  For the reasons discussed below, the *Final Results* are

remanded for further explanation and reconsideration, if necessary, of Commerce's

determination of the economic comparability of Thailand and the Philippines,

Commerce's determination that Thailand is a significant producer of activated carbon, and Commerce's calculation of the irrecoverable VAT.  The court defers resolution of Plaintiffs' challenges to Commerce's particular surrogate values pending the results of the redetermination.

### JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction pursuant to § 516A(a)(2)(B)(iii) of the Tariff Act of 1930, as amended, 19 U.S.C. § 1516a(a)(2)(B)(iii) (2012),[7] and 28 U.S.C. § 1581(c) (2012).

The court will uphold an agency determination that is supported by substantial evidence and otherwise in accordance with law.  19 U.S.C. § 1516a(b)(1)(B)(i). "Substantial evidence is 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Huaiyin Foreign Trade Corp. (30) v. United States*, 322 F.3d 1369, 1374 (Fed. Cir. 2003) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).  It '"requires more than a mere scintilla," but "less than the weight of the evidence."  *Nucor Corp. v. United States*, 34 CIT 70, 72, 675 F. Supp. 2d 1340, 1345 (2010) (quoting *Altx, Inc. v. United States*, 370 F.3d 1108, 1116 (Fed. Cir. 2004)). In determining whether substantial evidence supports Commerce's determination, the court must consider "the record as a whole, including evidence that supports as well as evidence that 'fairly detracts from the substantiality of the evidence.'"  *Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1379 (Fed. Cir. 2003) (quoting *Atl. Sugar, Ltd. v. United States*, 744 F.2d 1556, 1562 (Fed. Cir. 1984)).  However, that a plaintiff can point to evidence that detracts from the agency's conclusion or that there is a possibility

---

[7] All citations to the Tariff Act of 1930, as amended, are to Title 19 of the U.S. Code, 2012 edition, and all references to the United States Code and the Code of Federal Regulations are to the 2012 edition, unless otherwise stated.

of drawing two inconsistent conclusions from the evidence does not preclude the

agency's finding from being supported by substantial evidence.  *Matsushita Elec. Indus.*

*Co. v. United States,* 750 F.2d 927, 933 (Fed. Cir. 1984) (citing *Consolo v. Fed. Mar.*

*Comm'n*, 383 U.S. 607, 619-20 (1966)).  The court may not "reweigh the evidence or . .

. reconsider questions of fact anew."  *Downhole Pipe & Equip., L.P. v. United States*,

776 F.3d 1369, 1377 (Fed. Cir. 2015) (quoting *Trent Tube Div., Crucible Materials Corp.*

*v. Avesta Sandvik Tube AB*, 975 F.2d 807, 815 (Fed. Cir. 1992)); *see also Usinor v.*

*United States*, 28 CIT 1107, 1111, 342 F. Supp. 2d 1267, 1272 (2004) (citation omitted)

(the court "may not reweigh the evidence or substitute its own judgment for that of the

agency").

Separately, the two-step framework provided in *Chevron, U.S.A., Inc. v. Natural*

*Resources Defense Council, Inc.*,  467 U.S. 837, 842-45 (1984), guides judicial review

of the Department's interpretation of the antidumping and countervailing duty statutes.

*See Nucor Corp. v. United States*, 414 F. 3d 1331, 1336 (Fed. Cir. 2005).  First, the

Court "must determine whether Congress has directly spoken to the precise question at

issue."  *Heino v. Shinseki*, 683 F.3d 1372, 1377 (Fed. Cir. 2012) (quoting *Chevron*, 467

U.S. at 842).  If Congress's intent is clear, "that is the end of the matter."  *Id.* (quoting

*Chevron*, 467 U.S. at 842-43).  However, "[i]f the statute is silent or ambiguous," the

Court must determine "whether the agency's [action] is based on a permissible

construction of the statute."  *Dominion Res., Inc. v. United States*, 681 F.3d 1313, 1317

(Fed. Cir. 2012) (citing *Chevron*, 467 U.S. at 842-43).

**DISCUSSION**

**I.     Rule 56.2 Motions for Judgment on the Agency Record**

    **A.     Surrogate Country Selection**

       Plaintiffs contend that Commerce's surrogate country analysis was unlawful, and its decision to reject the Philippines as the primary surrogate country in favor of Thailand was not supported by substantial evidence.  Jacobi Mem. at 9-30; CATC Mem. at 2-9.  Commerce and Defendant-Intervenors Calgon Carbon Corp. and Cabot Norit Americas Inc. (together, "Calgon") argue that Commerce's selection of Thailand was lawful and supported by substantial evidence.  Def.'s Resp. to Pls.' Rule 56.2 Mots. For J. Upon the Agency R. ("Gov. Resp.") at 15-43, ECF No. 92; Confidential Def.-Intervenors' Resp. in Opp'n to Consolidated Pls.' Mots. For J. Upon the Agency R. ("Calgon Resp.") at 10-33, ECF No. 73.

         **i.     Legal Framework for Surrogate Country Selection**

            **a.     Statutory and Regulatory Framework**

       An antidumping duty is "the amount by which the normal value exceeds the export price (or the constructed export price) for the merchandise."  19 U.S.C. § 1673.  When, as here, "the subject merchandise is exported from a nonmarket economy country," Commerce determines "normal value" by valuing the "factors of production"[8] used in producing the subject merchandise, and "an amount for general expenses and

---

[8] The factors of production include, but are not limited to: "(A) hours of labor required, (B) quantities of raw materials employed, (C) amounts of energy and other utilities consumed, and (D) representative capital cost, including depreciation."  19 U.S.C. § 1677b(c)(3).

profit plus the cost of containers, coverings, and other expenses" in a surrogate market

economy country.  19 U.S.C. § 1677b(c)(1).

Commerce values the factors of production using "the best available information

regarding the values of such factors" in an "appropriate" market economy country or

countries.  19 U.S.C. § 1677b(c)(1)(B).  In deciding what is an "appropriate" market

economy country, Commerce must utilize, "to the extent possible, the prices or costs of

factors of production" in a market economy country that is at "a level of economic

development comparable to that of the [NME] country," and is a "significant producer[]

of comparable merchandise."  19 U.S.C. § 1677b(c)(4).  "The process of choosing a

market economy country to value the factors of production is known as surrogate

country selection."  *Jiaxing Bro. Fastener Co., Ltd. v. United States*, 822 F.3d 1289,

1293 (Fed. Cir. 2016) (citing *Dorbest Ltd. v. United States*, 604 F.3d 1363, 1368 (Fed.

Cir. 2010)).  Commerce generally values all factors of production in a single surrogate

country.  *See* 19 C.F.R. § 351.408(c)(2) (excepting labor).  *But see Antidumping*

*Methodologies in Proceedings Involving Non-Market Economies: Valuing the Factor of*

*Production: Labor*, 76 Fed. Reg. 36,092 (Dep't Commerce June 21, 2011) (expressing a

preference to value labor based on industry-specific labor rates from the primary

surrogate country).

### b.   Commerce Policy Bulletin 04.1

Commerce has adopted a four-step approach to implement the above-described

statutory and regulatory framework.  *See* Import Admin., U.S. Dep't of Commerce, Non-

Market Economy Surrogate Country Selection Process, Policy Bulletin 04.1 (2004),

http://enforcement.trade.gov/policy/bull04-1.html (last visited March 31, 2017)

[hereinafter "Policy Bulletin 04.1"].  First, OP compiles a list of potential surrogate

countries that are economically comparable to the NME based on per capita GNI as reported by the World Bank.  Policy Bulletin 04.1 at 2.  Potential surrogate countries "are not ranked" and are "considered equivalent in terms of economic comparability." *Id.*  Second, among the potential surrogates, Commerce identifies countries that produce comparable merchandise.  *Id.*  Third, Commerce determines whether any of the potential surrogates identified in step two are significant producers of comparable merchandise.  *Id.* at 3.  Whether production is "significant" is generally determined in relation to "world production of, and trade in, comparable merchandise."  *Id.*  Finally, if two or more countries fulfill the first three criteria, Commerce selects as the primary surrogate the country with the best surrogate value data.  *Id.* at 4; *see also Jiaxing Bro. Fastener Co., Ltd.*, 822 F.3d at 1293 (citation omitted) (describing the four-step process).

> ii.   **Commerce's Sequential Approach to Surrogate Country Selection**

> a.   **Parties' Contentions**

Jacobi contends that Commerce erred when it excluded the Philippines as a potential surrogate country solely on the basis of economic comparability and declined to consider its significant production of comparable merchandise and its data quality. *See* Jacobi Mem. at 9-13; *see also* CATC Mem. at 5 (asserting that "[Commerce] cannot lawfully make one criterion a threshold requirement . . . .").  CATC argues that the statutory mandate to use the "best available information" elevates Commerce's data criterion such that it "is, at a minimum, equally as critical" as the economic comparability and significant comparable production criteria.  CATC Mem. at 3.  Jacobi and CATC point to several decisions from this court as support for the proposition that "economic

comparability alone cannot be used to determine a reasonable primary surrogate

country."  Jacobi Mem. at 11-12 (citing *Vinh Hoan Corp. v. United States*, 39 CIT ___,49

F. Supp. 3d 1285, 1303 (2015), *Ad Hoc Shrimp Trade Action Committee v. United

States* , 36 CIT ___, 882 F. Supp. 2d 1366, 1374-75 (2012), and *Allied Pac. Food

(Dalian) Co. Ltd. v. United States* , 32 CIT 1328, 587 F. Supp. 2d 1330, 1357 (2008));

CATC Mem. at 3-4 (citing *Ad Hoc Shrimp*, 882 F. Supp. 2d at 1374, and *Amanda Foods

(Vietnam) Ltd. v. United States* ("*Amanda Foods*"), 33 CIT 1407, 1413, 647 F. Supp. 2d

1368, 1376-78 (2009)).

Commerce contends that Plaintiffs failed to raise arguments related to its

surrogate country methodology in the underlying administrative proceeding, and, thus,

failed to exhaust their administrative remedies.  Gov. Resp. at 20-23.  Commerce

further contends that it properly applied Policy Bulletin 04.1 in selecting Thailand as the

primary surrogate country.  Gov. Resp. at 18-20, 23-28.

### b.    Administrative Exhaustion

### 1.    Legal Standard

"[T]he Court of International Trade shall, where appropriate, require the

exhaustion of administrative remedies."  28 U.S.C. § 2637(d).  Exhaustion of

administrative remedies is a doctrine that holds "that no one is entitled to judicial relief

for a supposed or threatened injury until the prescribed administrative remedy has been

exhausted." *Consol. Bearings Co. v. United States*, 348 F.3d 997, 1003 (Fed. Cir. 2003)

(internal quotation marks and citation omitted).  Commerce regulations require parties to

raise all arguments they wish to preserve in their case briefs to the agency.  *See* 19

CFR § 351.309.[9]  This requirement permits the agency to address the issue in the first

instance, in its final results, prior to being considered by the courts and the Court of

Appeals for the Federal Circuit ("Federal Circuit") has confirmed the reasonableness of

this approach.  *See Qingdao Sea-Line Trading Co. Ltd. v. United States*, 766 F.3d

1378, 1388 (Fed. Cir. 2014) ("Commerce regulations require presentation of all issues

and arguments in a party's administrative case brief")*; Dorbest Ltd*, 604 F.3d at 1375

(insufficient for party to have raised an issue in a footnote in the rebuttal brief or during

the ministerial comment period when the issue was not raised in the party's case brief).

Issues not raised before the agency in case and rebuttal briefs are waived for failure to

exhaust and cannot be raised on appeal before this court.[10]   28 U.S.C. § 2637(d).

There are exceptions to the requirement of exhaustion, which may be applied at the

court's discretion.[11]

---

[9] *See* 19 C.F.R. § 351.309(c)(2) ("The case brief must present all arguments that
continue in the submitter's view to be relevant to the Secretary's final determination or
final results, including any arguments presented before the date of publication of the
preliminary determination or preliminary results."); *see also* 19 C.F.R. § 351.309(d)(2)
("The rebuttal brief may respond only to arguments raised in case briefs and should
identify the arguments to which it is responding.")

[10] Parties are able to raise ministerial errors with the Department if such errors appear in
the Final Results. *See* 19 C.F.R. 351.224(e).

[11] There is no exhaustive list of exceptions.  Previously enumerated exceptions include
futility, an intervening court decision such that the new interpretation would impact the
agency's actions, pure question of law, or when plaintiff had no reason to believe the
agency would not follow established precedent.  *See Luoyang Bearing Factory v. United
States,* 26 CIT 1156, 1186, n.26, 240 F. Supp. 2d 1268, 1297 n.26 (2002) (collecting
cases).  The court has also found exceptions to exhaustion when a private party is
denied access to critical information at a time when its case brief is due or when
requiring exhaustion is burdensome such that it would result in "undue prejudice to
subsequent assertion of a court action."  *See Corus Staal BV v. United States,* 502 F.3d
1370, 1381 (Fed. Cir. 2007) (citation omitted).

## 2.    Plaintiffs Adequately Exhausted Their Remedies

A careful review of the case briefs filed in the underlying administrative

proceeding show that Plaintiffs sufficiently raised Commerce's sequential approach to

surrogate country selection.  *See Trust Chem Co. Ltd. v. United States*, 35 CIT ___.

___, 791 F. Supp. 2d 1257, 1268 & n.27 (2011) ("The determinative question [regarding

administrative exhaustion] is whether Commerce was put on notice of the issue . . . .").

CATC squarely raised the issue in its case brief, asserting that:

> As demonstrated by [Commerce's] Preliminary Results, [Commerce] has
> *treated the economic comparability criteria of its surrogate country*
> *analysis as a threshold*.  [Commerce] did not consider the relative quality
> of data in countries outside of the [per capita] GNI band nor did
> [Commerce] consider the relative significant production of countries
> outside of the GNI band. After determining the Philippines and Indonesia
> were not at the same level of economic comparability, [Commerce]
> stopped its analysis of these countries.  This approach cannot be
> reconciled with the relevant statutory mandate.

CATC Case Br. (June 22, 2015) at 6, PJA Tab 33, PR 375, ECF No. 85-4

 (emphasis added).  Likewise, DJAC asserted that Commerce must "weigh the

economic comparability, significant production and data quality considerations

conjunctively, rather than disjunctively."  Case Br. of Datong Juqiang Activated Carbon

Co., Ltd. (June 22, 2015) at 4-5, PJA Tab 32, PR 374, ECF No. 85-4.  For its part,

Jacobi asserted that Commerce should select the Philippines because it "best meets *all*

of the criteria outlined in [Commerce's] policy bulletin," and that Commerce has

previously "conducted a broader analysis of what constitutes the best available

surrogate country," and has "relied upon the totality of facts *rather than the proximity of*

*the GNI* for the potential surrogate country."  Jacobi's Case Br. for POR 7 (June 22,

2015) ("Jacobi Case Br.") at 5, 7, PJA Tab 34, PR 381, ECF No. 85-4 (second

emphasis added).  Accordingly, Commerce's exhaustion argument lacks merit.

### c.   Commerce's Sequential Surrogate Country Selection Methodology is Lawful

Plaintiffs argue that Commerce erred when it excluded the Philippines as a

potential surrogate country on the basis of lack of economic comparability; instead,

Plaintiffs contend, Commerce should have considered the degree to which the

Philippines fulfilled all three statutory criteria before making its determination.  The

Federal Circuit, however, has rejected this same argument by parties in *Jiaxing Brother*

*Fastener Co., Ltd.*  Therein, the Federal Circuit addressed whether Commerce's

decision to exclude India from consideration as a potential surrogate country on the

basis of its lack of economic comparability conflicted with the express terms of 19

U.S.C. § 1677b.  *Jiaxing Bro. Fastener Co., Ltd.*, 822 F.3d at 1298.  Finding that it did

not, the Federal Circuit reasoned that "nothing in the statute . . . requires Commerce to

consider any particular country as a surrogate country."  *Id*.  The Federal Circuit noted

that "[w]hen Congress does not mandate a procedure or methodology for applying a

statutory test, 'Commerce may perform its duties in the way it believes most suitable.'"

*Id.* (quoting *JBF RAK LLC v. United States*, 790 F.3d 1358, 1364 (Fed. Cir. 2015)).

Further, this court has affirmed Commerce's discretion to exclude countries from

consideration on the basis of economic comparability.  *See Fresh Garlic Producers*

*Ass'n v. United States* ("*Fresh Garlic I*"), 39 CIT ___, ____, 121 F. Supp. 3d 1313, 1341

(2015) (recognizing that beginning its analysis with economically comparable countries,

in normal cases, better enables Commerce to calculate normal value in a hypothetical

market economy country; however, economic comparability should not be a first step

when the subject merchandise is unusual or unique, is produced in only a few countries,

or the major inputs are not widely traded); *Jiaxing Bro. Fastener Co., Ltd. v. United*

*States*, 39 CIT ___, ___, 961 F. Supp. 2d 1323, 1331 (2014) ("India though cannot be a

suitable primary surrogate country on this administrative record because it is not

economically comparable to the PRC."); *Foshan Shunde Yongjian Housewares &*

*Hardwares Co. v. United States*, 37 CIT ___, ___, 896 F. Supp. 2d 1313, 1321–22

(2013) (affirming Commerce's decision to exclude India from its surrogate country list

when it had the lowest GNI relative to China as compared to other countries under

consideration); *Clearon Corp. v. United States* ("*Clearon I*"), 38 CIT ___, ___, 2014 WL

3643332 at *11-*12, *15 (2014) (rejecting argument that Commerce wrongfully applied

per capita GNI as a threshold consideration in rejecting India as a potential surrogate

country; remanding for further explanation of how Commerce determined the range of

GNIs reflected on OP's list of potential surrogate countries).

In asserting that Commerce should have weighed the Philippines' fulfillment of all

three statutory criteria, Jacobi and CATC would misapply several opinions from this

court addressing Commerce's selection of a surrogate country from among two

countries on OP's list.   For example, Jacobi relies on the following passage from *Ad*

*Hoc Shrimp*:

> Because none of Commerce's three surrogate country eligibility criteria is
> preeminent, it follows that relative strengths and weaknesses among
> potential surrogates must be weighed by evaluating the extent to which
> the potential surrogates satisfy each of the three criteria.

Jacobi Mem. at 12 (citing *Ad Hoc Shrimp*, 882 F. Supp. 2d at 1371, 1374-75) (emphasis

omitted); *see also* CATC Mem. at 4.  However, *Ad Hoc Shrimp* addresses Commerce's

policy of treating all countries on OP's list as equally economically comparable.  882 F.

Supp. 2d at 1374.  The passage Jacobi relies on reflects the court's finding that

Commerce may not ignore relative differences in economic comparability and data

quality when deciding which of the listed countries to select as the primary surrogate

country.  *Id.* at 1375 ("Because Commerce has provided no reasonable explanation as

to why potentially slight differences in data quality necessarily outweigh potentially large

differences in economic comparability, a blanket policy of simply refusing to engage in

this inquiry does not amount to reasoned decision-making.").

CATC's reliance on a similar passage from *Amanda Foods* is also misplaced.

*See* CATC Mem. at 4 (quoting *Amanda Foods*, 33 CIT at 1413, 647 F. Supp. 2d at 1376

("Nor has Commerce explained why the difference between Bangladesh and Vietnam,

in *per capita* GDP, is not relevant in this case or why the difference in economic

similarity to Vietnam is outweighed by the differences in quality of data between

Bangladesh and India.")).  CATC omits the next sentence, however, in which the court

admonishes Commerce for "adopt[ing] a policy of treating all countries *on the surrogate*

*country list* as being equally comparable to Vietnam."  *Amanda Foods*, 33 CIT at 1413,

647 F. Supp. 2d at 1376 (emphasis added).  *Ad Hoc Shrimp* and *Amanda Foods* are

inapposite when, as here, Plaintiffs are advocating for the selection of a country that OP

did not include on its list.[12]

---

[12] Jacobi also seeks to rely on *Vinh Hoan Corp.*, which addresses "whether Commerce
was required to, and did in fact, compare the relative economic comparability of the
countries *on its OP List*."  49 F. Supp. 3d at 1302 (emphasis added). *Vinh Hoan Corp.*
relied on *Ad Hoc Shrimp* in finding that selecting the best available information to value
factors of production requires Commerce to "compare differences in economic
comparability with differences in the other factors, including data quality, when the facts
so require."  *Id*. at 1305.  However, as with *Ad Hoc Shrimp*, *Vinh Hoan Corp.* is
inapposite here because both countries were included on the list in that case.

*Allied Pac.*, another case relied on by Jacobi, addresses the conjunctive nature

of the statutory selection criteria.  In particular, *Allied Pac.* considers whether

Commerce's use of "regression analysis [pursuant to 19 C.F.R. § 351.408(c)(3)[13]]

based on a basket of countries not economically comparable to China" to determine the

surrogate labor rate complies with Congress's instruction to value, "to the extent

possible," factors of production in market economy countries that are economically

comparable and significant producers of comparable merchandise.  *Allied Pac.*, 32 CIT

at 1352, 1357, 587 F. Supp. 2d at 1351, 1355 ("Congress's use of the conjunctive in

§ 1677b(c)(4)(A) to join the two criteria signifies congressional intent that, to the extent

possible, Commerce must use prices or costs that satisfy the two criteria

---

Jacobi claims that Policy Bulletin 04.1 supports its position because it "explicitly states that 'none of the three surrogate country eligibility criteria—economic comparability, significant production of comparable merchandise, and quality data—is preeminent.'"  Jacobi Mem. at 10.  Policy Bulletin 04.1, however, states no such thing. That sentence is the *Ad Hoc Shrimp* court's interpretation of Policy Bulletin 04.1 as it applies to the countries on OP's list.  *See Ad Hoc Shrimp*, 882 F. Supp. 2d at 1374 ("Indeed, Commerce's own policy suggests that none of the three surrogate country eligibility criteria—economic comparability, significant production of comparable merchandise, and quality data—is preeminent.")(citing Policy Bulletin 04.1 ("[T]he relative importance that [Commerce] attaches to each [eligibility criterion] will necessarily vary depending on the specific facts in each case")) (first alteration added).

While Jacobi correctly notes that Policy Bulletin 04.1 acknowledges that it may be "more appropriate . . . to address economic comparability only after the significant producer of comparable merchandise requirement is met," Jacobi Mem. at 11 (quoting Policy Bulletin 04.1 at 4), that situation typically arises when the subject merchandise is "unusual or unique" because few countries produce it, or because "major inputs are not widely traded internationally,  Policy Bulletin 04.1 at 4.  Jacobi does not contend, nor is there record evidence suggesting, that activated carbon is unusual or unique, or is produced from inputs that are not widely traded.

[13] The regulation directed "[t]he Secretary [to] use regression-based wage rates reflective of the observed relationship between wages and national income in market economy countries. The Secretary will calculate the wage rate to be applied in nonmarket economy proceedings each year. The calculation will be based on current data, and will be made available to the public."  19 C.F.R. § 351.408(c)(3).

simultaneously."). After extensive analysis, the court held that 19 C.F.R.

§ 351.408(c)(3) conflicted with 19 U.S.C. § 1677b(c) and, thus, was invalid. *Allied Pac.*,

32 CIT at 1364, 587 F. Supp. 2d at 1361. *Allied Pac.* did not speak to the instant

issue—whether Commerce must consider a country's fulfillment of each of the statutory

criteria before excluding it from consideration.

Jacobi also attempts to rely on an opinion from this court analyzing whether

Commerce must, in the event an "off-list" country is proposed, determine whether that

country's data quality outweighs its lack of economic comparability. See Jacobi Mem.

at 12-13 (citing *Clearon Corp. v. United States* ("*Clearon II*"), 39 CIT___, ___, 2015 WL

4978995, at *4 (2015)). In *Clearon II*, the court stated that

> [o]n the one hand, it is unreasonable for Commerce to acknowledge that
> the level of economic comparability and the quality of a country's data are
> two separate considerations, and then refuse to undertake a comparative
> analysis, of the type Commerce here implies it must undertake, in order to
> determine whether data quality outweighs the fact that a country is not on
> the surrogate country list.

2015 WL 4978995, at *4; *see also* Jacobi Mem. at 12-13. However, in *Clearon II*, the

court further explained that "the party proposing a non-listed country [must first

demonstrate] that no country on the surrogate country list provides the scope of 'quality'

data that [Commerce] requires in order to make a primary surrogate country selection"

before Commerce must consider the data quality of the non-listed country. *Clearon II*,

2015 WL 4978995, at *4. Jacobi's reliance on *Clearon II* is misplaced for several

reasons.

First, the above-quoted passages essentially restate Commerce's policy to select

a country on OP's list unless none are usable because "(a) they either are not

significant producers of comparable merchandise, (b) do not provide sufficiently reliable

sources of publicly available SV data, or (c) are not suitable for use based on other reasons." *Final I&D Mem*. at 6; *see also Clearon Corp. v. United States* ("*Clearon III*"), 40 CIT ___, ___, 2016 WL 6892556, at *3 (2016) (characterizing its statement in *Clearon II* as an examination of how Commerce "typically" approaches surrogate country selection). The *Clearon II* court did not conclude, as Plaintiffs here assert, that Commerce's sequential approach to surrogate country selection is unlawful.

Second, Jacobi's reliance on *Clearon II* appears to interject a "substantial evidence" issue into its argument that Commerce's surrogate country analysis was "not in accordance with law" by urging the court to consider the sufficiency of Thai data for valuing factors of production as part of its consideration whether Commerce's sequential approach to surrogate country selection is lawful. *See* Jacobi Mem. at 9 (capitalization omitted). However, whether Commerce's *method* of selecting the primary surrogate country is lawful is an issue distinct from whether the *results* Commerce obtained are supported by substantial evidence. The court will not conflate the two.

Relatedly, and finally, it bears repeating that the issue Plaintiffs raise here is whether Commerce permissibly excluded the Philippines on the basis of lack of economic comparability, or whether Commerce should have considered the Philippines' fulfilment of the other statutory criteria--*irrespective of the quality of Thai data*--before excluding it. *Clearon II* is, thus, unsupportive of Plaintiffs' argument.

In sum, Commerce has discretion to develop a reasonable methodology to implement its surrogate country selection criteria. *Jiaxing Bro. Fastener Co., Ltd*., 822 F.3d at 1298. This court has consistently rejected challenges to Commerce's exclusion

of particular countries as potential surrogate countries based on their lack of economic

comparability.  *See Clearon I*, 2014 WL 3643332, at *11 (noting this court's consistent

"approach [to] the selection process [that treats] per capita GNI ranking as a threshold

statutory criterion that must be met before the other criteria are considered").  Plaintiffs

offer nothing new that merits a different outcome here.[14]

###### iii.    Whether Substantial Evidence Supports Commerce's Selection of Thailand as the Primary Surrogate Country

###### a.    Parties' Contentions

Jacobi contends that "Commerce's determination that Thailand was a better

surrogate country than the Philippines" rests on unsupported factual findings regarding

the Philippines' economic comparability, Thailand's status as a significant producer, and

the quality of Thai data.  Jacobi Mem. at 13.   CATC asserts that Commerce should

---

[14] CATC's argument that the statutory mandate to use the "best available information" elevates Commerce's data criterion such that it "is, at a minimum, equally as critical" as the economic comparability and significant production criteria, is a red herring.  *See* CATC Mem. at 3.  Use of the "best available information" is contingent upon Commerce first selecting an "appropriate" market economy country from which to value factors of production.  19 U.S.C. § 1677b(c)(1)(B).  In other words, Congress has instructed Commerce to first select an appropriate market economy country (or countries), and then evaluate, from the range of data available *from those countries*, what constitutes the "best available information."  Congress has not instructed Commerce to *first* look for the "best available information" from some unspecified list of countries and then decide which of that information comes from countries that are economically comparable significant producers of comparable merchandise, nor has Congress instructed Commerce to simultaneously weigh the statutory factors.  Indeed, Commerce has expressly rejected such an approach as "unfeasible."  Policy Bulletin 04.1 at 5 n.2 (declining to assign a "composite grade" on the basis of each country's fulfillment of the economic comparability and significant production of comparable merchandise criteria, which is then combined with "an assessment or grading of factors data quality and completeness"); *see also Fresh Garlic I*, 121 F. Supp. 3d at 1341.  CATC cites no authority for its proposition and its argument is unavailing.

have selected the Philippines as the primary surrogate country because it "is the most

significant producer of comparable merchandise" and has "critically superior" data than

does Thailand.  CATC Mem. at 2, 6, 7.  Jacobi and CATC also contend that Commerce

wrongly interpreted the term "significant producer."  Jacobi Mem. at 13; CATC Mem. at

5-6.

Commerce argues that (1) its determination that the Philippines is not

economically comparable to China is supported by substantial evidence, (2) its

determination that Thailand is a significant producer is adequately supported and rests

on a sound interpretation of the term, and (3) it reasonably relied on Thai data.  Gov.

Resp. at 28-43.  Calgon asserts that record evidence establishes that Thailand meets

each of the statutory criteria and, thus, Commerce need not have considered the

Philippines.  Calgon Resp. at 16, 29.  The court addresses Parties' arguments as to

each of the statutory criteria, in turn.

### b.  Economic Comparability

Jacobi contends that Commerce's determination that the Philippines' per capita

GNI falls outside the range of countries economically comparable to China "is factually

incorrect."  Jacobi Mem. at 14.  According to Jacobi, "the 2013 GNI data demonstrate

that the Philippines is as economically comparable to China as in previous years when

Commerce found the Philippines to be economically comparable"; that, in fact, the

Philippines' 2013 per capita GNI "was even closer to China's than . . . in previous

years."  Jacobi Mem. at 14,15.  In light of Commerce's previous selection of the

Philippines as the primary surrogate country, Jacobi argues that Commerce's

determination that it lacked economic comparability for this POR was "arbitrary and

capricious."  Jacobi Mem. at 15 (citing *Juancheng Kangtai Chem. Co. v. United States*, 39 CIT ___, 2015 WL 4999476 (2015)).

Commerce contends that it "is not required . . . to use the same surrogate country that it used in previous reviews," and it "selects the primary surrogate country for each segment of a proceeding based on the record of that particular segment."  Gov. Resp. at 29.  Commerce further contends that it "dropped the Philippines from its surrogate country list" because 2013 GNI data demonstrated that it had become "less economically comparable to China over time," such that "the Philippines' and China's per capita GNI rankings had moved further apart."  Gov. Resp. at 31.

While Jacobi acknowledges that Commerce must make its surrogate country determination on the basis of data submitted for this POR; it argues that "Commerce never explained why a permissible difference [from China's GNI] suddenly became impermissible."  Pls.' Reply Br. ("Jacobi Reply") at 10, ECF No. 81.

### 1.     Legal Framework

Section 1677b(c)(4)(A) does not define the phrase "economic comparability" or require a particular methodology to determine which countries are economically comparable.  *See* 19 U.S.C. § 1677b(4); *Jiaxing Bro. Fastener Co., Ltd.*, 961 F. Supp. 2d at 1328.  Thus, "Commerce may perform its duties in the way it believes most suitable.'" *Jiaxing Bro. Fastener Co., Ltd.*, 822 F.3d at 1298 (internal quotation marks and citation omitted).  Commerce's regulations "emphasi[ze] . . .  per capita GDP as the measure of economic comparability."  19 C.F.R. § 351.408(b).  However, because per capita GNI is a 'consistent, transparent, and objective measure to determine economic comparability,'" *Jiaxing Bro. Fastener Co., Ltd.*, 961 F. Supp. 2d at 1328, Commerce's

reliance on per capita GNI "is a reasonable interpretation of the statutory mandate to

identify and select a primary surrogate country at a 'level of economic development

comparable' to the nonmarket economy country," *Id.* at 1330 (quoting 19 U.S.C. §

1677b(c)(4)(A)); *see also Fresh Garlic I*, 121 F. Supp. 3d at 1337.

### 2.    Commerce's Economic Comparability Determination Lacks Reasoned Analysis

Commerce is correct that "nothing in the statute [] requires [it] to consider any

particular country as a surrogate country."  *Jiaxing Bro. Fastener Co., Ltd.*, 822 F.3d at

1298.  "[E]ach administrative review is a separate exercise of Commerce's authority that

allows for different conclusions based on different facts in the record." *Id.* at 1299

(quoting *Qingdao Sea-Line Trading Co. Ltd.*, 766 F.3d at 1387).  Accordingly, the

validity of Commerce's decision to exclude the Philippines from its list of potential

surrogate countries for AR7 depends on the validity of Commerce's compilation of the

list generally.  *See Juancheng Kangtai Chem. Co.,* 2015 WL 4999476, at *18-*20 & n.29

("'[A]gency action is arbitrary when the agency offers insufficient reasons for treating

similar situations differently'"; however, the validity of Commerce's "departure from prior

determinations finding that the high costs associated with transport of hazardous

chemicals like chlorine makes import statistics therefor suspect" depends on "the

validity of Commerce's ultimate conclusion" to rely on import data as the surrogate

value for chlorine) (quoting *Dongbu Steel Co., Ltd. v. United States,* 635 F.3d 1363,

1371 (Fed. Cir. 2011)).[15]

---

[15] Plaintiffs insert a comparative element framing the issue as whether substantial evidence supports Commerce's decision to select Thailand over the Philippines.  *See* Jacobi Mem. at 13 (insufficient evidence supported "Commerce's conclusion that Thailand was a *better* surrogate country than the Philippines")  (emphasis added)

To that end, the court will uphold Commerce's determination when the path to

that determination is reasonably discernable from the determination itself.  *See NMB*

*Singapore Ltd. v. United States,* 557 F.3d 1316, 1319 (Fed. Cir. 2009) ("Commerce

must explain the basis for its decisions; while its explanations do not have to be perfect,

the path of Commerce's decision must be reasonably discernable to a reviewing court.")

(internal citations omitted).  Although the agency is not required to "make an explicit

response to every argument made by a party," it is required to discuss "issues material

to the agency's determination."  *Timken U.S. Corp. v. United States,* 421 F.3d 1350,

1354 (Fed. Cir. 2005).

The path explaining the basis for OP's list of potential surrogate countries is not

discernible to the court.  In July 2014, Commerce sent interested parties a "non-

exhaustive list of countries" that, based on 2012 per capita GNI, were deemed

economically comparable to the PRC.  Commerce SC Letter at 1; OP SC List for AR7 at

2.  Thereafter, Commerce preliminarily selected Thailand as the primary surrogate

country.  *Prelim. I&D Mem*. at 17.  Commerce explained that it selected Thailand on the

basis of 2013 per capita GNI data that Jacobi had placed on the record; Commerce

further explained that "none of the surrogate country lists . . . based on 2013 GNI data

list . . . the Philippines as being [economically comparable] to the PRC."  *Id*. at 13-15

(citing Prelim. SV Mem.).  In the *Final Results*, Commerce again selected Thailand as

---

(capitalization omitted); CATC Mem. at 2 ("[Commerce] should select the Philippines . . .
."). Although the court must consider "evidence that fairly detracts from the
substantiality of the evidence," *Nippon Steel Corp.*, 337 F.3d at 1379 (internal quotation
marks and citation omitted), it may not reweigh the evidence, *Downhole Pipe*, 776 F.3d
at 1377. The issue here, in the first instance, is whether substantial evidence supports
Commerce's selection of Thailand as the primary surrogate country irrespective of the
degree of evidence supporting the selection of the Philippines.

the primary surrogate country.  *Final I&D Mem*. at 5.  Commerce responded to

arguments favoring the Philippines by reiterating that "[a]s stated in the <u>Preliminary</u>

<u>Results</u>, the Philippines['] GNI falls outside the range of GNI data represented by the

countries on the surrogate country lists and is therefore not at the same level of

economic development as the PRC."  *Id*.  Commerce further reiterated that "none of the

surrogate country lists issued by the Department based on 2013 GNI data that are on

the record of this review list the Philippines as being at the same level of economic

development as the PRC."  *Id*. at 6.

      Commerce's conclusory assertions fail to enable the "court [to] consider whether

[its compilation of the list] was based on a consideration of the relevant factors" because

the *Final Results* did not explain what factors OP considered when it compiled the list.

*Bowman Transp., Inc. v. Arkansas-Best Freight System, Inc.*, 419 U.S. 281, 285 (1974)

(internal citations omitted) ("The agency must articulate a rational connection between

the facts found and the choice made.").  At oral argument, Defendant explained that OP

relied on absolute percentage differences from China's GNI to determine the GNI range;

Ukraine, at 39.7% of China's GNI represented the low end of the range; and the

Philippines' GNI, which was "less than 50[%]"of China's GNI, thus fell outside the range.

Oral Arg. at 46:51-47:40.[16]  However, nowhere in the *Final Results* does Commerce

discuss OP's reliance on absolute difference or mention the Philippines' actual GNI or

its difference from China's GNI.  *See Id*. at 42:44-43:30 (referring the court to page 5 of

the *Final Results* for Commerce's explanation of the parameters upon which it relied to

determine economic comparability, wherein it simply states that "the Philippines['] GNI

---

[16] Citations to the Oral Argument reflect time stamps from the audio recording.

falls outside the range of GNI data represented by the countries on the surrogate

country lists"); *Final I&D Mem*. at 5.

In its briefing to the court, Commerce explains that OP compiles the list by

"compar[ing] the change in China's per capita GNI to the changes in the per capita GNIs

of the existing set of surrogate countries," and "then determin[ing] whether it is

necessary to re-center the GNI range in light of the year-to-year GNI changes, looking

for GNI ranges that are "evenly distributed around [] [China's] GNI."  Gov. Resp. at 30

(citing, *inter alia*, Remand Results, *Clearon Corp. v. United States*, Court No. 13-00073,

at 9 (Ct. Int'l Trade Dec. 11, 2014), ECF No. 69 (final alteration original).  "After

centering the GNI range, Commerce searches for countries within that range that are

suitable candidates for inclusion on the list." *Id.* at 30.[17]  Commerce further explains

that, in AR7, "the 2013 per capita GNI difference between the Philippines and China is

greater than all the countries on the surrogate country list." *Id.* at 31.[18]

---

[17] Commerce explains that when "search[ing] for countries within [the centered range] . .
. it takes into consideration that, in [*Dorbest Ltd.*], the Federal Circuit stated that, in
valuing labor, Commerce could rely on market economy countries that were between
half of China's GNI and between one to two times China's GNI."  Gov. Resp. at 30
(citing *Dorbest Ltd.*, 604 F.3d at 1372).  However, Commerce paradoxically asserts that
its "surrogate country lists *do not employ, or endorse, this particular ratio or bright-line*,"
before noting that "the GNIs of the surrogate countries selected for China's surrogate
country list fall within or near this range."  *Id.* at 30 (emphasis added).  The explanation
fails to explain.  How Commerce "takes into consideration" judicial precedent that it
does not "employ[] or endorse" is unclear.  Thus, that the end result, by happenstance,
apparently, complies (or nearly complies) with *Dorbest Ltd.* is not persuasive.
[18] In support, Commerce points to a table it created for the purpose of this action
comparing the Philippines' per capita GNI to China's in relation to the other countries on
OP's list.  *See id.* at 31 (citing Prelim. SV Mem., Attach. 2 ("Surrogate Country Memos"),
and Jacobi Case Br. at 8).  However, as stated above, in the underlying
proceeding Commerce failed to explain the basis upon which OP relied when it limited the GNI
range to the six countries on the list, and thereby excluded the Philippines.  Although
Commerce's decision to exclude the Philippines ultimately may be reasonable,

The inadequacy of Commerce's explanation for its determination of the GNI

range is demonstrated by its citation not to the *Issues and Decision Memorandum* or

record evidence, but to its explanation in another case, post-remand.  *See Id*. at 30;

*Clearon I*, 2014 WL 3643332, at *13 (remanding for Commerce to "provide a reasoned

explanation which permits the court to determine the process by which it [developed its

potential surrogate country list] was logical and rational, and . . .  supported by the

administrative record" when "Commerce created the potential surrogate country list for

the segment of the review at issue without explanation").  In any event, the court may

not accept "post hoc rationalizations for agency action," and may only sustain the

agency's decision "on the same basis articulated in the order by the agency itself."

*Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168-69 (1962).  Thus,

reasoning that is offered post hoc, in briefing to the court or during oral argument, is not

properly part of this court's review of the agency's underlying determination when such

reasoning is not discernable from the record itself.  Although the record contains the raw

data Commerce relied on to compile the list of countries it considers economically

comparable to the PRC, *see* Surrogate Country Memos, Attach. 1 (identifying the 2014

World Bank Development Indicators database as the source for potential surrogate

country GNIs); Jacobi SC Comments, Attach. B (2014 World Bank Development

Indicators), OP's determinations regarding what constitutes "economic comparability" on

the basis of that data is not discernible.  Because Commerce's determination regarding

economic comparability lacks reasoned analysis, the court remands this issue for

---

"Commerce must explain the basis for its decisions."  *NMB Singapore Ltd.*, 557 F. 3d at
1319.

Commerce to provide a reasoned explanation as to why the range of GNI data reflected

on OP's list demonstrates economic comparability to the PRC, including why the

Philippines' GNI does not.  *See Timken U.S. Corp.*, 421 F. 3d at 1354 (agency must

discuss "issues material to [its] determination").

### c.    Significant Production

Jacobi contends that "Global Trade Atlas data for this POR demonstrate that the

Philippines is, by far, the largest producer of activated carbon," and is "about eight times

greater than the production volume of Thailand."  Jacobi Mem. at 18-19 (emphasis

omitted).  Jacobi further argues that "Thailand does not meet the statutory definition of

'significant producer,'" and Commerce has impermissibly found that "any country with

non-zero production" is a significant producer.  *Id.* at 19, 21 (citing *Fresh Garlic I*, 121 F.

Supp. 3d at 1338-40 (rejecting the proposition that "significant producer" means "any

country with non-zero production")) (emphasis omitted); *see also* CATC Mem. at 6

("[Commerce] found that countries with any amount of exports of activated carbon are

presumed to be equally significant producers.  'Any' is a very broad interpretation of the

term 'significant.'").

According to Jacobi, Commerce has previously relied on "significant *net* exports

(exports minus imports)" and "significant exports to the United States when there was

no information showing worldwide production of subject merchandise or production

figures in potential surrogate countries."  Jacobi Mem. at 19 (citation omitted).  Jacobi

points to the statute's legislative history, which states that "[t]he term 'significant

producer' includes any country that is a significant net exporter and, if appropriate,

Commerce may use a significant net exporting country in valuing factors."  *Id.* at 19

(quoting *Conference Report to the 1988 Omnibus Trade & Competitiveness Act*, H. R.

Conf. Rep. No. 100-576 at 590).  Jacobi asserts that Thailand is not a significant

producer because it had insignificant net exports in terms of quantity, negative net

exports in terms of value, and insignificant exports to the United States.  *Id*. at 20; *see*

*also* Jacobi Reply at 12 (had Commerce relied on net exports, "Thailand would have

failed the 'significant producer' requirement").

Commerce responds that it need not select "the *most* significant producer."  Gov.

Resp. at 32.  Commerce asserts that although "'significant producer' *includes* any

country that is a significant net exporter," the term is not limited to net exporting

countries.  *Id*. at 32.  Moreover, because the legislative history does not define "net

exporter" in terms of quantity, value, or both, Commerce argues, pursuant to *Chevron*

the court must "defer to Commerce's reasonable interpretation of the statutory

provision."  *Id*. at 33 (citing *Fresh Garlic I*, 121 F. Supp. 3d at 1338).  Commerce

contends it "exercised its discretion to define 'significant producer' based on export

quantity rather than value," and notes that Thailand ranks ninth out of 27 activated

carbon exporting countries.  *Id*. at 34 (citing Global Trade Atlas Reporting Country

Export Statistics).

Calgon argues that of the countries OP considered economically comparable to

the PRC, Thailand is the largest exporter of activated carbon.  Calgon Resp. at 16-17

(citing *Prelim. I&D Mem.* at 16 and Pet'rs' Comments on Surrogate Country Selection

(Nov. 12, 2014) ("Pet'rs' SC Comments") at 3, PJA Tab 5, PR 179, ECF No. 85-1).

Calgon further argues there is record evidence of significant production of activated

carbon by Gigantic and Carbokarn.  Calgon Resp. at 17-18.

###### 1.      Legal Framework

Neither the statute nor Commerce's regulations define "significant producer."

*See* 19 U.S.C. § 1677b; 19 C.F.R. § 351.408; Policy Bulletin 04.1 at 3.

Because the term "is not statutorily defined, and is inherently ambiguous," the court

must assess "whether Commerce's definition of significant producer is based on a

permissible construction of the statute."  *Fresh Garlic I*, 121 F. Supp. 3d at 1338

(internal quotation marks and citation omitted); *see also United States v. Eurodif S. A.*,

555 U.S. 305, 316 (2009) ("[W]hen the Department exercises [its authority pursuant to

§ 1677(1)] in the course of adjudication, its interpretation governs in the absence of

unambiguous statutory language to the contrary or unreasonable resolution of language

that is ambiguous.") (citation omitted).

In *Fresh Garlic I*, the court opined that

> an interpretation of 'significant producer' countries as those whose
> domestic production could influence or affect world trade would be a
> permissible construction of the statute.  This follows from the plain
> meaning of the word 'significant' as something 'having or likely to have
> influence or effect.'  This definition, however, necessarily requires
> comparing potential surrogate countries' production to world production of
> the subject merchandise.

121 F. Supp. 3d at 1338–39 (citation omitted).  Agency policy is consistent with *Fresh

Garlic I*.  *See* Policy Bulletin 04.1 at 3 ("[A] judgement [*sic*] should be made consistent

with the characteristics of work production of, and trade in, comparable merchandise.").

Accordingly, whether production is "significant" is a case-specific determination based

on the "totality of the circumstances."  *See Dorbest Ltd. v. United States*, 30 CIT 1671,

1683, 462 F. Supp. 2d 1262, 1274 (2006); Policy Bulletin 04.1 at 3.

2.    **Commerce's Determination that Thailand is a
Significant Producer Lacks Substantial Evidence**

In the *Issues and Decision Memorandum*, Commerce identified Thailand as a

significant producer on the basis of its total export quantities.  *Final I&D Mem*. at 7

(citing Global Trade Atlas Reporting Country Export Statistics).  Commerce explained

that it "prefer[s] to consider quantity, rather than value, in determining whether a country

is a significant producer" because "the fact that a country is not a net exporter of a

particular product, in value terms, does not necessarily mean that the country is not a

significant producer of that good, given that the country *could* import more higher-valued

products than it exports."  *Id*. at 7 (emphasis added).

Commerce's reasoning falls short for several reasons.  First, Commerce does not

explain whether Thailand actually imports more higher-valued goods than it exports.

Second, Commerce relied on Thailand's total exports--not net exports--to find that it is a

"significant producer."  Thus, Commerce's rationale for disfavoring net value as a

measure of significant production does little to support (or explain) its preference for

considering total export quantities.  Finally, Commerce's reasoning fails to persuade

that reliance on total exports, devoid of evidence of influence on world trade, is a

permissible method of interpreting the term "<u>significant</u> producer," and, thus, identifying

significant producer countries.  *See Chevron*, 467 U.S. at 843; *Fresh Garlic I*, 121 F.

Supp. 3d at 1338-39.  The record evidence Commerce relies on demonstrates the

inadequacy of its justification.

In 2013, Thailand exported 7,871,321 kilograms of activated carbon.  *See* Global

Trade Atlas Reporting Country Export Statistics; *Final I&D Mem*. at 7 n.24.  However,

the court's calculations show that Thailand's proportion of 2013 global exports (which

collectively equaled 554,263,223 kilograms) was just 1.4% including the PRC, and 2.6%

excluding the PRC.  *See* Global Trade Atlas Reporting Country Export Statistics.

Commerce has not explained the significance of Thailand's contribution to global

exports sufficiently well so as to enable the court to conclude that its determination that

Thailand is a "significant producer" is supported by substantial evidence.  *See generally*

*Final I&D Mem*. at 7-8;[19] *cf. Fresh Garlic Producers Ass'n v. United States* ("*Fresh*

*Garlic II*"), 40 CIT ___, ___, 180 F. Supp. 3d 1233, 1244 (2016) (noting the Philippines

represented 0.2% of fresh garlic exports excluding the PRC, and Commerce's failure to

explain how "such data [was] suitable for a fair comparison between export price and

normal value").

Nor is Commerce's post hoc argument that Thailand ranks ninth out of the 27

activated carbon exporting countries included in its data set sufficient.  *See* Gov. Resp.

at 33-34 (citing Global Trade Atlas Reporting Country Export Statistics); *Burlington*

*Truck Lines, Inc.,* 371 U.S. at 168-69.  Although Policy Bulletin 04.1 contemplates that

in the event there are "ten large producers and a variety of small producers, 'significant

producer' could be interpreted to mean one of the top ten," Policy Bulletin 04.1 at 3,

Commerce has not established that that is the situation here.  In fact, there appears to

be no clear delineation between the top ten and remaining exporters; rather, the top five

exporters (China, India, United States, the Philippines, and Indonesia) collectively

---

[19] When pressed at oral argument to provide record evidence supporting the significance of Thailand's exports in terms of world production and trade, Defendant argued there is no record evidence *disputing* its significance.  Oral Arg. at 55:05-55:10. That is not the correct inquiry.  Commerce bears the burden of ensuring its determination regarding significant production is supported by substantial evidence. *See* 19 U.S.C. § 1516a(b)(1)(B)(i).

account for more than 90% of global exports.  *See* Global Trade Atlas Reporting

Country Export Statistics.  Thereafter, listed countries contribute relatively little to global

exports.  *See id.* (Canada, for example, is the sixth largest exporter and is responsible

for just 1.8% of global exports).  Further, the mere fact of Thailand's ranking on a list of

exporters does not override Commerce's responsibility to explain, with substantial

supporting evidence, the significance of that ranking in terms of its effect on global

trade.  *Cf. Fresh Garlic II*, 180 F. Supp. 3d at 1243 ("Determining that because the

Philippines is in the top half of fresh garlic producers it is a significant producer is

arbitrary and unreasonable.").  Accordingly, the court remands this issue for

reconsideration and further explanation.[20]

---

[20] Commerce also concluded, without elaboration, that Thailand is a significant producer on the basis of "production of comparable merchandise as evidenced by the financial statements on the record."  *Final I&D Mem.* at 7-8.  Commerce supports its conclusion with citations to November 12, 2014 letters submitted by the Domestic Industry and DJAC.  *Id.* at 8 n.26 (citing "Letter from Petitioner, dated November 12, 2014, at page 3" and "Letter from [DJAC], dated November 12, 2014, at Exhibit 1").  Those letters appear to constitute surrogate country comments, not financial statements.  *See* Gov. Resp. at 4 (noting that on November 12, 2014 interested parties submitted surrogate country comments).  The record documents, however, fail to provide sufficient (if any) support for Commerce's conclusion regarding Thai production of activated carbon.  *See* Pet'rs' SC Comments at 3 (discussing Indonesian export volume); Surrogate Country Comments by Datong Juqiang Activated Carbon Co., Ltd. (Nov. 12, 2014), Ex. 1, PJA Tab 7, PR 180, ECF No. 85-1 (Philippine and Thai activated carbon import and export statistics).

   Calgon also urges the court to sustain Commerce's finding on the basis of Thai production of activated carbon.  Calgon Resp. at 17-18.  In support, Calgon relies on the 2013 financial statements of Thai producers Gigantic and Carbokarn in conjunction with the average unit values of Thai imports and exports to estimate Gigantic's and Carbokarn's total sales and production volume.  *See Id.* at 17-18 (citing 2013 Gigantic Fin. Stmt., Second Surrogate Value Submission by Datong Juqiang Activated Carbon Co., Ltd. (March 31, 2015) ("DJAC Second SV Submission"), Ex. 8, PJA Tab 16, PR 323, ECF No. 85-3 (Carbokarn's 2010 financial statement), and Filipino and Thai Export Statistics).

   The suppositions embedded in Calgon's analysis notwithstanding, it is the agency's responsibility to "explain the basis for its decisions."  *See NMB Singapore Ltd.*,

### d.   Data Quality/Surrogate Value Selections

Plaintiffs present several challenges to Commerce's selection of a Thai financial

statement to value financial ratios and Thai HS code 4402.90.1000 to value carbonized

material.[21]  *See* Jacobi Mem. at 24-30, 34-44; CATC Mem. at 7, 9-18.[22]

To value the NME respondent's factors of production, Commerce must select the

"best available information" from one or more market economy countries that are

economically comparable to the NME country and are significant producers of

comparable merchandise. 19 U.S.C. § 1677b(c)(1)(B), (c)(4).  Because the court is

remanding the issues of economic comparability and significant production to the

agency, on remand, Commerce may decide to select a different country as the primary

surrogate country and, thus, may need to reconsider its surrogate value selections.

This is particularly true given Commerce's regulatory preference for using data from a

single surrogate country.  *See* 19 CFR § 351.408(c)(2).  Accordingly, to avoid rendering

an essentially advisory opinion, the court defers consideration of Plaintiffs' surrogate

value challenges pending the results of the redetermination.[23]

---

557 F.3d at 1319.  On remand, should Commerce rely on production (instead of or in
addition to export quantity) to seek to justify Thailand as a significant producer, it must
provide reasoned analysis supported by substantial record evidence.

[21] "Carbonized material is a charred, intermediate input used in the production of
activated carbon."  Calgon Resp. at 34 n.18.

[22] Plaintiffs challenge Commerce's determination that data considerations generally
favor selecting Thailand as the primary surrogate country by focusing on the financial
statements used to value financial ratios, and Commerce's separate decision to use
Thai HS 4402.90.1000 to value carbonized material.  *See, e.g.*, Jacobi Mem. at 24-44.
However, because Commerce's assessment of all factor of production data is
influenced by its determinations regarding economic comparability and significant
production, it is appropriate to defer reaching all of Plaintiffs' SV arguments. *See* 19
U.S.C. § 1677b(c)(1)(B), (c)(4).

[23] In relation to its argument that the average unit value for Thai HS 4402.90.1000 is
aberrant, Jacobi moved to supplement the administrative record with evidence of the

## B.    Adjustment for Chinese Value Added Tax

Plaintiffs contend that Commerce lacks authority to deduct irrecoverable VAT

from Jacobi's U.S. sales price, and Commerce's method of calculating the VAT

adjustment is not supported by substantial evidence.  Jacobi Mem. at 44; CATC Mem.

at 18; Huahui Mem. at 2; GDLSK Mem. at 7.  Commerce contends its deduction of

irrecoverable VAT from Jacobi's CEP was lawful and supported by substantial

evidence.  Gov. Resp. at 54; *see also* Calgon Resp. at 44.

### i.    Overview of Commerce's VAT Adjustment

Pursuant to 19 CFR § 351.401 and a 2012 change in methodology for calculating

export price or CEP, Commerce generally will deduct price adjustments "that are

reasonably attributable to the subject merchandise."  19 CFR § 351.401(c);

*Methodological Change for Implementation of Section 772(c)(2)(B) of the Tariff Act of*

*1930, as Amended, In Certain Non-Market Economy Antidumping Proceedings*, 77 Fed.

Reg. 36,481 (Dep't Commerce June 19, 2012) ("*Methodological Change*"); *Final I&D*

*Mem*. at 17.  Finding that "[t]he PRC's VAT regime is product-specific [and, thus,

'attributable to the subject merchandise'], with VAT schedules that vary by industry and

even across products within the same industry," Commerce applied a 17%

"irrecoverable VAT" adjustment to Jacobi's CEP for activated carbon.  *Final I&D Mem*.

at 16-17 & n.67 (citing Jacobi's Suppl. Sect. C Resp. (Oct. 21, 2014) ("Jacobi Suppl.

Sect. C Resp."), Ex. SC-54 ("Chinese VAT Regulations"), CJA Tab 2, CR 124, CR 133,

ECF No. 86.). [24]

---

nature of the Thai imports.  The court will deny that motion.  *See infra* Discussion
Section II.

[24] The relevant Chinese regulation provides that "[e]ntities and individuals engaged in
the . . . import of goods within the territory of the [PRC] are taxpayers of value

Commerce's adjustment for irrecoverable VAT consists of two steps: "(1) determining the irrecoverable VAT on subject merchandise, and (2) reducing U.S. price by the amount determined in step one." *Final I&D Mem*. at 17. Commerce defines "irrecoverable VAT" as "(1) the FOB ['free on board'] value of the exported good, applied to the difference between (2) the standard VAT levy rate and (3) the VAT rebate rate applicable to exported goods." *Id*. "The first variable, export value, is unique to each respondent while the rates in (2) and (3), as well as the formula for determining irrecoverable VAT, are each explicitly set forth in Chinese law and regulations." *Id*. Here, the PRC levies a 17% VAT on inputs and raw materials used in the production of activated carbon, for which there is no VAT rebate. *Id*. at 17 & n.68 (citing Chinese VAT Regulations). Thus, Commerce concluded, "the irrecoverable rate is equal to the full VAT percentage." *Id*. at 17.

### ii.     Parties' Contentions

Jacobi argues the Chinese VAT is not a statutory "export tax or other charge" and, thus, Commerce lacked authority to reduce Jacobi's U.S. sales price by the amount of VAT Jacobi paid and was not refunded. Jacobi Mem. at 45-47. Assuming Commerce had such authority, Jacobi contends that Commerce erroneously applied the VAT adjustment to a "fictitious entered value." *Id*. at 45, 47-55. CATC adopts Jacobi's argument, and further contends that a recent case in this court affirming Commerce's adjustment methodology, *Fushun Jinly Petrochemical Carbon Co. v. United States* ("*Fushun Jinly*"), 40 CIT ___, 2016 WL 1170876 (2016), did not resolve the issue.

---

added tax . . . , and shall pay VAT in accordance with this Regulation." Chinese VAT Regulations, Art. 1). For importers, "the tax rate shall be 17%." *Id.*

CATC Mem. at 18-19; *see also* Huahui Mem. at 2-3 (*Fushun Jinly* does not resolve the matter and "was predicated on the particular facts of that case"); GDLSK Mem. at 8 (*Fushun Jinly* was wrongly decided and did not examine the relevant Chinese regulation).  CATC also contends that Commerce erroneously applied the VAT adjustment to Jacobi's U.S. price, and not the lesser cost of the raw materials upon which Jacobi paid the VAT.  CATC Mem. at 21-22.

Commerce argues that it reasonably interpreted an ambiguous statutory provision when it applied its irrecoverable VAT methodology adopted after notice and comment in 2012, and its calculation is supported by substantial evidence.  Gov. Resp. at 54-55, 56-68.  Commerce further argues that Jacobi failed to exhaust administrative remedies regarding its arguments about Commerce's method of calculating the VAT adjustment.  *Id.* at 55, 64-65; *see also* Calgon Resp. at 49-50.  Calgon argues that judicial precedent and Commerce's past practice supports the deduction of irrecoverable VAT.  Calgon Resp. at 46-49 & n.28.   Calgon further argues that Commerce properly calculated Jacobi's VAT adjustment.  *Id.* at 51-57.

### iii.        Legal Framework

Pursuant to 19 U.S.C. § 1677a(c), Commerce may deduct from export price or CEP "the amount, if included in such price, of any export tax, duty, or other charge imposed by the exporting country on the exportation of the subject merchandise to the United States, other than an export tax, duty, or other charge described in section 1677(6)(C) of this title." [25] 19 U.S.C. § 1677a(c)(2)(B).  Such price adjustments must be

---

[25] Section 1677(6)(C), which concerns "export taxes, duties, or other charges levied on the export of merchandise to the United States specifically intended to offset the countervailable subsidy received," is not relevant here.

"reasonably attributable to the subject merchandise." 19 C.F.R. § 351.401(c).  Before

addressing Parties' contentions about Commerce's authority pursuant to

§ 1677a(c)(2)(B), a brief overview of the relevant legal landscape is merited.

In *Magnesium Corp. of Am. v. United States*, the Federal Circuit affirmed

Commerce's then-current practice in cases involving non-market economy countries of

not deducting export taxes paid to the Russian Federation.  166 F.3d 1364 (Fed. Cir.

1999).  Relying on the "plain meaning" of the statute, the court noted that "the statute

requires export taxes to be deducted from the [U.S. price] 'if [the export tax is] included

in such price.'"  *Id.* at 1370 (first alteration added).  Because "no reliable way exists to

determine whether or not an export tax has been included in the price of a product from

[an] [NME country], . . . [e]xport taxes must be treated as an intra-[NME] expense under

these circumstances."  *Id.* at 1370-71.  Accordingly, the court rejected plaintiff's

argument that "any export tax imposed must be deducted from the [U.S. sales price]"

because that "interpretation would impermissibly read the phrase 'if included in such

price' out of the statute.'"  *Id.* at 1370.

Consistent with *Magnesium Corp.*, Commerce had declined to apply

§ 1677a(c)(2)(B) "in NME antidumping proceedings because pervasive government

intervention in NMEs precluded proper valuation of taxes paid by NME respondents to

NME governments."  *Methodological Change*, 77 Fed. Reg. at 36,482.  After deciding

that subsidies provided by China and Vietnam to their respective domestic companies

could be "identified and measured," Commerce reconsidered its practice with respect to

export taxes, duties, and other charges.  *Id*.  Pursuant to this change in practice,

Commerce now considers whether the PRC "has imposed 'an export tax, duty, or other

charge' upon export of the subject merchandise during the period of investigation or the period of review," including, for example, a "VAT that is not fully refunded upon exportation." *Id.* If it has, Commerce will "reduce the respondent's export price and constructed export price accordingly, by the amount of the tax, duty or charge paid, but not rebated." *Id.* at 36,483.

When, as Commerce contends here, the VAT is "a fixed percentage of the price," Commerce "will adjust the export price or constructed export price downward by the same percentage." *Id.* "[B]ecause these are taxes affirmatively imposed by the Chinese and Vietnamese governments," Commerce "presume[s] that they are also collected." *Id.* According to Commerce, "[t]he unrefunded VAT or affirmatively imposed export tax only arises through the fact that there were export sales." *Id.* Therefore, "because the liability arises as a result of export sales, this is where payment originates." *Id.* Deducting irrecoverable VAT "is consistent with the Department's longstanding policy," and "with the intent of the statute, that dumping comparisons be tax-neutral." *Id.*

As noted above, the court recently addressed a challenge to Commerce's authority to deduct irrecoverable VAT. In *Fushun Jinly*, plaintiffs argued that *Magnesium Corp.*'s "plain meaning" determination still controls such that Commerce may not deduct export taxes, duties, or other charges imposed by an NME government. 2016 WL 1170876, at *9. The court disagreed, reasoning that the Federal Circuit's "plain meaning" analysis simply means that "the statute does not require all export taxes to be deducted from the U.S price but requires only deduction of those amounts that are included in the price of the merchandise." *Id.* (citing *Magnesium Corp.*, 166 F.3d at

1370–71).   Accordingly, "whether VAT and export taxes are included in, and should be

deducted from, the U.S. price is within Commerce's discretion to determine."   *Id.*

The court noted that "neither the governing statute nor its legislative history

defines 'export tax, duty or other charge imposed' for the purpose of adjusting U.S.

price," which is aside from the significance of the statutory terms "'if included in the

price'" that *Magnesium Corp.* considered unambiguous.   *Id.* at *11.  Finding the terms

"export tax, duty or other charge imposed" ambiguous, the court concluded that

Commerce's interpretation of the terms in the *Methodological Change*, "achieved

through notice and comment, compels *Chevron* deference."   *Id.* (citing *United States v.*

*Eurodif S.A.*, 555 U.S. 305, 316 (2009)).   According to the *Fushun Jinly* court, "the

plaintiffs do not persuade that deduction of the portion of the PRC's VAT that was

unrefunded or irrecoverable upon export of their subject merchandise to the United

States was contrary to law and not supported by substantial evidence."   *Id.*

## iv.       Commerce Properly May Adjust for Irrecoverable VAT

Jacobi contends that Commerce's interpretation of its authority pursuant to 19

U.S.C. § 1677a(c)(2)(B) is not entitled to *Chevron* deference because "[t]he statute

reflects the clear intent of Congress and leaves no room for Commerce's discretion."

Jacobi Mem. at 45 (citing *Chevron*, 467 U.S. at 837); Jacobi Reply at 24 (citing

*Magnesium Corp.*, 166 F.3d at 1370-71).   Commerce contends that its "irrecoverable

tax methodology is entitled to *Chevron* deference."   Gov. Resp. at 56-60.   In other

words, Parties disagree whether *Chevron* step one or step two applies.   As discussed

below, the relevant statutory phrase is ambiguous; *Chevron* step two applies.

In order to determine whether Commerce's statutory construction is permissible, the court considers whether the construction is reasonable, consistent with statutory goals, and reflects agency practice. *Apex Exps. v. United States*, 777 F.3d 1373, 1379 (Fed. Cir. 2015). If the agency's interpretation is permissible, then the court must accord it deference, even if the agency's construction is not the "reading the court would have reached if the question initially had arisen in a judicial proceeding." *Koyo Seiko Co., Ltd. v. United States*, 66 F.3d 1204, 1210 (Fed. Cir. 1995).

Section 1677a(c)(2)(B) authorizes the deduction of (1) "the amount, *if included in such price*," (2) "of any *export tax, duty, or other charge* imposed by the exporting country" (3) "*on the exportation of* the subject merchandise to the United States." 19 U.S.C. § 1677a(c)(2)(B) (emphasis added). *Magnesium Corp*. interpreted the first italicized phrase, finding the phrase to be unambiguous, and accepting Commerce's analysis of the facts (that it was not then able to determine if the taxes were included in the export price from the NME country); however, *Magnesium Corp*. did not preclude a finding that the latter two italicized phrases are ambiguous. *See Magnesium Corp*., 166 F.3d at 1370 ("Because the plain language of the statute does not require all export taxes to be deducted from the USP, but requires deduction of only those that are included in the price of the merchandise, the statute clearly contemplates a situation where the export tax is not included in the price of the merchandise."). *Fushun Jinly* thus correctly held that *Magnesium Corp*. did not control the issue of Commerce's authority to deduct irrecoverable VAT. *See Fushun Jinly*, 2016 WL 1170876, at *9. However, although *Fushun Jinly* correctly held that "export tax, duty or other charge imposed" was ambiguous, it did not interpret the phrase "by the exporting country on the

exportation of the subject merchandise."  *See id.* at \*9-\*11.  Plaintiffs contest

Commerce's interpretation of both phrases.  *See, e.g.*, CATC Mem. at 18 ("Chinese

VAT is not an export tax, and VAT is not imposed on subject merchandise when it is

exported.").

### a.   Whether the Chinese VAT is an "export tax, duty or other charge"

As this case demonstrates, the scope of the phrase "[e]xport tax, duty, or other

charge" is ambiguous.  Commerce does not expressly define the Chinese VAT as one

or the other; rather, it describes the VAT generally as an "export tax, duty, or other

charge imposed."  *Final I&D Mem*. at 17 (it is "reasonable to interpret *these terms* as

encompassing irrecoverable VAT because" it "is a cost that arises as a result of export

sales") (emphasis added) (citations omitted).  The relevant Chinese regulation imposes

a tax on imported goods; it does not explicitly tax exports.  *See* Chinese VAT

Regulations, Art. 1.  However, the catchall phrase "other charge" captures any financial

obligation provided it is "imposed by the exporting country on the exportation of the

subject merchandise," regardless of whether the imposing country explicitly labels the

charge as one pertaining to exports.  Commerce's interpretation of Chinese VAT as, if

not an "export tax," an "other charge," is a permissible construction of those statutory

terms.  *See Dominion Res., Inc.*, 681 F.3d at 1317.

### b.   Whether the Chinese VAT is Imposed on the Exportation of the Subject Merchandise

Interpreting the Chinese VAT as an "other charge" does not fully resolve the

issue; it must also reasonably be construed as one that is "imposed by the exporting

country on the exportation of the subject merchandise."  19 U.S.C. § 1677a(c)(2)(B).

With respect to Chinese domestic sales, a "company can credit the VAT they pay

on input purchases ["input VAT"] . . . against the VAT they collect from customers

["output VAT"]" before remitting VAT to the government.  *Final I&D Mem.* at 16.  And,

"[i]n a typical VAT system," companies receive on export a full rebate of the input VAT

paid in relation to "purchases of inputs used in the production of exports."  *Id*.  However,

in the PRC, "the input VAT . . . is not refunded" on the exportation of the goods.  *Id*.

Thus, the input VAT remains recoverable until such time as the product is exported;

only then does it become irrecoverable.  According to Commerce, "[t]his amounts to a

tax, duty or other charge imposed on exports that is not imposed on domestic sales."

*Id.* at 16-17 ("Irrecoverable VAT, as defined in PRC law, is a net VAT burden that arises

solely from, and is specific to, exports").

Because the VAT is stated in Chinese law, it is "'imposed by the exporting

country."  *Id.* at 17; *see also* Chinese VAT Regulations.  However, the key inquiry is

whether a VAT paid on inputs and not refunded on export is "imposed" on the

exportation of the subject merchandise.  In the *Methodological Change*, Commerce

concluded generally that "because the liability arises as a result of export sales, this is

where payment originates."  77 Fed. Reg. at 36,483.  This is not entirely accurate as to

the facts before the court.  Payment originates--i.e., is made--when Jacobi pays the

Chinese government any difference between the input VAT and the output VAT.  *See*

Jacobi Suppl. Sect. C Resp. at 29-30 (describing the Chinese VAT system; noting that

"[w]hen the output VAT is higher than the input VAT, Jacobi is subject to output VAT

payable"); *Webster's Third New Int'l Dictionary of the English Language Unabridged*

*("Webster's")* 1659 (2002) (defining "payment" as "the act of paying or giving

compensation: the discharge of a debt or an obligation").  There is no record evidence

that Jacobi pays VAT at the time of exportation; rather, the input VAT is not refunded

upon export as occurs in a "typical VAT system" and, thus, at that time, it becomes

irrecoverable because it cannot be used to offset payments of output VAT.  *See Final

I&D Mem*. at 16; Jacobi Suppl. Sect. C Resp. at 30 ("Jacobi does not pay any export

taxes on activated carbons . . . ").

       To understand the parameters of what it means for something to be "imposed,"

and, thus, to determine whether Commerce's statutory construction is permissible, the

court considers the term's plain meaning.  *See Taniguchi v. Kan Pacific Saipan, Ltd.*,

132 S. Ct. 1997, 2002 (2012) ("When a term goes undefined in a statute, we give the

term its ordinary meaning.") (citing *Asgrow Seed Co. v. Winterboer*, 513 U.S. 179, 187

(1995)) (surveying dictionary definitions to define "interpreter").  The Oxford English

Dictionary, "one of the most authoritative on the English language," *Taniguchi*, 132 S.

Ct. at 2003, defines "impose" as "[t]o put or subject (a person, etc) to a penalty." *The

Oxford English Dictionary* 731 (1989).  Webster's defines "imposed" as "to cause to be

burdened." *Webster's*, *supra*, 1136.  The American Heritage Dictionary of the English

Language defines "impose" as "[t]o apply or make prevail by or as if by authority."  *The

American Heritage Dictionary of the English Language* 881 (2000).

       The ordinary meaning of the term "imposed" demonstrates the reasonableness of

Commerce's interpretation.  Because the Chinese VAT is refunded in the context of

domestic sales but not exports, it constitutes a "penalty" that is "applied," and with which

Jacobi is forever "burdened," at the time of exportation.  Further, accounting for

irrecoverable VAT is consistent with Commerce's policy and the statute to calculate

accurate tax-neutral dumping margins.  *See Federal-Mogul Corp. v. United States*, 63

F.3d 1572, 1581-82 (Fed. Cir. 1995) (affirming Commerce's practice of calculating tax

neutral dumping margins by accounting for VAT when determining U.S. sales price);

*Methodological Change*, 77 Fed. Reg. at 36,483 (citations omitted); *Final I&D Mem.* at

17 & n.66.  Accordingly, the Chinese VAT is permissibly construed as an "other charge"

that is "imposed by [China] upon the exportation of the subject merchandise."

**v.      Commerce's VAT Calculation in This Case**

**a.      Overview of Commerce's Methodology**

Commerce calculates irrecoverable VAT by determining the amount of VAT

applicable to exports (defined as "the standard VAT levy rate" minus any VAT rebate on

exports) and applying that value to "the FOB value of the exported good."  *Final I&D*

*Mem.* at 17.  Here, China levies a 17% VAT on inputs and does not refund any VAT on

exports of activated carbon.  *Id.*; *see also* Jacobi Suppl. Sect. C Resp. at 29-30.  Thus,

Commerce determined that "the irrecoverable VAT rate is . . . 17[%]."  *Final I&D Mem.*

at 17.  Additionally, although "[e]ntered values reported by respondents are a

reasonable reflection of the FOB value of the exported goods," here, Commerce

concluded that Jacobi's entered values were "not representative of commercial export

values when compared to an ex-factory net U.S. price and/or an estimated customs

value"[26] because "a significant percentage of Jacobi's entered values [were] less than

the estimated customs values."  *Id.* at 18-19 (citing Margin Analysis for the Final Results

---

[26] Estimated customs value is "defined as ex-factory net U.S. price plus foreign
movement expenses."  *Final I&D Mem.* at 18.  To determine an ex-factory net U.S.
price, Commerce begins with a respondent's gross unit price, and then deducts
"expenses associated with selling the product in the United States[,] . . . international
movement expenses[,] and profit."  *Id.* at 18 n.73 (citation omitted).

(Jacobi) (Oct. 2, 2015) ("Jacobi Final Margin Analysis Mem."), CJA Tab 3, CR 357-58,

ECF No. 86).   Because Jacobi's entered values resulted in "an inappropriately low VAT

adjustment," Commerce relied on an estimated customs value as a substitute for the

FOB China port value to calculate the irrecoverable VAT adjustment.  *Id.* at 18-19.

### b.   Parties' Contentions

Jacobi contends that Commerce should have applied the 17% VAT adjustment to

its actual entered values and not "some sort of concocted estimated customs value."

Jacobi Mem. at 48-50 (underline omitted).  According to Jacobi, to assess the reliability

of its entered values Commerce should have compared its entered values to its net U.S.

sales price, as it had done for the purpose of assessing duties in the second

administrative review ("AR2").  *See Id.* at 49-50; Jacobi Mem., Attach. A ("Jacobi VAT

Comparison") (chart comparing Jacobi's entered values and U.S. sales price); Calgon

Resp. at 51 (noting "the basis for Jacobi's claim is a comparison of the VAT adjustment

Commerce applied in the underlying proceeding . . . with Commerce's duty assessment

analysis in [AR2]," which concerned Commerce's decision to calculate duties on the

basis of a per-unit assessment rate rather than on an *ad valorem* basis).  In support,

Jacobi points to a spreadsheet contained in Commerce's margin analysis for Jacobi's

final results comparing Jacobi's "entered value[s] to a new version of "NETPRI" (the

Commerce acronym for the calculated *net* U.S. selling price) which Commerce has

labelled "*NETPRI1*."   Jacobi Mem. at 50 (citing Jacobi Final Margin Analysis Mem.,

Attach IV ("Commerce VAT Comparison").  Jacobi further explains that during AR2

Commerce concluded its entered values were unreliable because 58% "of total sales

had a reported entered value that was less than half of Jacobi's reported net unit price."

*Id*. at 51 (citation omitted).  In contrast, here, Jacobi contends, its entered value was less than half the net sales price in only 3.6% of the transactions. *Id.* at 52; Jacobi VAT Comparison at 1.  Jacobi also contends that Commerce erred when it relied on Carbokarn's profit to calculate the estimated customs value.  *Id.* at 53-55.

CATC contends that Commerce erred when it applied the 17% VAT rate to the "higher . . . cost of the finished subject merchandise rather than the lower . . . cost of raw materials."  CATC Mem. at 21-22.

Commerce asserts that it relied on the same methodology it used in AR2 to assess the reliability of Jacobi's entered values for the purpose of determining "the most reliable base values upon which to calculate the VAT adjustment."  Gov. Resp. at 62; *see also id.* at 63 ("In both reviews, Commerce analyzed the difference between Jacobi's entered values reported to Customs [a]nd Border Protection [('CBP')] and the estimated customs values, and found that substantial differences existed between the two values.").  Different from AR2, however, in AR7, Commerce had to apply a VAT adjustment to that base value.  *Id.* at 62.  "Therefore, to avoid confusion in its calculations, Commerce referred to [what it had called] the 'net unit price' in [AR2] as the 'estimated customs value' in this review."  *Id.* at 63; *see also id.* at 64 (noting the field labelled "USNETPRI1" has the label "Estimated Customs Value" above it "to indicate that the field labelled U.S. Net Price is being calculated as an estimated customs value without the inclusion of VAT") (citing Commerce VAT Comparison).  Commerce then derived the "final 'net unit price'" by applying the VAT rate to the estimated customs value.  *Id.* at 64.  In so doing, "Commerce treated the 'estimated customs value' the same as it treated the 'net unit price' in [AR2]."  *Id*.

Commerce further asserts its reliance on Carbokarn's profit is consistent with

agency policy, which requires CEP profit in NME cases to be based on surrogate

information instead of "financial report data of [an NME] respondent."  *Id.* at 67 (citing

Import Admin., U.S. Dep't of Commerce, Calculation of Profit for Constructed Export

Price Transactions, Policy Bulletin 97.1 (1997), http://enforcement.trade.

gov/policy/bull97-1.htm (last visited March 31, 2017) ("Policy Bulletin 97.1")); *see also*

Calgon Resp. at 55 ("market distortions" render Commerce's use of profit data from an

NME company inappropriate, and "Jacobi's argument goes to the heart of the surrogate

value methodology, which is directed by the statute and has been judicially upheld")

(citing 19 U.S.C. § 1677b(c)(1) and *CP Kelco US, Inc. v. United States*., 39 CIT ___,

2015 WL 1544714, at *1 (2015).

Defendant also contends that Jacobi failed to exhaust administrative remedies

with regard to its comparison of entered values to net price and its arguments about

Commerce's profit calculation.  Gov. Resp. at 64; *see also* Calgon Resp. at 50

(asserting "Jacobi had ample opportunity to raise this argument before Commerce"

because "the VAT adjustment was a live issue").  Defendant further contends that

Jacobi's "calculations [in Jacobi VAT Comparison] are not on the record of this review,"

and, thus, should not be considered by this court.  Gov. Resp. at 64-65; *see also*

Calgon Resp. at 49-50.

Jacobi asserts it lacked the opportunity to respond to Commerce's use of

"fictitious entered values" in the *Final Results* because Commerce had relied on

Jacobi's actual entered values in the *Preliminary Results*; thus, "[t]he exhaustion

doctrine does not apply." Jacobi Reply at 27 n.2 (citing *Prelim I&D Mem*. at 23; *Corus Staal BV*, 502 F.3d at 1381).

###### c.     Comparison of "Entered Value" to "Estimated Customs Value"

###### 1.     Administrative Exhaustion

"This court has discretion to determine when it will require the exhaustion of administrative remedies." *Blue Field (Sichuan) Food Indus. Co., Ltd. v. United States* ("*Blue Field*"), 37 CIT ___, ___, 949 F. Supp. 2d 1311, 1321–22 (2013) (citing 28 U.S.C. § 2637(d) ("[T]he Court of International Trade shall, where appropriate, require the exhaustion of administrative remedies.")).  Parties may raise arguments on appeal provided they raised them "during agency proceedings." *Id.* at 1322 (citations omitted). "The determinative question is whether Commerce was put on notice of the issue, not whether Plaintiff's exact wording below is used in the subsequent litigation." *Trust Chem Co. Ltd.*, 791 F. Supp. 2d at 1268 & n.27.

In the *Preliminary Results*, Commerce derived the final net U.S. Price by "reduc[ing] each of [Jacobi's] sale's U.S. price by the irrecoverable VAT rate of 17 [%] of entered value." *Prelim. I&D Mem*. at 23 (citing Prelim. Results Analysis Mem. for Jacobi Carbons AB (Apr. 29, 2015), CJA Tab 4, CR 351, ECF No. 86).  Thereafter, the Domestic Industry argued that Jacobi's entered values were unreliable as the basis for calculating VAT; thus, Commerce "should use a recalculated entry based on estimated customs value [] when the reported [entered value] is understated."  Pet'rs' Rev. Case Br. (June 30, 2015) ("Pet'rs' Rev. Case Br.") at 13-15, CJA Tab 5, CR 353, ECF No. 86. In rebuttal, Jacobi argued that its entered values were reliable and disputed the Petitioners' comparison of entered values and net U.S. price.  Jacobi's Rebuttal Br. for

POR 7 (July 2, 2015) ("Jacobi Rebuttal Br.") at 9-16, CJA Tab 6, CR 354, ECF No. 86.

Jacobi also disputed Commerce's use of Carbokarn's financial statement for deriving

the profit portion of the estimated customs value. Jacobi Rebuttal Br. at 15. Commerce

agreed with the Petitioners, and, "for the final results, . . . revised Jacobi's irrecoverable

VAT adjustment" when the entered value was less than the estimated customs value.

*See* Jacobi Final Margin Analysis Mem. at 3; Commerce VAT Comparison.

    Based on the foregoing, Jacobi had no reason to contest Commerce's

comparison methodology or use of estimated customs value in its case brief because

Commerce did not rely on an estimated customs value until issuing the *Final Results*.

*See* Jacobi Final Margin Analysis Mem. at 3. The Domestic Industry first raised the

issue in its case brief, to which Jacobi responded in rebuttal. Pet'rs' Rev. Case Br. at

13-15; Jacobi Rebuttal Br. at 9-16; *see also* 19 C.F.R. § 351.309(d)(2) ("The rebuttal

brief may respond only to arguments raised in case briefs and should identify the

arguments to which it is responding."). Jacobi relied on data from the "same U.S. sales

database that Commerce used for its [antidumping] margin calculation" to compile the

chart appended to its motion, which pertains to an issue about which Commerce had

notice. *See* Jacobi Mem. at 52; Jacobi VAT Comparison. On these facts, Jacobi's

arguments are not barred by the exhaustion doctrine. *See Trust Chem Co. Ltd.*, 791 F.

Supp. 2d at 1268 & n.27 (finding the exhaustion doctrine satisfied when the information

was before the agency and Commerce was on notice).

### 2.   Commerce's Determinations Regarding Jacobi's Entered Values Were Supported by Substantial Evidence.

Jacobi challenges three aspects of Commerce's VAT calculation: (1) Commerce's comparison of Jacobi's entered values to an estimated customs value, (2) Commerce's subsequent decision that Jacobi's entered values were unreliable, and (3) Commerce's reliance on Carbokarn's profit amount to derive the estimated customs value.  The court addresses each, in turn.

First, as to Commerce's methodology, what Jacobi characterizes as a "concocted estimated customs value" is the same estimated customs value Commerce used to determine reliability in AR2.  *See Final I&D Mem.* at 18 (noting that Commerce "performed a similar comparison in this review" as it had in the 2AR, "comparing Jacobi's entered values to the estimated customs values"); Gov. Resp. at 63-64 (explaining that, "to avoid confusion in its calculations, Commerce referred to [what it had called] the 'net unit price' in [AR2] as the 'estimated customs value' in this review").  Commerce labeled the relevant field "USNETPRI1," and, above it, "Estimated Customs Value," to indicate that it is using net price as the estimated customs value for comparison purposes and to distinguish it from Jacobi's final net price, which included a VAT adjustment.  Commerce VAT Comparison; Gov. Resp. at 63-64.  Commerce's methodology was reasonable.

Second, substantial evidence supported Commerce's conclusion that Jacobi's entered values were unreliable.  Preliminarily, Commerce prefaced its explanation about its determination by noting that, during AR2, it had "found substantial differences between Jacobi's estimated customs value for its entries of certain activated carbon and

the entered values reported to CBP." *Final I&D Mem*. at 18.  Commerce thus

determined that Jacobi's entered values "were being systematically understated," which,

if relied upon, "would result in the under-collection of antidumping duties by CBP." *Id*. at

18.  Commerce therefore "performed a similar comparison in this review," and, likewise,

found that "a significant percentage of Jacobi's entered values [were] less than the

estimated customs values." *Id.* at 18-19 (citing Jacobi Final Margin Analysis Mem.); *see

also* Commerce VAT Comparison.  Its identical comparison methodology

notwithstanding, Commerce did not purport to be conducting identical analyses in AR2

and AR7; rather, Commerce discussed AR2 for the purpose of explaining its past

practice of comparing Jacobi's entered values to an estimated customs value to assess

the reliability of those entered values. *See Id.* at 18; *see also* Calgon Resp. at 52

(noting Commerce's explanation "that issues concerning Jacobi's reported entered

values dated back to [AR2]").

      Here, record evidence shows that, in 98% of transactions, the entered value was

lower than the estimated customs value.  Commerce VAT Comparison; *see also* Gov.

Resp. at 66.  Even had Commerce relied on Jacobi's actual net price as Jacobi

contends it should have, according to the court's calculations, the entered value was

lower than the net price for 75% of transactions. *See* Jacobi VAT Comparison.  That

Commerce determined unreliability in AR2 on the basis of transactions where the

entered value was less than half the net price does not mean that Commerce was

required to use the same standard here.  Record evidence shows that Jacobi's entered

values were consistently understated; thus, Commerce's conclusion is reasonable and

supported by substantial evidence.

Finally, Commerce properly relied on Carbokarn's financial statement for the profit portion of the estimated customs value.  Antidumping duties are derived from the difference between the normal value and the CEP for the subject merchandise.  19 U.S.C. § 1673.  In the NME context, Commerce determines normal value using financial information from a surrogate market economy country-based company.   19 U.S.C. § 1677b(c)(1); *see also Jiangsu Jiasheng Photovoltaic Technology Co., Ltd. v. United States*, 38 CIT ___, ___, 28 F. Supp. 3d 1317, 1334 n.65 (2014); *CP Kelco U.S., Inc.*, 2015 WL 1544714, at *1.  Correspondingly, agency policy provides that "that a CEP profit deduction must [] be made in cases involving [NME] countries," and that the profit deduction must be based on financial data provided by a surrogate producer.  Policy Bulletin 97.1 at 4.

Here, Commerce deducted profit (designated "CEPROFIT") in its calculation of Jacobi's net price.  Jacobi Final Margin Analysis Mem. at 3.  Record evidence shows that "CEPROFIT" is derived from Carbokarn's 2011 financial statement.  Surrogate Values for the Final Results (Oct. 2, 2015) ("Final SV Mem."), Attach. II, PJA Tab 40, PR 408, ECF No. 85-4 (non-Global Trade Atlas surrogate value sources).  During oral argument, Jacobi asserted it had provided financial information derived from its domestic affiliate, thereby rendering resort to Carbokarn's financial statement unnecessary.  Oral Arg. at 1:53:40-54:15.  However, the financial statement Jacobi placed on the record appears to include financial information regarding the "Jacobi Carbons Group" of companies, not just the domestic importer, Jacobi Carbons, Inc. *See* Jacobi's Sect. C Resp. (Aug. 18, 2014), Ex. C-21 ("Jacobi Sales Reconciliation"), CJA Tab 9, CR 48, ECF No. 86; *see also* Jacobi Mem. at 1 (distinguishing Jacobi

Carbons AB as the foreign exporter from Jacobi Carbons, Inc. as the U.S. importer); *Id.* at 53 (citing Jacobi Sales Reconciliation in support of its argument that Commerce should have relied on Jacobi's profit from the relevant POR).  Jacobi offers no other reason why Commerce should have departed from its policy and practice, which has statutory and judicial support.

Accordingly, Commerce's determination that Jacobi's entered values were unreliable, and, thus, unsuitable as a basis for the VAT adjustment, and its methodology for arriving at that conclusion, were reasonable and supported by substantial evidence, as was Commerce's use of a surrogate financial ratio to calculate CEP profit.

### d.    Commerce's VAT Calculation Was Not Supported By Substantial Evidence

CATC contends that Commerce erroneously applied the 17% VAT adjustment to the cost of the finished subject merchandise rather than the cost of Jacobi's raw materials.  CATC Mem. at 21-22.  CATC asserts that the "calculation essentially assumes that the raw materials imported by Jacobi [and upon which it paid the VAT] cost the same as the retail price of subject merchandise exported by Jacobi," which it describes as an "untenable theory."  CATC Mem. at 22.  Commerce did not respond to CATC's argument in its brief before the court.  *See* Gov. Resp. at 65-68.  During oral argument, Defendant was unable to explain the reasoning behind Commerce's methodology on the basis of the record before the court.  *See* Oral Arg. at 1:56:40-2:02:59.

The statute provides for reducing the starting price used to calculate CEP by "the amount, if included in such price, of any export tax, duty, or other charge imposed by the exporting country on the exportation of the subject merchandise to the United

States." 19 U.S.C. § 1677a(c)(2)(B).  Correspondingly, the *Methodological Change*

states that when an NME government, such as the PRC, imposes "an export tax, duty

or other charge on subject merchandise . . ., from which the respondent was not

exempted, [Commerce] will reduce the respondent's . . . [CEP] accordingly*, by the*

*amount of the tax, duty or charge paid, but not rebated*."  77 Fed. Reg. at 36,483

(emphasis added).  Additionally, the *Methodological Change* "anticipates that, *in many*

*instances*, the export tax, VAT, duty, or other charge will be a fixed percentage of the

price.  In such cases, [Commerce] will adjust the export price or constructed export

price downward by the same percentage."  *Id.* (emphasis added).  The *Methodological*

*Change* thus contemplates that often, *but not always*, the VAT will be a fixed

percentage of the price of the exported merchandise.

In the *Issues and Decision Memorandum* Commerce recognizes that an NME

government may "impose[] an export tax, duty, or other charge on subject merchandise

*or* on inputs used to produce the subject merchandise," and insists Commerce "will

reduce the respondent's EPs or CEPs accordingly *by the amount . . . paid*, but not

rebated."  *Final I&D Mem.* at 16 (emphasis added) (citation omitted).  Commerce also

recognizes that, "[i]rrecoverable VAT, as defined in PRC law, is a . . . VAT paid on

inputs and raw materials (used in the production of exports)."  *Id.* at 16-17 (citations

omitted); *see also id.* at 20 (the "irrecoverable VAT adjustment does not entail deducting

VAT paid on the sale of activated carbon, but rather the portion of VAT paid on inputs to

produce activated carbon that is not rebated by the PRC government").  Though

recognizing that the Chinese VAT applies to (and, thus, is calculated as a percentage of

the cost of) inputs and not the finished subject merchandise, here, Commerce applied

the VAT rate to the value of the finished goods.  *See* Jacobi Final Margin Analysis Mem.

at 3 (applying the 17% irrecoverable VAT adjustment to Jacobi's entered values or its

estimated customs values as a proxy for entered values); *Prelim. I&D Mem.* at 18 ("[F]or

the purposes of these preliminary results of review, for Jacobi's CEP sales, we reduced

each sale's U.S. price by the irrecoverable VAT rate of 17% of entered value. . . .").

　　　As discussed above, the irrecoverable VAT deducted from Jacobi's CEP must be

"the amount" of VAT included in the price.  19 U.S.C. § 1677a(c)(B)(2); *see also*

*Methodological Change*, 77 Fed. Reg. at 36,483 (accounting for the amount "paid").

Here, the amount of VAT included in Jacobi's net price is the 17% input VAT.  *See*

Chinese VAT Regulations; Jacobi Suppl. Sect. C Resp. at 29-30.  The *Final Results*

lacked reasoned explanation as to why Commerce's application of the VAT rate to the

value of the finished goods did not overstate the VAT amount Jacobi actually paid, and

was not supported by substantial evidence.  Accordingly, the court is remanding the

issue of Commerce's VAT calculation for further explanation and reconsideration in

accordance with this opinion.

## II.　　Motion to Supplement the Administrative Record

　　　Jacobi moves to supplement the administrative record with evidence it contends

demonstrates that the average unit value for Thai HS 4402.90.1000 is aberrant.  *See*

Confidential Jacobi Mem. to Suppl. the Admin. R. ("Jacobi's Mot."), ECF No. 49.

Defendant and Defendant-Intervenor oppose Jacobi's motion.  *See* Def.'s Resp. to Pl.'s

Mot. to Suppl. the Admin. R., ECF No. 66; Def.-Intervenors' Opp'n to Pl.'s Mot. to Suppl.

the Admin. R., ECF No. 65.

"Except in very limited circumstances, this court's review of Commerce's

determination is limited to the record before it," *Assoc. of Am. School Paper Suppliers v.*

*United States* ("*AASPS*"), 34 CIT 31, 33, 683 F. Supp. 2d 1317, 1320 (2010) (citing 19

U.S.C. § 1516a(b)(2)(A)), which interested parties bear the burden of creating, *Essar*

*Steel Ltd. v. United States*., 678 F.3d 1268, 1277 (Fed. Cir. 2012) (citing *Zenith Elecs.*

*Corp. v. United States*, 988 F.2d 1573, 1583 (Fed. Cir. 1993)).   Efficiency and finality

considerations disfavor reopening the record.   *Essar Steel*, 678 F.3d at 1277.   However,

the Federal Circuit has recognized that supplementation may be permitted "when the

original record was tainted by fraud" or "when the underlying agency decision was

based on inaccurate data that the agency generating those data indicates are incorrect."

*Id.* at 1277-78 (internal quotation marks and citations omitted).   Additionally, this court

has permitted supplementation "when at the time that supplementation of the record is

sought, there is new, changed, or extraordinary information available that was not

available during the investigation," or "when the party makes a strong showing of bad

faith or improper behavior by agency decision makers."   *AASPS*, 34 CIT at 36, 683 F.

Supp. 2d at 1322-23 (citations omitted).

Jacobi does not rely on the exceptions recognized by the Federal Circuit; rather,

Jacobi seeks supplementation on the basis of new information that was not "publicly

available during the underlying administrative proceeding."   Jacobi Mem. at 2, 3-12.   In

sum, Jacobi contends that supplementation is merited because of "a mid-proceeding

change in surrogate country [(Thailand)]," "limited time . . . to address data for that new

country," "a last minute change" to Thai HS 4402.90.1000 as the surrogate value for

carbonized material, "no time . . . to address" the surrogate value, and aberrant data in

the surrogate value that distorted the dumping margin. *Id.* at 11.

Jacobi, however, had the opportunity to obtain the information it now seeks to

submit. As early as July 25, 2014, Jacobi had notice that Thailand was a potential

primary surrogate country. *See generally* Commerce SC Letter. On March 31, 2015,

DJAC timely proposed Thai HS 4402.90.1000 as the surrogate value for carbonized

material. *See* Thai Import Statistics.

On May 5, 2015, Commerce preliminarily selected Thailand as the primary

surrogate country and Thai HS 4402.90.9000 as the surrogate value for carbonized

material. *Prelim. I&D Mem.* at 17, 24. Commerce's preliminary selections gave

interested parties additional notice that Commerce may rely on Thai import data for the

Final Results, and, thus, the impetus to address that data. Jacobi had until June 2,

2015 to submit additional data. *See* Jacobi's Post-Prelim. Submission of Factual

Information Concerning Appropriate Surrogate Values (June 2, 2015), PJA 30, PR 370-

71, ECF No. 85-4. However, Jacobi declined to submit surrogate value information

regarding carbonized material. *See id.* at 2.

Accordingly, Jacobi had about 10 months from the time it first had notice that

Thailand was a potential surrogate country, and more than two months from when

DJAC first proposed Thai HS 4402.90.1000 as the surrogate value for carbonized

material, to obtain and submit the information it now seeks to submit. According to

Jacobi's own motion, this should have been ample time. *See* Jacobi Mem. at 9 (noting

that Jacobi spent two months--November and December 2015--researching imports into

Thailand under Thai HS 4402.90.1000). Jacobi has not shown that it *could not* have

obtained the information in question in time to submit it to the agency, but rather, that it *did not* obtain the information until it had the financial incentive to do so. *See id.* at 2, 11, 14-15 (describing the financial consequences on Jacobi of an increased dumping margin due to Commerce's reliance on Thai HS 4402.90.1000 to value carbonized material). Because the information is not new and formerly unavailable, permitting supplementation now would be "tantamount to [permitting] *de novo* review through the back door." *AASPS*, 34 CIT at 37, 683 F. Supp. 2d at 1324 (internal quotation marks and citation omitted) (denying motion to supplement when party failed to show that it could not have taken steps to introduce the document at issue into the record during the underlying investigation).

Nor is the court persuaded by Jacobi's appeal to the court's inherent authority to provide an equitable remedy. *See* Jacobi Mem. at 12-15. Pursuant to 28 U.S.C. § 1585, this court "shall possess all the powers in law and equity of, or as conferred by statute upon, a district court of the United States." However, "in the federal courts equity has always acted only when legal remedies were inadequate" or unavailable. *Canadian Lumber Trade All. v. United States*, 30 CIT 892, 894-98, 441 F. Supp. 2d 1259, 1261-68 (2006) (quoting *Beacon Theatres, Inc. v. Westover*, 359 U.S. 500, 509 (1959)) (granting equitable relief when U.S. Customs and Border Protection had violated plaintiffs' legal rights). Jacobi has not shown that it lacks a legal remedy or that Commerce acted contrary to its authority. *See* Jacobi Mem. at 14 (emphasizing financial considerations). Jacobi also relies on *Borlem S.A.-Empreedimentos Industriais v. United States*, *id*. at 13, but in that case, the Federal Circuit recognized this court's authority to order the International Trade Commission to reconsider its decision in light

of new information "the agency generating those data indicates are incorrect," *Borlem*

*S.A.-Empreedimentos Industriais v. United States*, 913 F.2d 933, 937 (Fed. Cir. 1990).

It is, thus, inapposite.  Jacobi's motion is denied.

Nevertheless, on remand, Commerce may decide whether to reopen and

supplement the record.  *See Essar Steel*, 678 F.3d at 1278 ("The decision to reopen the

record is best left to the agency, in this case Commerce."); *Fresh Garlic Producers*

*Ass'n v. United States*, 40 CIT ___, ___,190 F. Supp. 3d 1302, 1306 (2016) ("As long as

the Court does not forbid Commerce from considering new information, it remains within

Commerce's discretion to request and evaluate new data on remand.") (internal

quotations marks and citation omitted).

## CONCLUSION

In accordance with the foregoing, it is hereby

**ORDERED** that Commerce's *Final Results* are remanded to Commerce to further

address the issue of economic comparability, as set forth in Discussion Section I.A.iii.b

above; it is further

**ORDERED** that Commerce's *Final Results* are remanded to Commerce to further

address the issue of significant production, as set forth in Discussion Section I.A.iii.c

above; it is further

**ORDERED** that Commerce's *Final Results* are remanded to Commerce to further

address the issue of its calculation of the irrecoverable VAT adjustment, as set forth in

Discussion Section I.B.v.d above; it is further

**ORDERED** that Commerce's *Final Results* are remanded to Commerce for

reconsideration of the separate rate assigned to non-mandatory respondents in

accordance with any redetermination of the antidumping margin assigned to Jacobi; and it is further

**ORDERED** that the court defers ruling on Plaintiffs' challenges to Commerce's determinations regarding Thai data quality and surrogate value selection; it is further

**ORDERED** that Commerce shall file its remand results on or before July 6, 2017; it is further

**ORDERED** that the deadlines provided in USCIT Rule 56.2(h) shall govern thereafter; it is further

**ORDERED** that any comments or responsive comments must not exceed 6000 words; it is further

**ORDERED** that Jacobi's motion to supplement the administrative record (ECF No. 49) is **DENIED**.


                                        /s/      Mark A. Barnett
                                        Mark A. Barnett, Judge


Dated:  April 7, 2017
          New York, New York