Slip Op. 18-46

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| JACOBI CARBONS AB AND JACOBI CARBONS, INC.,<br>            Plaintiffs,<br><br>and<br><br>NINGXIA HUAHUI ACTIVATED CARBON CO., LTD., et al.,<br>            Plaintiff-Intervenors,<br><br>v.<br><br>UNITED STATES,<br>            Defendant,<br><br>and<br><br>CALGON CARBON CORP. AND CABOT NORIT AM., INC.,<br>            Defendant-Intervenors. | Before: Mark A. Barnett, Judge<br><br>Consol. Court No. 15-00286 |

## OPINION AND ORDER

[Sustaining Commerce's determination with respect to economic comparability. Remanding Commerce's determinations with respect to significant production of comparable merchandise, surrogate value selections, and the irrecoverable value added tax adjustment.]

                                                                    Dated: April 19, 2018

Daniel L. Porter and Tung A. Nguyen, Curtis, Mallet-Prevost, Colt & Mosle LLP, of Washington, DC, argued for Plaintiffs Jacobi Carbons AB and Jacobi Carbons, Inc.

Gregory S. Menegaz and Alexandra H. Salzman DeKieffer & Horgan PLLC, of Washington, DC, argued for Plaintiff-Intervenors Carbon Activated Tianjin Co., Ltd., Jilin Bright Future Chemicals Co., Ltd., Ningxia Mineral and Chemical Ltd., Shanxi DMD Corp., Shanxi Industry Technology Trading Co., Ltd., Shanxi Sincere Industrial Co., Ltd., Tancarb Activated Carbon Co., Ltd., and Tianjin Maijin Industries Co., Ltd.  With them on the brief was J. Kevin Horgan.

Jeffrey S. Grimson, Kristin H. Mowry, Jill A. Cramer, Sarah M. Wyss, Yuzhe PengLing, and James C. Beaty, Mowry & Grimson, PLLC, of Washington, DC, for Plaintiff-Intervenor Ningxia Huahui Activated Carbon Co., Ltd.

Francis J. Sailer and Dharmendra N. Choudhary, Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt LLP, of Washington, DC, for Plaintiff-Intervenors Ningxia Guanghua Cherishmet Activated Carbon Co., Ltd, Beijing Pacific Activated Carbon Products Co., Ltd., Datong Municipal Yunguang Activated Carbon Co., Ltd, and Cherishmet Inc.

Antonia R. Soares, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, argued for Defendant.  With her on the brief were Chad A. Readler, Acting Assistant Attorney General, Jeanne E. Davidson, Director, and Reginald T. Blades, Jr., Assistant Director.  Of counsel on the brief was Emma T. Hunter, Attorney, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, DC.

R. Alan Luberda and Melissa M. Brewer, Kelley Drye & Warren LLP, of Washington, DC, argued for Defendant-Intervenors Calgon Carbon Corp. and Cabot Norit Americas, Inc.  With them on the brief were John M. Herrmann, David A. Hartquist, and Scott M. Wise.

Barnett, Judge:  This matter is before the court following the U.S. Department of

Commerce's ("Commerce" or the "agency") redetermination upon remand in this case.

See Final Results of Redetermination Pursuant to Court Remand ("Remand Results"),

ECF No. 105-1.

Plaintiffs Jacobi Carbons AB and Jacobi Carbons, Inc. (together, "Jacobi"), and

Plaintiff-Intervenors[1] (collectively, with Jacobi, "Plaintiffs"), initiated this case challenging

---

[1] Plaintiff-Intervenors include: Ningxia Huahui Activated Carbon Co., Ltd. ("Huahui"); Carbon Activated Tianjin Co., Ltd., Jilin Bright Future Chemicals Company, Ltd., Ningxia Mineral and Chemical Limited, Shanxi DMD Corporation, Shanxi Industry Technology Trading Co., Ltd., Shanxi Sincere Industrial Co., Ltd., Tancarb Activated Co., Ltd., and Tianjin Maijin Industries Co., Ltd. (collectively, "CATC"); and Ningxia Guanghua Cherishmet Activated Carbon Co., Ltd., Beijing Pacific Activated Carbon Products Co., Ltd., Cherishmet Inc., and Datong Municipal Yunguang Activated Carbon Co., Ltd., (collectively, "Cherishmet").  The court consolidated cases filed by Huahui, CATC, and Cherishmet under lead Court No. 15-286.  See Order (Dec. 16, 2015), ECF No. 39.

Commerce's final results in the seventh administrative review ("AR7") of the

antidumping duty order on certain activated carbon from the People's Republic of China

("PRC" or "China").   *See Certain Activated Carbon from the People's Republic of China*,

80 Fed. Reg. 61,172 (Dep't Commerce Oct. 9, 2015) (final results of antidumping duty

admin. review; 2013-2014) ("*Final Results*"), ECF No. 37-3, and accompanying Issues

and Decision Mem., A-570-904 (Oct. 2, 2015) ("I&D Mem."), ECF No. 37-4.[2]   Plaintiffs

challenged Commerce's (1) selection of Thailand as the primary surrogate country, (2)

selection of Thai surrogate values to value financial ratios and carbonized material, and

(3) reduction of Jacobi's constructed export price ("CEP") by an amount for

irrecoverable value added tax ("VAT").   *See generally* Confidential Pls. Jacobi Carbons

AB and Jacobi Carbons, Inc.'s Mot. for J. on the Agency R. and Pls.' Br. in Supp. of

their Mot. for J. on the Agency R. ("Jacobi Rule 56.2 Mem."), ECF No. 51; Pls. Carbon

Activated Tianjin Co., Ltd., Jilin Bright Future Chemicals Company, Ltd., Ningxia Mineral

and Chemical Limited, Shanxi DMD Corporation, Shanxi Industry Technology Trading

---

Those parties had also intervened in this case. *See* Order (Oct. 26, 2015), ECF No. 22; Order (Nov. 17, 2015), ECF No. 28; Order (Nov. 20, 2015), ECF No.33. Accordingly, those parties are referred to by the court as "Plaintiff-Intervenors" rather than "Consolidated Plaintiffs."

[2] The administrative record filed in connection with the *Final Results* is divided into a Public Administrative Record ("PR"), ECF No. 37-1, and a Confidential Administrative Record ("CR"), ECF No. 37-2. Parties submitted joint appendices containing all record documents cited in their Rule 56.2 briefs. *See* Public Joint App. ("PJA"), ECF Nos. 85, 85-1 to 85-4; Confidential Joint App. ("CJA"), ECF No. 86. The administrative record associated with the Remand Results is contained in a Public Remand Record ("RR"), ECF No. 106-2. Parties submitted a joint appendix containing record documents cited in their Remand briefs. *See* Joint App. to Parties' Comments on Remand Results ("RJA"), ECF No. 114. Parties also submitted supplemental documents pursuant to court request. *See* Confidential Submission of Admin. R. Documents ("Suppl. Conf. RJA"), ECF No. 119; Confidential Submission of Admin. R. Evidence Discussed at Oral Arg. ("2nd. Suppl. Conf. RJA"), ECF No. 120.

Co., Ltd., Shanxi Sincere Industrial Co., Ltd., Tancarb Activated Carbon Co., Ltd., and

Tianjin Maijin Industries Co., Ltd. Mot. for J. on the Agency R., ECF No. 59; Pls. Carbon

Activated Tianjin Co., Ltd., Jilin Bright Future Chemicals Company, Ltd., Ningxia Mineral

and Chemical Limited, Shanxi DMD Corporation, Shanxi Industry Technology Trading

Co., Ltd., Shanxi Sincere Industrial Co., Ltd., Tancarb Activated Carbon Co., Ltd., and

Tianjin Maijin Industries Co., Ltd. Mem. in Supp. of Mot. for J. on the Agency R. ("CATC

Rule 56.2 Mem."), ECF No. 59-2 (incorporating Jacobi's arguments and providing

additional arguments on all issues); Pl.-Int. Ningxia Huahui Activated Carbon Co., Ltd.'s

Rule 56.2 Mot. for J. on the Agency R., ECF No. 58 (incorporating Jacobi's arguments

regarding surrogate country and surrogate value selection, adopting Jacobi's arguments

regarding VAT and making additional arguments thereto); Mot. of GDLSK Pl.-Ints. for J.

on the Agency R. under USCIT Rule 56.2 and Mem. of Law in Supp. of GDLSK Pls.'

Rule 56.2 Mot. for J. on the Agency R., ECF No. 60 (adopting all arguments made by

Jacobi and providing additional argument regarding VAT).

On April 7, 2017, the court remanded Commerce's surrogate country selection

(in particular, its determinations vis-à-vis economic comparability and significant

production of comparable merchandise), and Commerce's irrecoverable VAT

adjustment for further explanation or reconsideration, and deferred considering

Plaintiffs' arguments regarding Thai surrogate values pending the results of

Commerce's remand redetermination.  *See Jacobi Carbons AB v. United States*

("*Jacobi (AR7) I*"), 41 CIT ___, 222 F. Supp. 3d 1159 (2017).[3]   Commerce filed its

---

[3] The court's opinion in *Jacobi (AR7) I* presents background information on this case, familiarity with which is presumed.

remand redetermination on August 10, 2017.  *See* Remand Results.  Therein,

Commerce retained Thailand as the primary surrogate country and further explained its

VAT calculation.  *See id.*

Jacobi, CATC, and Cherishmet filed comments opposing the Remand Results.

*See* Jacobi's Comment on Commerce's Remand Redetermination ("Jacobi Opp'n

Cmts"), ECF No. 108; Consol. Pls. Carbon Activated Tianjin Co., Ltd., Jilin Bright Future

Chemicals Company, Ltd., Ningxia Mineral and Chemical Limited, Shanxi DMD

Corporation, Shanxi Industry Technology Trading Co., Ltd., Shanxi Sincere Industrial

Co., Ltd., Tancarb Activated Carbon Co., Ltd., and Tianjin Maijin Industries Co., Ltd.

Comments in Opp'n to U.S. Department of Commerce's Remand Redetermination

("CATC Opp'n Cmts"), ECF No. 107; GDLSK Pls.' Comment on Commerce's Remand

Redetermination, ECF No. 109 (adopting Jacobi's comments).  Defendant and

Defendant-Intervenors filed comments in support of the Remand Results.  *See* Def.'s

Reply to Pls.', Consol. Pls.', and Pl-Ints.' Respective Comments on the Remand

Redetermination ("Gov. Supp. Cmts"), ECF No. 112; Def.-Ints.' Responsive Comments

in Supp. of U.S. Department of Commerce's Remand Redetermination ("Def-Ints. Supp.

Cmts"), ECF No. 113.  On February 15, 2018, the court held oral argument on the

irrecoverable VAT issue.  *See* Order (Jan. 26, 2018), ECF No. 117; Docket Entry, ECF

No. 121.

For the following reasons, the court sustains Commerce's economic

comparability determination but remands its determinations regarding significant

production of comparable merchandise, surrogate value selections, and the

irrecoverable VAT adjustment.

**JURISDICTION AND STANDARD OF REVIEW**

The court has jurisdiction pursuant to § 516A(a)(2)(B)(iii) of the Tariff Act of 1930,

as amended, 19 U.S.C. § 1516a(a)(2)(B)(iii) (2012),[4] and 28 U.S.C. § 1581(c).  The

court will uphold an agency determination that is supported by substantial evidence and

otherwise in accordance with law.  19 U.S.C. § 1516a(b)(1)(B)(i).  "The results of a

redetermination pursuant to court remand are also reviewed for compliance with the

court's remand order."  *SolarWorld Americas, Inc. v. United States*, 41 CIT ___, ___,

273 F. Supp. 3d 1314, 1317 (2017) (quoting *Xinjiamei Furniture (Zhangzhou) Co. v.

United States*, 38 CIT ___, ___, 968 F. Supp. 2d 1255, 1259 (2014)(internal quotation

marks omitted).

**DISCUSSION**

## I.   Relevant Legal Framework for Nonmarket Economy Proceedings

An antidumping duty is "the amount by which the normal value exceeds the

export price (or the constructed export price) for the merchandise."  19 U.S.C. § 1673.

When an antidumping duty proceeding involves a nonmarket economy country,

Commerce determines normal value by valuing the factors of production[5] in a surrogate

country, *see* 19 U.S.C. § 1677b(c)(1), and those values are referred to as "surrogate

values."  In selecting surrogate values, Commerce must use "the best available

information" that is, "to the extent possible," from a market economy country or

---

[4] All further citations to the Tariff Act of 1930, as amended, are to Title 19 of the U.S. Code, and all references to the U.S. Code are to the 2012 edition, unless otherwise stated.
[5] The factors of production include, but are not limited to: "(A) hours of labor required, (B) quantities of raw materials employed, (C) amounts of energy and other utilities consumed, and (D) representative capital cost, including depreciation."  19 U.S.C. § 1677b(c)(3).

countries that are economically comparable to the nonmarket economy country and

"significant producers of comparable merchandise."  *Id.* § 1677b(c)(1),(4).  In selecting

its surrogate values, Commerce generally prefers publicly-available and "non-

proprietary information from producers of identical or comparable merchandise in the

surrogate country."  19 C.F.R. § 351.408(c)(1),(4).  Commerce's practice "is to select, to

the extent practicable, [surrogate values] which are product-specific, representative of a

broad-market average, publicly available and contemporaneous with the POR ["period

of review"], and tax and duty exclusive."  I&D Mem. at 25.

Commerce generally values all factors of production in a single surrogate

country.[6]  Commerce has adopted a four-step approach to selecting a primary surrogate

country.   *See* Import Admin., U.S. Dep't of Commerce, *Non-Market Economy Surrogate*

*Country Selection Process*, Policy Bulletin 04.1 (2004), http://enforcement.trade.gov/

policy/bull04-1.html (last visited April 10, 2018) (hereinafter "Policy Bulletin 04.1").

Pursuant to Policy Bulletin 04.1,

> (1) the Office of Policy ("OP") assembles a list of potential surrogate
> countries that are at a comparable level of economic development to the
> [non-market economy] country; (2) Commerce identifies countries from the
> list with producers of comparable merchandise; (3) Commerce determines
> whether any of the countries which produce comparable merchandise are
> significant producers of that comparable merchandise; and (4) if more than
> one country satisfies steps (1)–(3), Commerce will select the country with
> the best factors data.

---

[6] *See* 19 C.F.R. § 351.408(c)(2) (excepting labor).  *But see Antidumping Methodologies*
*in Proceedings Involving Non-Market Economies: Valuing the Factor of Production:*
*Labor*, 76 Fed. Reg. 36,092 (Dep't Commerce June 21, 2011) (expressing a preference
to value labor based on industry-specific labor rates from the primary surrogate
country).

*Jiaxing Brother Fastener Co., Ltd. v. United States*, 822 F.3d 1289, 1293 (Fed. Cir.

2016) (citation omitted); *see also* Policy Bulletin 04.1.

When calculating export price and constructed export price, Commerce may

deduct "the amount, if included in such price, of any export tax, duty, or other charge

imposed by the exporting country on the exportation of the subject merchandise to the

United States, other than an export tax, duty, or other charge described in section

1677(6)(C) of this title."[7]  19 U.S.C. § 1677a(c)(2)(B).  Such price adjustments must be

"reasonably attributable to the subject merchandise."  19 C.F.R. § 351.401(c).

In 2012, Commerce reconsidered its unwillingness to apply § 1677a(c)(2)(B) to

certain NME countries, including China,[8] and, henceforth, considers whether the PRC

"has imposed an export tax, duty, or other charge upon export of the subject

merchandise during the period of investigation or the period of review," including, for

example, "an export tax or VAT that is not fully refunded upon exportation."

*Methodological Change for Implementation of Section 772(c)(2)(B) of the Tariff Act of*

*1930, as Amended, In Certain Non–Market Economy Antidumping Proceedings*, 77

Fed. Reg. 36,481, 36,482 (Dep't Commerce June 19, 2012) ("*Methodological Change*")

(internal quotation marks omitted).  If it has, Commerce will "reduce the respondent's

export price and constructed export price accordingly, by the amount of the tax, duty or

charge paid, but not rebated."  *Id.* at 36,483.  When the VAT is "a fixed percentage of

the price," Commerce "will adjust the export price or constructed export price downward

---

[7] Section 1677(6)(C), which concerns "export taxes, duties, or other charges levied on the export of merchandise to the United States specifically intended to offset the countervailable subsidy received," is not relevant here.

[8] For a more detailed overview of Commerce's policy change with respect to NMEs, see *Jacobi (AR7) I*, 222 F. Supp. 3d at 1184-85.

by the same percentage." *Id.* "[B]ecause these are taxes affirmatively imposed by the

Chinese . . . government[]," Commerce "presume[s] that they are also collected." *Id.*

## II.    Economic Comparability

In briefing their original Rule 56.2 motions, Plaintiffs argued that Commerce erred

when it excluded the Philippines as a potential surrogate country solely on the basis of

economic comparability and declined to consider its significant production of

comparable merchandise and data quality.  *See* Jacobi Rule 56.2 Mem. at 9-13; CATC

Rule 56.2 Mem. at 5 (asserting that "[Commerce] cannot lawfully make one criterion a

threshold requirement . . . .").  The court upheld Commerce's sequential surrogate

country selection methodology, but found that its economic comparability determination

in this matter lacked reasoned analysis.  *Jacobi (AR7) I*, 222 F. Supp. 3d at 1171-75,

1176-79.  The court remanded the *Final Results* "for Commerce to provide a reasoned

explanation as to why the range of GNI data reflected on OP's list demonstrates

economic comparability to the PRC, including why the Philippines' GNI does not."  *Id.* at

1179 (citation omitted).

### A.  Commerce's Redetermination

On remand, Commerce explained its formulation of the GNI range generally, and

in this proceeding specifically.  *See* Remand Results at 3-15.  Commerce's "long-

standing practice" is to use *per capita* gross national income ("GNI") data reported in the

World Bank's annual *World Development Report* as the indicator of each country's

economic development.  *Id.* at 3 (citations omitted).  Although the statute only requires

Commerce to seek a surrogate market economy country whose economic development

is "comparable" to the subject nonmarket economy ("NME"), when possible, the agency

"selects a surrogate country at the *same* level of economic development as the NME

country." *Id.* at 4.  Commerce considers those countries that occupy a "relatively narrow

*per capita* GNI range that is *centered* on the *per capita* GNI of the NME country" to have

attained the same level of economic development.  *Id.*

Commerce likens *per capita* GNI ranges to a flight of stairs.  *Id.* at 5.  "[E]ach

(flat) step . . . is associated with a [relatively narrow] range of *per capita* GNI," whereas

"the staircase itself . . . is associated with a relatively broad range of *per capita* GNI."  *Id.*

The staircase metaphor demonstrates that

> (a) the level of economic development increases with *per capita* GNI if the
> difference or jump in *per capita* GNI is big enough to take one from step to
> step, and (b) different countries can be at the same level of economic
> development, even if their *per capita* GNIs differ, so long as those
> differences are small enough that one stays on the same step.

Id.  Commerce defines each step for each subject NME country "using a relatively

narrow range of *per capita* GNI [that is] centered on the country at issue."  *Id.* at 6.

The annual release of the *World Development Report* triggers Commerce's

reconsideration of the surrogate countries on OP's list.  *Id.* at 10.  Commerce first

"examines the *per capita* GNI data for the PRC and the change in *per capita* GNI from

the year before, and compares the change in the PRC's per capita GNI to the

respective changes in the *per capita* GNIs of the existing set of surrogate countries,"

and "determine[s] whether it is necessary to re-center the GNI range in light of the year-

to-year GNI changes."  *Id.*  Because of "the PRC's rapid GNI growth rate," Commerce

usually must re-center the list.  Remand Results at 10.  From 2009 to 2013, the PRC's

*per capita* GNI grew from $3,590 to $6,560, an 82% increase.  *Id.* at 10-11 (citations

omitted).[9]  Commerce subsequently "reevaluated the GNI range and expanded it at roughly the same rate."  *Id.* at 10.

Commerce does not explicitly state how OP determines the precise *per capita* GNI range associated with each "step" that it uses to formulate its list.  *See id.* at 12-13 (simply noting that once it has "preliminarily determined" the *per capita* GNI range, Commerce searches for suitable countries to include on the list).  Commerce notes that the GNI range associated with each step or "level" generally increases as economic development increases.  *Id.* at 11; *see also id.* at 12 (noting that "the World Bank's general premise of more expansive income ranges for higher per capita income is informative to [Commerce's] analysis").[10]  However, Commerce does explain that, pursuant to judicial precedent, it attempts to balance the list by including three countries above and below the PRC's *per capita* GNI, for a total of six countries.  Remand Results at 13; *see also id.* at 9-10 & n.30 (citing *Dorbest Ltd. v. United States*, 35 CIT ___, ___, 755 F. Supp. 2d 1291, 1297-98 & n.17 (2011) (faulting Commerce for establishing a *per*

---

[9] Table 1 in the Remand Results shows that, from 2009 to 2013, the *per capita* GNI income of the highest country on the list increased 57 percent, from $5,770 to $9,060; the *per capita* GNI of the lowest country on the list increased 121 percent, from $1,790 to $3,960; and the GNI range (i.e. the difference between the highest and lowest country on the list) increased 28 percent, from $3,980 to $5,100.  Remand Results at 10-11, Table 1.

[10] Commerce notes that the World Bank relies on four income groups to classify a country's level of economic development.  Remand Results at 11.  Relevant here, the World Bank's upper middle income group, in which the PRC is included, reflects *per capita* GNIs ranging from $4,126 to $12,745.  *Id.*  According to Commerce, the $5,100 *per capita* GNI range reflected in OP's surrogate country list "is roughly consistent" with the $8,619 World Bank range (i.e., $12,745 minus $4,126), indicating the reasonableness of Commerce's range.  *Id.* at 11-12.  Commerce does not rely on the World Bank's income groups, however, because they "are not sufficiently 'centered' on the NME countries that are subject to [the agency's antidumping] proceedings."  *Id.* at 12.

*capita* GNI range that only included countries with incomes below China's to determine

economic comparability)).  Commerce may rebalance the list when a country changes

from having a *per capita* GNI higher than the PRC's to one that is lower, and vice versa.

Remand Results at 13.  When a surrogate country's *per capita* GNI tracks China's *per*

*capita* GNI, and is "actively used—and advocated for by interested parties[,] . . . there is

a strong inclination to continue relying on them" provided that country's *per capita* GNI

remains within the selected range.  *Id.*  Countries that are not selected as surrogate

countries are reevaluated and may be replaced on the list.  *Id.*  When considering new

countries to add to the list, Commerce considers the surrogate value requirements for

the subject merchandise, data quality and availability, the "economic diversity of the

manufacturing sector," and the "specificity of the import data relied on to value the

[factors of production]."  *Id.* at 14.[11]

        The list is non-exhaustive, and is intended to provide interested parties with a

"manageable set of potential surrogate countries" to focus on.  *Id.* at 14, 15.  When an

interested party proposes an alternative country with a *per capita* GNI within the range

of countries on the list, Commerce affords that country the same consideration as

others on the list.  *Id.* at 14.  When an interested party proposes a country with a *per*

*capita* GNI outside the selected range, Commerce will consider the country only if its

data quality and availability, and significant producer status, outweigh its deficient

economic comparability, *id.* at 14-15, and only when none of the countries at the same

---

[11] For example, Dominica and Iraq have *per capita* GNIs close to that of China, but their less diversified economies render them nonviable surrogates in light of the above-mentioned considerations.  Remand Results at 14.

level of economic development (i.e., within Commerce's *per capita* GNI range) present

viable surrogate country options, *id.* at 7-8.[12]

As to the Philippines' economic proximity to China, Commerce explains that,

from 2009 to 2013, the "absolute difference between the PRC['s] *per capita* GNI and the

Philippines['] *per capita* GNI grew" from $1,800 to $3,290.  *Id.* at 16 & n. 45 (citations

omitted).  Thus, "it was only a matter of time before the PRC—regardless of whatever

'bright line' or range is used to define a level of economic development . . .—would

eventually move into a level of economic development different than that of the

Philippines."  *Id.* at 16.  Because of the growing difference between the two countries'

*per capita* GNI, there were more market economy countries falling between the *per*

*capita* GNIs of the Philippines and China.  *Id.* at 16.  Stated differently,

> [f]rom 2000 to 2013, the PRC's GNI *per capita* [had] grown 605 percent, or
> an average of 16 percent a year, while the Philippines [had] grown 166
> percent, or an average of 8 percent per year.  As the *per capita* GNI of the
> PRC has increased and outpaced that of the Philippines, which steadily
> fell behind in terms of GNI, [Commerce] has sought other countries to fill
> the void left by the Philippines.

*Id.* at 31 & n.108 (citations omitted).  In this segment of the proceeding, OP identified

three other countries with *per capita* GNIs lower than China's, but higher than the

Philippines', to include on the list.  *Id.* at 16.[13]  Those countries were "likely to have good

data availability and quality, i.e., the specificity of these countries' data are more likely to

assist the team in its valuation of the inputs."  *Id.* at 17 & n.46 (quoting Req. for

_____

[12] This may occur when none of the countries on the list are significant producers of
comparable merchandise or have suitable sources of surrogate value data.  *See*
Remand Results at 7.
[13] Ukraine, with a 2013 *per capita* GNI of $3,960, occupied the lowest point on the list.
Remand Results at 11 and 12; *see also* Gov. Supp. Cmts at 13 n.4 (noting that
Commerce erred in identifying Indonesia instead of the Ukraine in the Remand Results
as the country with the lowest *per capita* GNI on the list).

Surrogate Country and Surrogate Value Comments and Information (July 25, 2014),

Attach. 1 at 2), RJA Tab 1, PR 64, ECF No. 114.

Because Commerce identified a country on the list (Thailand) that it determined

was a significant producer of comparable merchandise, and had good data availability

and quality, Commerce affirmed its prior opinion that the Philippines is "not an

appropriate surrogate country for purposes of [AR7]."  Remand Results at 17-18.

**B. Commerce's Redetermination as to Economic Comparability is Sustained**

Section 1677b(c)(4)(A) does not define the phrase "economic comparability" or

require a particular methodology to determine which countries are economically

comparable to the nonmarket economy country in question.  *See* 19 U.S.C.

§ 1677b(c)(4); *Jiaxing Brother Fastener Co., Ltd. v. United States*, 38 CIT ___, ___, 961

F. Supp. 2d 1323, 1328 (2014), aff'd 822 F.3d 1289.  Thus, "Commerce may perform its

duties in the way it believes most suitable," provided its determinations are supported by

reasoned analysis and substantial evidence.  *Jiaxing Brother*, 822 F.3d at 1298 (internal

quotation marks and citation omitted).  With respect to economic comparability,

Commerce's Remand Results meet those requirements.  As detailed above, Commerce

has complied with the court's instruction to better explain why its GNI range reflects

economic comparability to the PRC, including why the Philippines' GNI does not.  *See*

*Jacobi (AR7) I*, 222 F. Supp. 3d at 1179; Remand Results at 3-18.  Commerce's

decision to exclude the Philippines from the list of countries is supported by substantial

evidence demonstrating the widening disparity between the two countries' level of

economic development.  *See* Remand Results at 16 & n.45; *id.* at 31 & n.108.  Plaintiffs'

contrary arguments are unavailing.

Jacobi first contends that Commerce unreasonably determined that the

Philippines was not at the same level of economic development on the basis of its

"arbitrarily narrow GNI range."  Jacobi Opp'n Cmts at 3.   According to Jacobi,

Commerce did not expand the GNI range as China's *per capita* GNI increased, but

actually narrowed the range for 2013.  *Id.* at 4-5.  Specifically, between 2011 and 2013,

Jacobi asserts, Commerce narrowed the spread between China's *per capita* GNI and

the lowest *per capita* GNI[14] on the surrogate list from 55.3 percent to 39.6 percent.  *Id.*

at 5 (citing Remand Results at 10-11, Table 1).

The Remand Results show that as China's *per capita* GNI increased from 2009

to 2013, Commerce increased the total *per capita* GNI range in U.S. dollar terms from

$3,980 to $5,100.  Remand Results at 10-11, Table 1.[15]  Commerce's expansion of its

---

[14] In other words, according to Jacobi, the difference between China's *per capita* GNI and the lowest *per capita* GNI on the list, expressed as a percentage of China's *per capita* GNI, decreased from 2011 to 2013.  Jacobi Opp'n Cmts at 5.

[15] Jacobi points to the fact that the total GNI range decreased from $5,430 in 2011 to $5,100 in 2013.  Jacobi Opp'n Cmts at 5.  Generally speaking, however, from 2009 to 2013, the GNI range increased as China's *per capita* GNI increased.  *See* Remand Results at 10-11, Table 1.  Jacobi also raises arguments about whether Commerce relied on absolute percentage differences from China's GNI or absolute value differences.  Jacobi Opp'n Cmts at 5-7.  At oral argument on Jacobi's Rule 56.2 Motion, "Defendant explained that OP relied on absolute percentage differences from China's GNI to determine the GNI range; Ukraine, at 39.7 [percent] of China's GNI represented the low end of the range; and the Philippines' GNI, which was less than 50 percent of China's GNI, thus fell outside the range."  *Jacobi (AR7) I*, 222 F. Supp. 3d at 1178 (internal quotation marks, citation, and alteration omitted).  In the Remand Results, Commerce notes that "the absolute percentage difference between the GNI of the PRC and the Philippines is 66.93 percent, not 50 percent, which is not within the GNI range on a percentage basis as argued by Jacobi."  Remand Results at 31; *see also* Gov. Supp. Cmts at 12 n.3 (calculating the absolute percentage difference).  Nevertheless, Commerce did not rely on the absolute percentage difference to determine the GNI range.  *See* Remand Results at 10-15.  Instead, Commerce relied on the "absolute difference," i.e., the difference between China's and the Philippines' respective *per capita* GNIs expressed as dollar values, to determine that the Philippines is not at the same level of economic development.  *See id.* at 16.  As with any real-world data set,

GNI range need not exactly mirror China's economic growth; mathematical precision is

not required.  *Cf. Dorbest*, 755 F. Supp. 2d at 1298 ("Commerce does not have to

achieve mathematical perfection in its choice of countries to act as bookends for its

initial selection [of the GNI range].").  Rather, as China's *per capita* GNI increases,

countries occupying a broader range of *per capita* GNIs may generally be considered to

be at the same level of economic development, and the increased range reflects that

principle.  *See* Remand Results at 11-12.

Jacobi also contends that Commerce's determination that the Philippines is not

at the same level of economic development as the PRC is "factually incorrect," because

"the Philippines was as economically comparable to China in 2013 as in previous years

when Commerce found the Philippines to be at the same level of economic

development."  Jacobi Opp'n Cmts at 6 (emphasis omitted).  Jacobi made a similar

argument in the proceedings before remand, *see* Jacobi Rule 56.2 Mem. at 14-15, to

which the Government responded that it "is not required . . . to use the same surrogate

country that it used in previous reviews," and it "selects the primary surrogate country

for each segment of a proceeding based on the record of that particular segment," Gov.

Rule 56.2 Resp. at 29.

In *Jacobi (AR7) I*, the court explained that

[the Government] is correct that nothing in the statute requires it to
consider any particular country as a surrogate country.  [E]ach

_____

the statistics cited by the Parties may be examined through multiple lenses to suggest
various trends or to dispute those trends.  For purposes of the court's review, the
question is not whether there is a perfect alignment of every data point regardless of the
lens through which it is examined, but whether the data, as a whole, reasonably support
the agency's conclusion.  In this case, as discussed herein, the data reasonably
supports the agency's finding that the Philippines is no longer at the same level of
economic development as China.

> administrative review is a separate exercise of Commerce's authority that
> allows for different conclusions based on different facts in the record.
> Accordingly, the validity of Commerce's decision to exclude the
> Philippines from its list of potential surrogate countries for AR7 depends
> on the validity of Commerce's compilation of the list generally.

222 F. Supp. 3d at 1176-77 (internal quotation marks and citations omitted).  As

discussed above, Commerce's compilation of the list is reasonably based on its

examination of annual changes to China's *per capita* GNI and re-centering of the list

based on China's rapid economic expansion.  *See* Remand Results at 10.  Contrary to

Jacobi's contention, *see* Jacobi Opp'n Cmts at 7, Commerce's explanation that the GNI

range for a particular economic step increases with higher levels of economic

development is not inconsistent with Commerce's exclusion of the Philippines because,

as this court has recognized, Commerce properly may "narrow a list of countries within

a band for purposes of administrative feasibility," *Juangcheng Kangtai Chem. Co., Ltd.*

*v. United States*, Slip Op. 15-93, 2015 WL 4999476, at *7-8 (CIT Aug. 21, 2015)

(internal quotation marks omitted); *see also* Remand Results at 10.  Commerce's

decision to limit OP's list of potential surrogates to six countries represents "precisely

the type of discretion left within the agency's domain."  *Baoding Yude Chem. Indus. Co.,*

*Ltd. v. United States*, 25 CIT 1118, 1126, 170 F. Supp. 2d 1335, 1343 (2001)

(Commerce's statutory obligation to select the best information available, for which

"[t]here are no set rules," provides Commerce with the discretion to make certain

determinations based on the record before it, provided those determinations are

supported by substantial evidence); *see also* Remand Results at 15 (explaining that

OP's list "is intended to initiate a process whereby parties can focus their attention on a

*manageable set* of potential surrogate countries") (emphasis added).  Commerce's

decision to exclude the Philippines is supported by substantial evidence demonstrating

the widening gap between its *per capita* GNI and China's, and the apparent availability

of other suitable countries.  *See* Remand Results at 16 & n.45, 17 & n.46, and 31 &

n.108 (citations omitted).  That Jacobi may draw a different conclusion from the

evidence does not mean that Commerce's decision is not supported by substantial

evidence.  *See Matsushita Elec. Indus. Co. v. United States,* 750 F.2d 927, 933 (Fed.

Cir. 1984).

Finally, CATC contends that Commerce has not provided a "predictable or

reasonable" method of assessing economic comparability.  CATC Opp'n Cmts at 1.[16]

CATC points to the difference between China's percentage change in *per capita* GNI

and the percentage change in the GNI band from 2009 to 2013 to support its argument

that Commerce has not expanded the GNI range at roughly the same rate as China's

increase.  CATC Opp'n Cmts at 2.[17]  To be sure, the percentage change in the GNI

---

[16] CATC also asserts that Commerce's "failed explanation of its GNI band . . . underscores [CATC's] argument that [Commerce] has unlawfully and unreasonably considered economic comparability as the primary surrogate country factor to the exclusion of . . . significant production and quality of data."  CATC Opp'n Cmts at 1-2.  According to CATC, this treatment of economic comparability "undermin[es] the plain meaning of the statute and the over-arching purpose of using the 'best available information.'"  *Id.* at 2.  This is a reformulation of CATC's argument that Commerce cannot lawfully treat economic comparability as a threshold consideration in its examination of potential surrogate countries.  *See* CATC Rule 56.2 Mem. at 5.  The court rejected that argument in *Jacobi (AR7) I.  See Jacobi (AR7) I*, 222 F. Supp. 3d at 1172 (citations omitted); *see also id.* at 1175 n. 14 (rejecting "CATC's argument that the statutory mandate to use the 'best available information' elevates Commerce's data criterion such that it 'is, at a minimum, equally as critical' as the economic comparability and significant production criteria" as "a red herring").

[17] CATC also points the court to data spanning 2002 to 2014 and included in Commerce's remand redetermination in the eighth administrative review ("AR8") of this proceeding.  CATC Opp'n Cmts at 3 (citation omitted).  Defendant-Intervenors urge the court to strike CATC's comments with instructions to re-file without the AR8 information, or to disregard them.  Def-Ints. Supp. Cmts at 8 n.2.

band differs from the percentage change in China's *per capita* GNI.  *See* Remand

Results at 10-11, Table 1 (showing that, from 2009 to 2013, China's *per capita* GNI

increased 82 percent, whereas the GNI range increased 28 percent).  As discussed

above, however, the expansion of the GNI range need not exactly match China's

increasing *per capita* GNI for Commerce's development of the surrogate country list to

be reasonable.  Moreover, it would be inappropriate for this court to impose that type of

bright-line requirement.  As the Government notes, "[t]he GNI data on which the

surrogate country list is based is a fluid measurement that can change from year to

year."  Gov. Supp. Cmts at 13.

   In sum, Commerce has provided a reasoned explanation of how it generated the

surrogate country list, including why it considers those countries on the list to be at the

same level of economic development as the PRC, and why the Philippines is not, which

explanation is supported by substantial evidence.[18]

_____

   USCIT Rule 12(f) provides that the court may strike "an insufficient defense or
any redundant, immaterial, impertinent, or scandalous matter."  The court has broad
discretion in disposing of motions to strike. *Beker Indus. Corp. v. United States*, 7 CIT
199, 200, 585 F. Supp. 663, 665 (1984).  Nevertheless, "motions to strike are not
favored by the courts and are infrequently granted."  *Jimlar Corp. v. United States*, 10
CIT 671, 673, 647 F. Supp. 932, 934 (1986) (citation omitted).
   Information submitted as part of Commerce's remand redetermination in AR8 is
irrelevant to the court's disposition of this action, which, by statute, turns on whether the
agency's decision is supported by substantial evidence on the record of AR7, and is
otherwise in accordance with law.  *See* 19 U.S.C. § 1516a(a)(2), (b)(1)(B).  Accordingly,
the court will disregard CATC's contention that information submitted in AR8 supports
its argument that Commerce's decision in AR7 is unsustainable; however, striking those
arguments is not merited.  *See Jimlar Corp.*, 10 CIT at 673, 647 F. Supp. at 934
(granting a motion to strike is an "extraordinary remedy," and should only occur when
"there has been a flagrant disregard of the rules of court").
[18] Assuming the Philippines is not at the same level of economic development, Jacobi
also contends that Commerce still should have considered it as a potential surrogate
country because it "was at a *comparable* level of economic development," and "there
are serious defects that disqualify all countries in the potential surrogate country list."

### III.    Significant Producer of Comparable Merchandise

In briefing its original Rule 56.2 motion, Jacobi argued that, during the period of

review, the Philippines was the largest producer of activated carbon, Thailand was not a

significant producer, and Commerce had impermissibly found that "any country with

non-zero production" was a significant producer.  Jacobi Rule 56.2 Mem. at 18-19, 21.

CATC argued that Commerce had impermissibly "found that countries with any amount

of exports of activated carbon are presumed to be equally significant producers."  CATC

Rule 56.2 Mem. at 6.

In the Issues and Decision Memorandum, Commerce had identified Thailand as

a significant producer on the basis of its total export quantities.  I&D Mem. at 7.

Commerce explained that it "prefer[s] to consider quantity, rather than value, in

determining whether a country is a significant producer" because "the fact that a country

is not a net exporter of a particular product, in value terms, does not necessarily mean

that the country is not a significant producer of that good, given that the country *could*

import more higher-valued products than it exports."  *Id*. (emphasis added).   The court

found several faults with Commerce's reasoning:

> First, Commerce does not explain whether Thailand actually imports more
> higher-valued goods than it exports.  Second, Commerce relied on

---

Jacobi Opp'n Cmts at 8; *see also id*. at 10-11 (asserting that that none of the countries
on the list, including Thailand, are significant producers of comparable merchandise,
and none have quality data).
      This court previously found Commerce's sequential surrogate country selection
method to be a reasonable means of implementing its surrogate country selection
criteria.  *See Jacobi (AR7) I*, 222 F. Supp. 3d at 1172.  Nonetheless, because
Commerce's selection of Thailand as the primary surrogate country rests on its
determinations that Thailand is a significant producer of comparable merchandise and
has suitable surrogate value data, which determinations are unsustainable at this time,
*see infra*, as a factual matter, Commerce's primary surrogate country selection remains
an open question.

Thailand's total exports—not net exports—to find that it is a "significant
producer."  Thus, Commerce's rationale for disfavoring net value as a
measure of significant production does little to support (or explain) its
preference for considering total export quantities.  Finally, Commerce's
reasoning fails to persuade that reliance on total exports, devoid of
evidence of influence on world trade, is a permissible method of
interpreting the term "significant producer," and, thus, identifying
significant producer countries.

*Jacobi (AR7) I*, 222 F. Supp. 3d at 1181 (citing *Chevron U.S.A., Inc. v. Nat. Res. Def.*

*Council, Inc.*, 467 U.S. 837, 843 (1984); *Fresh Garlic Prod. Ass'n v. United States, 39*

*CIT ___, ___,* 121 F. Supp. 3d 1313, 1338-39 (2015)).  The court also rejected the

Government's *post hoc* argument that Thailand's ranking on a list of activated carbon-

exporting countries demonstrated significant production absent evidence of "the

significance of that ranking in terms of its effect on global trade."  *Id.* at 1181-82.

## A.  Commerce's Redetermination

On remand, Commerce changed its basis for finding Thailand to be a significant

producer of comparable merchandise.  Commerce now relies on financial statements as

providing evidence of domestic Thai production of comparable merchandise and

Thailand's status as a net exporter (in quantity terms) of the subject merchandise.[19]

Remand Results at 20-24.[20]

Commerce first points to financial statements from two Thai manufacturers of activated carbon, C. Gigantic Carbon Co., Ltd. ("Gigantic") and Carbokarn Co., Ltd. ("Carbokarn") as evidence of "significant production of comparable merchandise in Thailand" and which, according to Commerce, "in and of itself, establishes that Thailand is a significant producer."  Remand Results at 20-21 & nn. 63-65.[21]  Commerce

---

[19] Commerce appears to contend that evidence of domestic production *alone* satisfies the significant producer criterion, but that evidence regarding Thailand's status as a net exporter provides *further support* for its finding.  *See* Remand Results at 20-21 (financial statements from domestic producers of identical merchandise "demonstrates that there is significant production of comparable merchandise in Thailand"); *id.* at 24 (stating same); *id.* at 37 ("Thailand is a significant producer . . . based on the domestic production of activated carbon . . . ."); *id.* at 40 ("[D]omestic production . . . provides the best indication that Thailand is a significant producer of comparable merchandise."); *id.* at 21-22 (evidence of net exports "also demonstrates that Thailand can be considered a significant producer of comparable merchandise");  *id.* at 41 ("In sum, the meaning of the term 'significant,' the evidence of domestic production of activated carbon, and the net exports of Thailand all support our finding here.").  *But see id.* at 24 ("While we are *not relying on export or net export quantity* in determining that Thailand is a significant producer, the record demonstrates that Thailand is not only a significant exporter of comparable merchandise, but also a net exporter of comparable merchandise, a metric that [Commerce] *may rely on* in its significant producer analysis.") (emphasis added).
[20] Commerce also discusses Thailand's ranking on a list of activated carbon-exporting countries and its concomitant asserted influence on global trade of the subject merchandise.  Remand Results at 23-24.  Commerce did so in response to the court's concern that the agency's prior discussion of Thailand's ranking on a list of activated carbon exporting countries lacked evidence regarding "the significance of that ranking in terms of its effect on global trade."  *Jacobi (AR7) I*, 222 F. Supp. 3d at 1182 (citing *Fresh Garlic Prod. Assoc. v. United States*, 40 CIT ___, ___, 180 F. Supp. 3d 1233, 1243 (2016); *see also* Remand Results at 23.  However, because Commerce does not support its significant producer determination with this evidence, the court accords it no further consideration.  *See* Remand Results at 24, 39 ("[G]lobal trade analysis is not a basis [Commerce] is using to determine whether Thailand is a significant producer of comparable merchandise.").
[21] Commerce cites to "Petitioners' Surrogate Value Submission" to substantiate Gigantic's financial information.  Remand Results at 20 n.63; *see also* Pet'rs' Final Pre-Prelim. Submission of Surrogate Value Information (March 31, 2015), Attach. 3, RJA

separately notes that record evidence "indicates that Carbokarn is the 'biggest

manufacturer of coconut shell based activated carbon in the world market.'"  Remand

Results at 37 & n.125 (quoting DJAC 2nd Surrogate Value Cmts, Ex. 8) (responding to

arguments that Carbokarn's reported sales include non-comparable merchandise).

     Commerce next explains that it may rely on "other criteria in lieu of evidence of

domestic production," such as net exports of comparable merchandise.  *Id.* at 21 &

nn.66-67 (citing Policy Bulletin 04.1).  In 2013 and 2014, Thailand had net exports of

activated carbon in the amount of 2,035,309 kilograms.[22]  *Id.* at 21-22 & nn.70-71 (citing

DJAC Surrogate Country Cmts).  According to Commerce, Thailand's net exports (in

---

Tab 4, PR 320-321, ECF No. 114 (supplying Gigantic's 2013 financial statement).
Commerce cites to "Datong Juqiang's Surrogate Value Submission" to substantiate
Carbokarn's financial information.  Remand Results at 20-21 n.64; *see also* Second
Surrogate Value Submission by DJAC ("DJAC 2nd Surrogate Value Cmts"), Ex. 8, RJA
Tab 5, PR 322-323, ECF No. 114 (supplying Carbokarn's 2013 financial statement).
Commerce goes on to state that "[i]n 2013, [Gigantic] had activated carbon sales of
165,415,855 Baht and in 2010, [Carbokarn] had activated carbon sales of 306,799,179
Baht."  Remand Results at 21 n.65 (citations omitted).  The figure Commerce provides
as reflecting Carbokarn's 2010 sales is *not* found in DJAC's submission, which, as
stated above, contains Carbokarn's 2013 financial statement.  Rather, Carbokarn's
2010 financial statement was appended to Commerce's preliminary surrogate value
memorandum.  *See* Surrogate Values for the Prelim. Results (Apr. 29, 2015), Attach.
10, PJA Tab 18, PR 336-39, ECF No. 85-3.  That document substantiates Commerce's
assertion regarding the amount of activated carbon Carbokarn sold in 2010.  *See id.*
For 2013, Carbokarn's financial statement reflects sales of 469,739,739.45 Baht and
total revenue of 500,363,415.32 Baht, 93.89 percent of which is accounted for by the
company's "[m]anufacture, export and import [of] charcoal water filter, charcoal, and
chemical products."  *See* DJAC 2nd Surrogate Value Cmts, Ex. 8.
[22] Commerce characterizes this figure as Thailand's net exports for "the POR (2013-
2014)."  *See* Remand Results at 21.  However, this figure is derived from Thailand's
exports and imports for the two years ending March 2013 *and* March 2014.  In other
words, it is the sum of Thailand's *combined* 2013 and 2014 exports (14,426,415
kilograms) minus its combined 2013 and 2014 imports (12,391,106 kilograms).  *See*
Surrogate Country Comments by DJAC (November 12, 2014) ("DJAC Surrogate
Country Cmts"), Ex. 1, RJA 3, PR 180, ECF No. 114.

quantity terms)[23] represent further evidence that Thailand is a significant producer of comparable merchandise.  *See id.* at 22.

## B. Commerce's Redetermination as to Significant Production is Remanded

Neither the statute nor Commerce's regulations define "significant producer."  *See* 19 U.S.C. § 1677b; 19 C.F.R. § 351.408; Policy Bulletin 04.1 at 3. Because the term is undefined and ambiguous, the court must assess whether Commerce's interpretation of significant producer is based on a permissible construction of the statute.  *Chevron,* 467 U.S. at 843; *Apex Frozen Foods Private Ltd. v. United States*, 862 F.3d 1337, 1344 (Fed. Cir. 2017).  Commerce's explanation on remand suggests two measures of significant production: (1) domestic production of identical merchandise; and (2) net exports (by quantity).

Jacobi and CATC each challenge Commerce's reliance on evidence of domestic production as a measure of significant production.  *See* Jacobi Opp'n Cmts at 13-16; CATC Opp'n Cmts at 5-6.  CATC also contends that Commerce has not demonstrated that its reliance on Thailand's net exports is a reasonable interpretation of significant producer.  *See* CATC Opp'n Cmts at 5 ("[T]he fact that Thailand has some production (whether measuring by exports or the unknown financial statement quantity) does not make it a *significant* producer merely because [Commerce] says it is significant. . . .

---

[23] Commerce explains that it prefers to consider quantity because several factors may "distort" value determinations, such as "the relationship between the seller and customer, terms of sale, the volume of specific transactions, or market distortions." Remand Results at 22.  Commerce also notes that the statute directs Commerce to consider "aggregate quantity" and not value when "determining whether a given comparison market is viable."  Remand Results at 22 & n.74 (citing 19 U.S.C. § 1677b(a)(1)(B)(ii)(II)).

[Commerce] may be given a measure of discretion in determining the definition of significant producer, but [its] definition must be reasonable.").

As discussed more fully below, each of Commerce's bases suffer from the same flaw: a lack of reasoning as to why the chosen measures and particular amounts of domestic production or net exports represent significant production.  Without some basis for reviewing Commerce's conclusions, the court is unable to ensure that the agency's interpretation is not "arbitrary, capricious, or manifestly contrary to statute." *Apex Frozen Foods*, 862 F.3d at 1346 (citation omitted); *see also NMB Singapore Ltd. v. United States,* 557 F.3d 1316, 1319 (Fed. Cir. 2009) ("Commerce must explain the basis for its decisions; while its explanations do not have to be perfect, the path of Commerce's decision must be reasonably discernable to a reviewing court.") (citations omitted).  *Cf.* Policy Bulletin 04.1 at 3 (although "fixed standards . . . have not been adopted," the significant producer determination "should be made consistent with the characteristics of world production of, and trade in, comparable merchandise (subject to the availability of data on these characteristics).").

*Domestic Production*

Commerce seeks to ground its determination that domestic production, evidenced by financial statements, constitutes significant production in agency and judicial precedent; *to wit*, Commerce explains that it

> has [] previously stated that, if comparable merchandise is produced, a country qualifies as a producer of comparable merchandise. Therefore, if the record contains evidence of domestic production of comparable merchandise, then this evidence directly addresses the requirement of significant production of comparable merchandise under [19 U.S.C. § 1677b(c)(4)]. Such evidence may include the financial statements of a commercial producer of comparable merchandise in the surrogate country.

Remand Results at 20 & nn. 61-62 (citing *Sebacic Acid from the People's Republic of China*, 62 Fed. Reg. 65,674, 65,676 (Dep't Commerce Dec. 15, 1997) (final results of antidumping admin. review; 1995-1996) ("*Sebacic Acid*"); *Dorbest Ltd. v. United States*, 30 CIT 1671, 1683-84, 462 F. Supp. 2d 1262, 1274 (2006) (upholding the Department's selection of India as a significant producer using the financial statements of Indian companies).  Commerce then identifies the Carbokarn and Gigantic financial statements as evidence of significant production, *see* Remand Results at 20-21, but that finding does not follow from its explanation of legal precedent.

*Sebacic Acid* is an example of Commerce exercising broad discretion to determine what constitutes comparable merchandise for purposes of selecting its primary surrogate country.  *See* 62 Fed. Reg. at 65,676.  While "evidence of domestic production of comparable merchandise" may "directly *address*[] the requirement of significant production," Remand Results at 20 (emphasis added), nothing in Commerce's *Sebacic Acid* ruling suggests that it *fulfills* the requirement without more. Commerce's *Dorbest* citation is also unavailing.  Therein, the court affirmed Commerce's finding that India is a significant producer of merchandise comparable to wooden bedroom furniture (the subject merchandise) on the basis of evidence that included nine Indian surrogate financial statements *in addition to* directories of hundreds of Indian furniture producers and information on the value of Indian furniture output. *See Dorbest*, 30 CIT at 1683, 462 F. Supp. 2d at 1274.  Thus, *Dorbest* does not support Commerce's determination that evidence of domestic production in the form of financial statements, "in and of itself, establishes that Thailand is a significant producer."  *See* Remand Results at 21.

Additionally, Commerce's reference to the Thai Baht value of Gigantic's and Carbokarn's respective sales does not save its determination.  Read in context, Commerce's citation to Gigantic's and Carbokarn's respective sales appears solely to demonstrate the fact of domestic production.  *See* Remand Results at 21 n.65; *id.* at 24 n.83.  Commerce does not explain whether, or why, Gigantic's and Carbokarn's sales are "significant," and has, therefore, failed to articulate a "rational connection between the facts found and the choice made."[24]  *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)).  This omission is important because reliance on evidence of domestic production, without explaining its significance, reads the word "significant" out of the statute.  It is well settled "that a statute must, if possible, be construed in such a fashion that every word has some operative effect."  *United States v. Nordic Village Inc.*, 503 U.S. 30, 36 (1992).  Commerce's discretion to interpret the terms of the antidumping dumping statute does not include the discretion "to interpret them out of existence."  *Hussey Copper, Ltd. v. United States*, 19 CIT 1081, 1084, 895 F. Supp. 311, 314 (quoting *Smith-Corona Group v. United States*, 713 F.2d 1568, 1571 (Fed. Cir. 1983).

Finally, the Government's attempt to rely on Commerce's passing reference to Carbokarn's status as "one of the largest manufacturers of coconut shell based activated carbon in the world market" is unpersuasive.  Gov. Supp. Cmts at 18 (citing, *inter alia*, Remand Results at 37).  Most importantly, Commerce did not rely on

---

[24] Nor does Commerce explain its reliance on Carbokarn's 2010 sales, as opposed to its POR sales.  *See supra* note 21 (noting that Commerce identified Carbokarn's 2010 sales but cited to its 2013 financial statement).

Carbokarn's status, *see* Remand Results at 18-24, and the court may only sustain the agency's decision "on the same basis articulated in the order by the agency itself," *Burlington Truck Lines*, 371 U.S. at 168–69.  Rather, Commerce referenced Carbokarn's status in its response to Jacobi's contention that "Carbokarn's 2013 sales include chemical products," i.e., "non-comparable merchandise."  Remand Results at 37 (internal citation omitted).[25]  Accordingly, record evidence of domestic production in the form of financial statements, absent any discussion of its significance, fails to adequately substantiate Commerce's finding that Thailand is a significant producer.

*Net Exports*

Commerce points to agency policy, legislative history, and judicial precedent to support its consideration of net exports as a measure of significant production.  Remand Results at 21 & nn.67-69 (citing Policy Bulletin 04.1; *Conference Report to the 1988*

---

[25] Commerce points to Carbokarn's status in an apparent attempt to buttress its finding that the company's reference to "chemical products" in its description of its business as the "[m]anufacture, export and import [of] charcoal water filter, charcoal, and chemical products" means activated carbon.  *See* Remand Results at 37; DJAC 2nd Surrogate Value Cmts, Ex. 8.  Commerce's logic is unclear.  Commerce explains that "International Labor Organization and Thai industry statistics categorize a manufacturer of activated carbon" as a "'manufacturer of other chemicals and chemical products.'"  Remand Results at 37 & n.126 (citations omitted).  From there, Commerce contends that "it is reasonable to conclude that while Carbokarn's Financial Statement Submission Form indicates that it is a '(m)anufacture(r), export(er) and import(er of) charcoal water filter, charcoal, and chemical products,' as a manufacturer of activated carbon, the company would also categorize itself as a manufacturer of 'other chemicals.'"  Remand Results at 37 & n.127 (citations omitted).  Commerce's internal and record citations fail to reference a document that supports the agency's proposition.  Moreover, Commerce appears to surmise that because Carbokarn's production of activated carbon would be correctly referenced in the broader categories of charcoal water filter, charcoal and chemical products or other chemicals, these broad categories may be relied upon as representative of the narrower category of activated carbon.  The basis for such an assumption is not explained and, in any case, there is no discussion of why Gigantic's and Carbokarn's particular sales values render the companies' production "significant."

*Omnibus Trade & Competitiveness Act*, H.R. Conf. Rep. No. 576, 590, 100th Cong. 2nd

Sess. (1988), *reprinted in* 134 Cong. Rec. H2031 (daily ed. April 20, 1988); *Calgon*

*Carbon Corp. v. United States*, 40 CIT ___, ___, 190 F. Supp. 3d 1224, 1243, n.25

(2016)).  However, Commerce offers little explanation for its interpretation.[26]

        Commerce's Policy Bulletin 04.1 does explain that when sufficient data from

"major producing countries" is unavailable, "'significant producer' *could* mean a country

that is a net exporter."  Policy Bulletin 04.1 (emphasis added).  This guidance, however,

does not suggest that positive net exports *per se* satisfies the significant producer

criterion.

        The legislative history states that "[t]he term 'significant producer' includes any

country that is a significant net exporter and, if appropriate, Commerce may use a

significant net exporting country in valuing factors."  H.R. CONF. REP. 100-576, 590,

1988 U.S.C.C.A.N. 1547, 1623.  The legislative history does not define "significant net

exporter, *see id.*, but, in any event, Commerce does not characterize Thailand as a

"significant net exporter" and instead relies solely on its status as a net exporter, *see*

Remand Results at 21, 23, 24.

        In *Calgon Carbon*, the court noted that "the legislative history [did] not purport to

create an exhaustive definition of significant producer," and affirmed as reasonable

"Commerce's interpretation of significant producer, which looked to whether the country

---

[26] Commerce does explain that it prefers to rely on quantity rather than value because of certain distortions that may arise when relying on value.  Remand Results at 22. Commerce's reliance on quantity is reasonable, but that does not explain why the existence of net export quantities is a reasonable interpretation of significant producer.

exported comparable merchandise."  190 F. Supp. 3d at 1243 n.25 (citations omitted).[27]

Yet, in *Jacobi (AR7) I*, the court remanded Commerce's significant producer

determination, in part, because the agency had "fail[ed] to persuade that reliance on

total exports, devoid of evidence of influence on world trade, is a permissible method of

interpreting the term '*significant* producer.'"  222 F. Supp. 3d at 1181 (citing *Chevron*,

467 U.S. at 843; *Fresh Garlic*, 121 F. Supp. 3d at 1338-39);[28] *cf. Shandong Rongxin*

*Imp. & Exp. Co. v. United States*, 35 CIT ___, ___, 774 F. Supp. 2d 1307, 1315-16

(2011) (rejecting Commerce's interpretation of significant producer as any subject

merchandise-exporting country because the agency relied on speculation to link exports

---

[27] The *Calgon Carbon* court further noted that Thailand had net exports of activated carbon in the amount of 862,000 kilograms, which was not obviously "insignificant," and total POR exports in the amount of 6,555,094 kilograms.  190 F. Supp. 3d at 1243 n.25 (citations omitted).  However, Commerce's basis for finding Thailand a significant producer in that case rested purely on evidence of exports in any amount.  *See* Final Results of Redetermination Pursuant to Court Remand at 35, Consol. Court No. 14-00326, ECF No. 97 ("We find the fact that a country exports comparable merchandise to other countries to be a strong indication that the country is a significant producer of such merchandise.").

[28] In *Fresh Garlic*, the court opined that

> an interpretation of 'significant producer' countries as those whose domestic production could influence or affect world trade would be a permissible construction of the statute. This follows from the plain meaning of the word 'significant' as something 'having or likely to have influence or effect.' This definition, however, necessarily requires comparing potential surrogate countries' production to world production of the subject merchandise.

121 F. Supp. 3d at 1338–39 (citation omitted), *quoted in Jacobi (AR7) I*, 222 F. Supp. 3d at 1180.  The *Jacobi (AR7) I* court noted that "[a]gency policy is consistent with *Fresh Garlic* []."  222 F. Supp. 3d at 1180 (quoting Policy Bulletin 04.1 at 3) ("[A] judgement [*sic*] should be made consistent with the characteristics of world production of, and trade in, comparable merchandise.")).

to substantial production).  Commerce's citation to *Calgon Carbon* is, therefore,

unpersuasive, and irrelevant to its decision to rely on *net* exports here.[29]

In sum, the court does not hold that the current record does not support a

permissible interpretation of significant producer on the basis of net exports.  But it is

not for the court to infer Commerce's reasons for so finding when they are absent—and,

thus, not "reasonably discernable"—from the determination itself.  *See NMB Singapore*

*Ltd.*, 557 F.3d at 1319-20; *Borusan Mannesmann Boru Sanayi ve Ticaret A.S. v. United*

*States*, 41 CIT ___, ___, 222 F. Supp. 3d 1255, 1267 (2017) ("An agency's

determination [] cannot be sustained on the basis of a rationale supplied after the fact—

whether by the agency's litigation counsel, by another party, *or by the court*.")

(emphasis added) (citations omitted).

Accordingly, the court is remanding Commerce's significant producer

determination for further explanation or reconsideration.  In the event Commerce

continues to rely on evidence of domestic production or net exports, it must explain why,

---

[29] In responding to Jacobi's argument that Commerce should not rely on the financial statements because they lack any indication of quantities sold, the agency asserts that it "considers net exports of 2,035,309 [kilograms] and 472,215,034 Baht in domestic sales to be reflective of the fact that Thailand . . . has a viable activated carbon sector," such that it would supply reliable surrogate values.  Remand Results at 38.  As Jacobi contends, however, "viable" is not the statutory standard, and Commerce's use of the term in this context is unclear.  Jacobi Opp'n Cmts at 16.  Additionally, Commerce's conclusion relies on unexplained temporal discrepancies; its net export value represents the sum of Thailand's 2013 and 2014 combined net exports, and its sales value represents the sum of Gigantic's 2013 sales and Carbokarn's 2010 sales.  *See supra* notes 21, 22.

with substantial supporting evidence, those metrics constitute a permissible
interpretation of <u>significant</u> producer.[30]

## IV.     Surrogate Value Selections

### A. Financial Ratios

In the underlying proceeding, Commerce had before it several options for valuing
financial ratios: (1) 2013 financial statements from Indonesia and the Philippines; (2)
Carbokarn's financial statements for the years 2010, 2011, and 2013; and (3) Gigantic's
2013 financial statement.  I&D Mem. at 12.  For the *Preliminary Results*, Commerce had
relied upon Carbokarn's 2010 financial statement.  *See* Decision Mem. for the Prelim.
Results of Antidumping Duty Admin. Review: Certain Activated Carbon from the
People's Republic of China; 2013-14 ("Prelim. Mem.") at 26, PJA Tab 17, PR 335, ECF
No. 85-3.  Thereafter, DJAC placed Carbokarn's 2011 financial statement on the record.
Second Surrogate Value Submission by Datong Juqiang Activated Carbon Co., Ltd.
(June 2, 2015) ("DJAC 2nd Surrogate Value Submission"), Ex. 1, PJA Tab 27, PR 363,
ECF No. 85-3.  Although DJAC advocated for use of Philippine financial statements,
DJAC argued in the alternative that, should Commerce continue to use Thai data, it
should select Carbokarn's 2011 statement because it is more contemporaneous than
the company's 2010 statement.  I&D Mem. at 11 (summarizing DJAC's arguments).

For the *Final Results*, Commerce rejected the Indonesian and Philippine
statements because those countries did not meet the economic comparability criterion.
*Id.* at 12.  Commerce also rejected Carbokarn's 2013 statement as insufficiently detailed

---

[30] To that end, Commerce must also clarify whether it seeks to rely on Carbokarn's
2010 or 2013 sales, and whether it seeks to rely on two years' worth of net exports or
net exports for the POR.

and Gigantic's 2013 statement because it contained evidence of countervailable

subsidies.  *Id.* at 12-13.  Commerce ultimately selected Carbokarn's 2011 statement to

value financial ratios because it was more contemporaneous with the period of review

than the 2010 statement the agency had preliminarily relied upon.  *Id.* at 13.

      Jacobi contends that Carbokarn's 2011 statement did not support Commerce's

selection of Thailand as the primary surrogate country because it contained evidence of

countervailable subsidies and was not contemporaneous with the POR.  Jacobi Rule

56.2 Mem. at 27-30; Pls.' Reply Brief ("Jacobi Rule 56.2 Reply") at 14-15, ECF No. 81;

*see also* CATC Rule 56.2 Mem. at 7; Pls. Carbon Activated Tianjin Co., Ltd., Jilin Bright

Future Chemicals Company, Ltd., Ningxia Mineral and Chemical Limited, Shanxi DMD

Corporation, Shanxi Industry Technology Trading Co., Ltd., Shanxi Sincere Industrial

Co., Ltd., Tancarb Activated Carbon Co., Ltd., and Tianjin Maijin Industries Co., Ltd.

Reply Br. ("CATC Rule 56.2 Reply") at 9, ECF No. 84.  The Government and

Defendant-Intervenors contend that lack of contemporaneity does not preclude its use

of the Thai financial statement, and Jacobi failed to exhaust administrative remedies

with respect to the argument that Carbokarn's 2011 statement reflects countervailable

subsidies, which also fails on the merits.  Def.'s Resp. to Pls.' Rule 56.2 Mots. for J.

Upon the Agency R. ("Gov. Rule 56.2 Resp.") at 40-43, ECF No. 75; Confidential Def.-

Ints.' Resp. in Opp'n to Consol. Pls.' Mots. for J. on the Agency R. ("Def.-Ints. Rule 56.2

Resp.") at 23-29, ECF No. 73.  The court finds that a remand is required for Commerce

to further explain or reconsider its determination that the Carbokarn 2011 statement

contains no evidence of countervailable subsidies.  Accordingly, the court declines to

reach the issue of Carbokarn's statement's lack of contemporaneity.

### 1.   Countervailable Subsidies

"[T]he Court of International Trade shall, where appropriate, require the

exhaustion of administrative remedies."  28 U.S.C. § 2637(d).  The statute "indicates a

congressional intent that, absent a strong contrary reason, the court should insist that

parties exhaust their remedies before the pertinent administrative agencies."

*Boomerang Tube LLC v. United States*, 856 F.3d 908, 912 (Fed. Cir. 2017) (citation

omitted).  Administrative exhaustion generally requires a party to present all arguments

in its administrative case and rebuttal briefs before raising those issues before this

court.  *See Dorbest Ltd v. United States*, 604 F.3d 1363, 1375 (Fed. Cir. 2010); 19

C.F.R. § 351.309(c)-(d).  This permits the agency to address the issue in the first

instance, prior to judicial review.  *See Boomerang Tube*, 856 F.3d at 912-13 (trial court

erred in declining to require exhaustion and addressing an argument in the first instance

when Commerce changed its data source for calculating constructed value profit

between the preliminary and final determinations pursuant to arguments presented by

the respondent in its case brief, and petitioner had raised only one objection to the new

methodology before the agency but subsequently raised an additional argument before

the trial court); *Vinh Hoan Corp. v. United States*, 40 CIT ___, ___, 179 F. Supp. 3d

1208, 1226 (2016) (exhaustion "allows the agency to apply its expertise, rectify

administrative mistakes, and compile a record adequate for judicial review—advancing

the twin purposes of protecting administrative agency authority and promoting judicial

efficiency") (citation omitted).

In the underlying proceeding, Jacobi asserted generally that Carbokarn

"benefitted from countervailable subsidies."  Jacobi's Case Br. for POR 7 ("Jacobi Case

Br.") at 18 & nn.20-21, PJA 34, PR 381, ECF No. 85-4 (citing, *inter alia*, *Certain Frozen*

*Warmwater Shrimp From Thailand*, 78 Fed. Reg. 50,379 (Dep't of Commerce Aug. 19,

2013) (final neg. countervailing duty determination).   Jacobi then pointed to a line item

in Carbokarn's 2010 financial statement to "confirm[] the basis for suspicion that

Carbokarn benefited from [a] Thai export subsidy." *Id.* at 18-19.   Jacobi did not address

specifically the issue of subsidies in Carbokarn's 2011 statement in its case or rebuttal

briefs even though it was on notice that Commerce may rely on the 2011 statement due

to its placement on the record and DJAC's alternative argument for Commerce's use of

that statement.   *See id.* at 18-19; Jacobi's Rebuttal Br. for POR 7 ("Jacobi Rebuttal

Br."), PJA Tab 36, CJA Tab 6, PR 392, CR 354, ECF No. 85-4; *Boomerang Tube*, 856

F.3d at 913.

      Nevertheless, this is not a situation when the purposes of exhaustion would be

served by a finding that Jacobi has waived its subsidy-related argument with respect to

the 2011 financial statement.   "The determinative question [regarding administrative

exhaustion] is whether Commerce was put on notice of the issue . . . ."   *Trust Chem Co.*

*Ltd. v. United States*, 35 CIT ___, ___, 791 F. Supp. 2d 1257, 1268 & n.27 (2011).

Commerce appeared to understand Jacobi's argument as pertaining to all of

Carbokarn's statements.   *See* I&D Mem. at 9 (referring to Jacobi's argument "that

Carbokarn's financial statement̲s̲ contain evidence of countervailable subsidies")

(emphasis added).   More importantly, Commerce reviewed Carbokarn's 2011 financial

statement for evidence of countervailable subsidies, and made a negative determination

thereto.   *See id.*   Accordingly, the court would not be resolving this issue before the

agency has had the opportunity "to apply its expertise."   *See Vinh Hoan Corp.*, 179 F.

Supp. 3d at 1226.  *Cf. Weishan Hongda Aquatic Food Co., Ltd. v. United States*, 41 CIT

___, ___, 273 F. Supp. 3d 1279, 1287-88 (2017) (addressing only those objections to

the use of certain financial data that "Commerce had notice of and an opportunity to

address," and declining to address arguments that had not been presented to the

agency).[31]

As to the merits of Commerce's determination, the agency has "discretion to

avoid using prices if it has determined that subsidization occurred with respect to those

price or cost values."  I&D Mem. at 9 & n.30 (citation omitted); *see also* 19 U.S.C.

§ 1677b(c)(5)(2015) (affording Commerce discretion to reject surrogate values "without

further investigation if [it] has determined that broadly available export subsidies existed

or particular instances of subsidization occurred with respect to those [surrogate

values]").[32]  *Cf. DuPont Teijin Films v. United States*, 37 CIT ___, ___, 896 F. Supp. 2d

1302, 1311-12 (2013) (sustaining Commerce's decision to reject financial statements

when specific line items reflected receipt of countervailable subsidies).   However, "[t]he

Supreme Court has 'frequently reiterated that an agency must cogently explain why it

has exercised its discretion in a given manner . . . .'"  *Allied Pac. Food (Dalian) Co. Ltd.*

---

[31] There are exceptions to the requirement of exhaustion, which may be applied at the
court's discretion, however, none are applicable here.  For the reasons discussed, the
court declines to require further exhaustion of this issue.

[32] Section 1677b(c)(5) came into effect during the pendency of the underlying
administrative proceeding.  *See Dates of Application of Amendments to the
Antidumping and Countervailing Duty Laws Made by the Trade Preferences Extension
Act of 2015*, 80 Fed. Reg. 46,793, 46,795 (Dep't Commerce Aug. 6, 2015) (clarifying
that § 1677b(c)(5) applies "to determinations made on or after August 6, 2015").  The
codification of Commerce's discretion to reject subsidy-tainted financial statements is
not determinative, however, because the provision simply "clarifies [Commerce's]
authority for its existing practice, and does not impose any new requirements on the
parties to [antidumping] proceedings."  *Id.*

*v. United States*, 30 CIT 735, 758, 435 F. Supp. 2d 1295, 1314 (2006) (quoting *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 48).  Commerce has not done so here.

In the Issues and Decision Memorandum, Commerce explained that it "it is our practice not to reject financial statements based on the grounds that the company received export subsidies unless we have previously found the specific export subsidy program to be countervailable," and asserted that Jacobi failed to "cite or identify any specific subsidy program related to the financial statements which the [agency] has previously found to be countervailable."  I&D Mem. at 9 & nn.32-33 (citations omitted). Jacobi, however, expressly pointed to Commerce's *Frozen Warmwater Shrimp from Thailand* determination, wherein Commerce "found that the receipt of tax coupons is . . . countervailable."  *See* Issues and Decision Mem., C-549-828 (Aug. 12, 2013), accompanying *Frozen Warmwater Shrimp from Thailand* ("*Frozen Warmwater Shrimp from Thailand*, I&D Mem.") at 6; Jacobi Case Br. at 18 & n.21.  Moreover, Carbokarn's 2011 statement reflected an amount for "Tax coupon receivables."  DJAC 2nd Surrogate Value Submission, Ex. 1.  Commerce's conclusory assertion that Carbokarn's 2011 statement "contain[s] no evidence of countervailable subsidies" fails to apprise the court of the agency's reasons for concluding that Carbokarn's entry for "[t]ax coupon receivables" bears no relation to the tax coupon program Commerce determined to be countervailable in *Frozen Warmwater Shrimp from Thailand*.  *See NMB Singapore Ltd.*, 557 F.3d at 1319.  The court is, therefore, unable to ascertain whether Commerce reasonably exercised its discretion in this area.  *See* 19 U.S.C. § 1677b(c)(5)(2015); *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 48.

Defendant-Intervenors' assertion that the tax coupon program countervailed in *Frozen Warmwater Shrimp from Thailand* is specific to the shrimp industry lacks merit. *See* Def.-Ints. Rule 56.2 Resp. at 26.  Nothing in Commerce's determination suggests that the tax coupon program is industry-specific.  *See Frozen Warmwater Shrimp from Thailand*, I&D Mem. at 6-7.[33]  Accordingly, Commerce's determination to rely on Carbokarn's 2011 financial statement to value financial ratios is remanded for reconsideration and further explanation as to whether the financial statement reflects the receipt of countervailable subsidies or otherwise provides suitable surrogate financial data.

## 2. Contemporaneity

Jacobi asserts that Commerce's reliance on the 2011 Carbokarn financial statement lacks substantial evidence because the record contained POR-contemporaneous Philippine financial statements.  Jacobi Rule 56.2 Mem. at 30. Commerce declined to consider those statements because the Philippines had failed to satisfy the economic comparability criterion *and* because it found that it had "complete, audited, publicly available," and "*otherwise suitable*" data "from the primary surrogate country."  *See* I&D Mem. at 12-13 (emphasis added); *see also id.* at 12 & n.43 (reiterating Commerce's "practice" of using data from a secondary surrogate country

---

[33] Commerce explained that, pursuant to the tax coupon program, the Thai government "provides tax coupons to exporters equal to a certain percentage of the [free on board] value of their exports," the purpose of which "is to refund import duties paid for the imported raw materials and other inputs used in the production of exported goods." *Frozen Warmwater Shrimp from Thailand*, I&D Mem. at 6 (footnote citations omitted). "[T]he program is designed to act as a duty drawback or remission within the meaning of 19 CFR [§] 351.519," and "[e]xporters can use the tax coupons to pay other taxes and duties."  *Id.* (footnote citation omitted); *see also* 19 C.F.R. § 351.519 (governing the "[r]emission or drawback of import charges upon export").

only when "data from the primary surrogate country are unavailable or unreliable")

(citation omitted).  As discussed above, the "suitability" of the 2011 Carbokarn

statement remains an open question due to the potential presence of countervailable

subsidies and Thailand's unresolved status as a significant producer.  Accordingly, the

court cannot assess whether Commerce reasonably selected the Thai statement

notwithstanding its lack of POR-contemporaneity and disregarded contemporaneous

statements from a less economically comparable country.  On remand, Commerce may

choose to reevaluate the relative merits of each proposed source of financial ratios.[34]

## B. Carbonized Material

Commerce was presented with five possible surrogate values to value Jacobi's

carbonized material:[35]

> (1) GTA data for Thai HS 4402.90.10000 "of Coconut Shell"; (2) GTA data
> for Thai HS 4402.90.90090 "Wood Charcoal (Including Shell Or Nut
> Charcoal), Excluding That Of Bamboo: Other"; (3) *Cocommunity* coconut
> shell charcoal price data from the Philippines; (4) *Cocommunity* coconut
> shell charcoal price data from Indonesia; [and] (5) GTA data for
> Indonesian HS 4402.90.9000.

I&D Mem. at 25.  Commerce disregarded Philippine and Indonesian data because it

was not from the primary surrogate country or a country at the same level of economic

development as China, and Commerce believed it had "useable" data from the primary

---

[34] Likewise, the court declines to resolve Jacobi's argument that the greater number of
Philippine financial statements favored the use of Philippine data to value financial
ratios as compared to the sole Thai statement.  Jacobi Rule 56.2 Mem. at 24-26.
Jacobi's argument presumes the usability of each data source, which, as discussed,
remains an open question.  *See id.* at 24 ("[E]ven if the court were to conclude that this
single Thai financial statement was somehow usable, Commerce's conclusion would
still be unsupported by the evidentiary record because the evidentiary record contained
*multiple* usable Philippine financial statements.").
[35] "Carbonized material is a charred, intermediate input used in the production of
activated carbon."  Def.-Ints. Rule 56.2 Resp. at 34 n.18.

surrogate country.  *Id.* Commerce also disregarded Thai GTA data for wood charcoal

because Jacobi does not use wood-based charcoal in the production of activated

carbon.  *Id.*  Commerce, therefore, selected Thai HS 4402.90.10000 to value

carbonized material because it was more specific to Jacobi's input.  *Id.* at 25-26.

Commerce declined to examine the Thai import value for possible aberrancy on the

basis that parties had not supplied appropriate benchmark data.[36]  *Id.* at 26-27.

Jacobi contends that Commerce should have compared the Thai and Philippine

data to select the surrogate value that yields the most accurate dumping margin.  Jacobi

Rule 56.2 Mem. at 32-33; Jacobi Rule 56.2 Reply at 16-17.  Jacobi further contends that

Commerce's surrogate value selection was unreasonable because it was contrary to the

agency's past reliance on Philippine *Cocommunity* data, and the Thai value is unreliable

and aberrantly high.  Jacobi Rule 56.2 Mem. at 34-44;[37] Jacobi Rule 56.2 Reply at 15-

16, 19-22; *see also* CATC Rule 56.2 Mem. at 8-9, 17-18.  CATC echoes Jacobi's

concerns about the unreliability of Thai import data on the basis that Thai customs

officials increase the entered values of imported goods.  CATC Rule 56.2 Mem. at 10-

18; CATC Rule 56.2 Reply at 11-12.  The Government contends that Commerce need

not consider Philippine surrogate value data unless parties demonstrate the lack of

suitable data from economically comparable countries, and the Thai data is not aberrant

or unreliable.  Gov. Rule 56.2 Resp. at 46-53.  Defendant-Intervenors contend that Thai

---

[36] A benchmark is "a product whose price roughly correlates with the price of an input assigned a surrogate value."  *Blue Field (Sichuan) Food Indus. Co., Ltd. v. United States*, 37 CIT ___, ___, 949 F. Supp. 2d 1311, 1317 (2013).
[37] In particular, Jacobi refers to Commerce's selection of *Cocommunity* data to value carbonized material in the fifth and sixth administrative reviews of this proceeding. Jacobi Rule 56.2 Mem. at 38-39 (citations omitted).

import data was the best available information to value carbonized material, and

Jacobi's arguments regarding use of Philippine data impermissibly invite the court to

reweigh the evidence.  Def.-Ints. Rule 56.2 Resp. at 35-44.

As an initial matter, "each administrative review is a separate exercise of

Commerce's authority that allows for different conclusions based on different facts in the

record."  *Jiaxing Brother*, 822 F.3d at 1299 (quoting *Qingdao Sea-Line Trading Co. Ltd.*

*v. United States*, 766 F.3d 1378, 1387 (Fed. Cir. 2014)).  Thus, Commerce's previous

reliance on Philippine *Cocommunity* data to value carbonized material, without more,

does not undermine Commerce's selection of Thai data in this segment of the

proceeding.  Unlike in prior reviews, here, Commerce no longer considers the

Philippines to be at the same level of economic development as the PRC.  *See, e.g.*,

Remand Results at 15-18.  Accordingly, this is not a situation where Commerce has

failed to articulate reasons for treating similar situations in a dissimilar manner.  *See,*

*e.g.*, *SKF USA Inc. v. United States*, 263 F.3d 1369, 1382 (Fed. Cir. 2001) ("[A]n

agency action is arbitrary when the agency offer[s] insufficient reasons for treating

similar situations differently.") (first alteration added) (citation omitted).

As to the reliability of the Thai value, Jacobi points to several annual reports by

the U.S. Trade Representative expressing its concerns regarding "the significant

discretionary authority exercised by [Thai] Customs Department officials . . . to arbitrarily

increase the customs values of imports."  Jacobi Rule 56.2 Mem. at 40 (citation

omitted); *see also* CATC Rule 56.2 Mem. at 10-11.  CATC points to the FedEx Country

Report on Thailand stating that Thai Customs "keeps records of the highest declared

price of [imported] products," which will be used to determine the customs value instead

of the transaction value, and to Commerce's own statements regarding concerns of

U.S. companies and government officials regarding Thai Customs' practices.  CATC

Rule 56.2 Mem. at 12-13 (citations omitted).  At the administrative level, Commerce

responded to these arguments saying that although the reports speak to "the general

state of Thai customs practice, [CATC] has pointed to no evidence on the record which

demonstrates that the specific [surrogate values] relied on . . . are the result of the

alleged Thai Customs practices."  I&D Mem. at 8.

     The court has addressed challenges to Commerce's selection of Thai import data

in several other cases.  Although each recognized the relevance of the reports to the

reliability of Thai import values, none remanded Commerce's surrogate value or

surrogate country determination on the basis of the reports.  *See Elkay Mfg. Co. v.*

*United States*, 40 CIT ___, ___, 180 F. Supp. 3d 1245, 1254-55 (2016), *aff'd sub*

*nom. Guangdong Dongyuan Kitchenware Indus. Co. v. Elkay Mfg. Co.*, 702 F. App'x

981 (Fed. Cir. 2017) (although "evidence of manipulation was relevant to the question of

the reliability of the Thai data," it did not "establish that Thai Customs import values are

affected generally, and significantly, by the [identified] practice," and, thus, did not

"foreclose [Commerce's] use of Thai import data"; Commerce reasonably "weigh[ed] the

superior specificity of the Thai import data . . . against other factors" before concluding

"that the Thai data were the best available information"); *Calgon Carbon,* 190 F. Supp.

3d at 1235 (the cited report is "evidence of manipulation" but "without more, the general

concerns noted in the report" do not undermine Commerce's surrogate value selection);

*Yingqing v. United States*, 41 CIT ___, ___, 195 F. Supp. 3d 1299, 1306-07 (2016)

(following *Elkay Mfg.* and explaining that Thai import data were "more specific to Plaintiffs' reported experience than Ukrainian and Philippine data").

The U.S. Trade Representative's concerns about possible upwards manipulation of Thai customs values are relevant to the inquiry regarding the reliability and potential aberrancy of Thai import values.  However, as noted in the prior opinions cited above, without more, the reports do not sufficiently detract from Commerce's selection of a particular surrogate value (or Thailand as the primary surrogate country) so as to find it unsupported by substantial evidence.  In contrast to those cases, however, that "something more" appears to exist in this case—at least so much so as to require further inquiry by Commerce than occurred here.  Although the concerns expressed in the trade reports do not form the sole basis of the court's remand of this issue, they support the need for a remand for Commerce to further explain its benchmarking methodology or reconsider its refusal to use Philippine and Indonesian data to test for aberrancy in light of indications that the Thai value is unusually high.

In the underlying administrative proceeding, Jacobi argued that the Thai import value is aberrant as compared to the surrogate values used in the past six administrative reviews; particularly, the fifth and sixth administrative reviews (respectively, "AR5" and "AR6").  Jacobi Case Br. at 48; Jacobi Rebuttal Br. at 5-6 & n.9 (citing Jacobi's Rebuttal Surrogate Value Comments (Dec. 9, 2014) ("Jacobi Surrogate Value Rebuttal"), Ex. SVR-5, PJA Tab 11, PR 240-41 (surrogate value spreadsheets for the past six reviews)).[38]  In response, Commerce explained that

---

[38] In the instant litigation, Jacobi also contends that the Thai import value is aberrant on the basis that most of the imports into Thailand under HS 4402.90.10000 are from France, and "it is common knowledge that coconuts are not grown in France."  Jacobi

> [w]ith respect to benchmarking, the [agency] examines historical import
> data for the potential surrogate countries for a given case, to the extent
> such import data is available, and/or examines data from the same HS
> category for the primary surrogate country over multiple years to
> determine if the current data appear aberrational compared to historical
> values.  Merely appearing on the low or high end of a range of values is
> not enough to make data aberrational.

I&D Mem. at 26 (footnote citations omitted).  Because the record lacked Commerce's

preferred benchmarking data, it declined to undertake any inquiry.  I&D Mem. at 26-27

(declining to consider Philippine data relied upon in past reviews or the Philippine and

Indonesian data proposed in the instant review because those "countries are not as

economically comparable to the PRC").

Commerce is required to calculate antidumping duty margins "as accurately as

possible, and to use the best information available to it in doing so."  *Lasko Metal Prod.,*

---

Rule 56.2 Mem. at 43.  Jacobi urges the court to take judicial notice of the fact that
coconuts are not native to France.  *See id.* (recognizing that "it is not possible to point to
a specific written sentence somewhere on the evidentiary record that explicitly makes
this point").

The court previously denied Jacobi's motion to supplement the administrative
record to add information regarding French imports into Thailand.  *See Jacobi (AR7) I*,
222 F. Supp. 3d at 1194-95.  Additionally, the Government is correct that Jacobi failed
to exhaust its administrative argument about the lack of French production of coconuts
before the agency.  *See* Gov. Rule 56.2 Resp. at 54.  Jacobi first raised this argument in
its rebuttal brief to the agency, which is insufficient.  *See* 19 C.F.R. § 351.309(d) ("The
rebuttal brief may respond only to arguments raised in case briefs . . . . "); *Qingdao*, 766
F.3d at 1388 ("Commerce regulations require the presentation of all issues and
arguments in a party's case brief.").  In any event, Jacobi has not shown that judicial
notice is merited.  "The court may judicially notice a fact that is not subject to reasonable
dispute because it . . . is generally known within the trial court's territorial jurisdiction; or .
. . can be accurately and readily determined from sources whose accuracy cannot
reasonably be questioned."  Fed. R. Evid. 201(b); *see also* 28 U.S.C. § 2641 (stating
that the Federal Rules of Evidence apply to all civil actions, with certain exceptions not
relevant here, in the U.S. Court of International Trade).  Beyond the conclusory
assertion that it is a "basic geographic fact that coconuts are not native to France,"
Jacobi has not made any showing pursuant to Rule 201(b).  The court therefore denies
Jacobi's request.  Accordingly, the court will not further address this aspect of Jacobi's
argument.

*Inc. v. United States*, 43 F.3d 1442, 1443 (Fed. Cir. 1994).  To that end, "[w]hen

confronted with a colorable claim that the data that Commerce is considering is

aberrational, Commerce must examine the data and provide a reasoned explanation as

to why the data it chooses is reliable and non-distortive." *Mittal Steel Galati S.A. v.

United States*, 31 CIT 1121, 1135, 502 F. Supp. 2d 1295, 1308 (2007) (citation omitted).

The $1,146.60/MT average unit value of coconut shell charcoal imports into Thailand

during the period of review and relied upon by Commerce appears to be beyond the

high end of any range before Commerce for this input.  *See* Jacobi Case Br. at 48 &

n.87 (citing Second Surrogate Value Submission by Datong Juqiang Activated Carbon

Co., Ltd. (March 31, 2015) ("DJAC 2nd Surrogate Value Submission"), Ex. 2A, PJA Tab

15, PR 322, ECF No. 85-3 (supplying the Thai import value Commerce relied upon in

the instant review)); I&D Mem. at 25 & n.96 (citing same); Jacobi Surrogate Value

Rebuttal, Ex. SVR-5 (supplying the average source values for carbonized material

selected in AR6 and AR5, which were, respectively, $346.25/MT and $391.67/MT).

Those values are roughly consistent with the Philippine and Indonesian values placed

on the record as potential surrogate values for the instant review, which were,

respectively, $343/MT and $355.25/MT.  Jacobi's Surrogate Value Comments (Nov. 18,

2014), Ex. SV-4 at ECF p. 244, PJA Tab 9, PR 195-205, ECF No. 85-2 (supplying the

Philippine POR-average price); *id.* at ECF pp. 279-638 (supplying Indonesian domestic

prices for each POR-month, from which the average price of $355.25/MT is derived).

The Thai value is, thus, more than three times the average of the Philippine values

selected in AR5 and AR6 and the Philippine and Indonesian values suggested as

surrogate values in AR7.[39]

Commerce dismissed this data for benchmarking purposes on the basis that the

Philippines and Indonesia "are not as economically comparable to the PRC."  I&D Mem.

at 26-27.  However, Commerce's reason for disregarding the proffered benchmarks has

been regularly rejected by the court.  *See Juancheng Kangtai*, 2015 WL 4999476, at

*22 (lack of economic comparability is an insufficient reason for disregarding data to test

for aberrancy); *CS Wind Vietnam Co., Ltd. v. United States*, 38 CIT ___, ___, 971 F.

Supp. 2d 1271, 1280 (2014) (data from non-economically comparable countries are

relevant to test for aberrancy in import values, particularly when imports into the

surrogate country are from non-economically comparable countries); *Xinjiamei Furniture

(Zhangzhou) Co., Ltd. v. United States*, Slip Op. 13-30, 2013 WL 920276, at *6 (CIT

March 11, 2013) (rejecting Commerce's argument that export data from non-

economically comparable countries were inappropriate benchmarks; although "the

prices might not satisfy the requirements for surrogate values, they are sufficient to call

into question the reliability of the [import] data"); *Peer Bearing Co.-Changshan v. United*

---

[39] The Government's assertion that appearing "at the high or low end of a range of values does not render that data aberrational" is unpersuasive.  Gov. Rule 56.2 Resp. at 50 (citing I&D Mem. at 26; *Camau Frozen Seafood Processing Imp. Exp. Corp. v. United States*, 37 CIT ___, ___, 929 F. Supp. 2d 1352, 1356 n.9 (2013)); s*ee also Camau*, 929 F. Supp. 2d 1356 n.9 (Bangladeshi labor data was not aberrant when it occupied "the lowest price in a range of prices" and comparison prices "form a nearly straight line continuum from the Bangladeshi data on the low end to the Philippine . . . data on the high end").  *Cf. Elkay Mfg.*, 180 F. Supp. 3d at 1252 (Thai data was not aberrant when it was the highest ($3.61) in a range of six other values from $2.10 to $3.21).  In contrast to the ranges reflected in *Camau* and *Elkay Mfg.*, here, the Thai import value is roughly three times the proffered benchmark values, all of which were similar.

*States*, 35 CIT ___, ___, 752 F. Supp. 2d 1353, 1372 (2011) (rejecting the

Government's argument that U.S. data was unhelpful for benchmarking purposes and

noting that it corroborated information from economically comparable countries that also

suggested the selected value was aberrational);[40] *Clearon Corp. v. United States*, Slip

Op. 15-91, 2015 WL 4978995, at *7 (CIT Aug. 20, 2015) (stating that Commerce has

failed to adequately explain its chosen benchmarks, and data from countries not on

Commerce's surrogate country list may be useful for benchmarking purposes).

Like these other cases, the court is unable to discern Commerce's rationale for

limiting its benchmarking inquiry to historical data from potential surrogate countries—

i.e., those countries it considers *presently* to be at the same level of economic

development as China.  *See* I&D Mem. at 26.  Commerce noted in the Remand Results

that its list of potential surrogate countries is subject to annual change based on

changes to China's *per capita* GNI.  *See* Remand Results at 10.[41]  Thus, historical data

---

[40] On remand, Commerce initially declined to recalculate the surrogate value and instead applied adverse facts available.  *Peer Bearing Co.-Changshan v. United States*, 36 CIT ___, ___, 853 F. Supp. 2d 1365, 1370 (2012).  The CIT remanded again, and, on remand, Commerce, under protest, selected the relevant surrogate value from a different economically comparable country, which it noted was "considerably closer in value to the benchmark value established by U.S. import data."  *Peer Bearing Co.-Changshan v. United States*, Slip Op. 13-116, 2013 WL 4615134, at *4 (CIT Aug, 30, 2013), *vacated on other grounds*, 766 F.3d 1396 (Fed. Cir. 2014) (holding that the CIT erred in remanding Commerce's application of facts available with an adverse inference).

[41] The changeability of Commerce's list of potential surrogate countries is also demonstrated by changes Commerce made to the list in the underlying proceeding when it determined to rely on 2013 GNI data instead of 2012 GNI data.  *Compare* Request for Surrogate Country and Surrogate Value Comments and Information (July 25, 2014) ("Commerce SC Letter"), Attach. 1, PJA Tab 43, PR 64, ECF No. 85-4 (initially listing South Africa, Colombia, Bulgaria, Thailand, Ecuador, and Indonesia as economically comparable countries on the basis of 2012 data), *with* Prelim. Mem. at 14-15 (preliminarily determining that Bulgaria, Ecuador, Romania, South Africa, Thailand, and Ukraine as economically comparable on the basis of 2013 data).

from a current potential surrogate country may derive from a time when that country

was *not* at the same level of economic development as the PRC.  Commerce provides

no explanation why such data, in its view, might be a useful benchmark, while historical

data from a country that Commerce then considered to be at the same level of

economic development as the PRC may not be considered for benchmarking purposes

simply because the country is, at present, no longer at the same level of economic

development.

Further, economic comparability and, thus, the usefulness of proffered

benchmarks, is a matter of degree.  *See Calgon Carbon*, 190 F. Supp. 3d at 1234

(Commerce reasonably declined to use U.S. data as a benchmark when the United

States' GNI is almost ten times higher than China's); *Blue Field (Sichuan),* 949 F. Supp.

2d at 1317 (noting that benchmarks need not derive from economically comparable

countries, but may "become less informative" depending on the degree of economic

difference between the countries).  Here, Commerce dismissed benchmark data *not*

because the countries are *not* economically comparable to the PRC, but because they

"are not *as* economically comparable to the PRC" as the countries on OP's list.  I&D

Mem. at 27; *see also* Remand Results at 17 (noting that "the Philippines is *less*

[economically] comparable to the PRC . . . relative to the six other countries" on the

surrogate country list) (emphasis added).  Commerce's conclusory dismissal of such

proposed benchmark data "misreads the statute, which directs Commerce to value

factors of production using the best available information from countries at a level of

economic development comparable to that of China," but "does not prohibit Commerce

from considering, for corroboration purposes, record evidence consisting of prices for a

commodity in a market economy country when determining which information from countries at a level of economic development comparable to China is the best available information." *Peer Bearing Co.-Changshan*, 752 F. Supp. 2d at 1372 (citing 19 U.S.C. § 1677b(c)(1),(4)).

Accordingly, this issue is remanded for Commerce to reconsider or further explain its position with respect to the proposed benchmarks and, if appropriate, to reconsider its surrogate value selection in light of the proposed benchmark data.[42]  If, on remand, Commerce concludes that the Thai value is aberrational, the agency should, consistent with its practice, consider "all relevant price information on the record, including any appropriate benchmark data, . . . to accurately value the input in question."  I&D Mem. at 26.  Such "relevant price information" may, therefore, include data from countries not on the surrogate country list.  *See Mittal Steel*, 31 CIT at 1135, 502 F. Supp. 2d at 1308 ("If the Filipino data which meets Commerce's surrogate criteria nonetheless proves to be unusable, or demonstrably aberrational, Commerce should examine data sources that it has outside of those from the surrogate countries."); Policy Bulletin 04.1 (explaining that Commerce's policy is to rely on data from less economically comparable countries only when none of the countries on OP's surrogate country list supply suitable data).[43]

---

[42] The court notes that Commerce has discretion to reopen the record for the purpose of examining the Thai value for aberrancy.  *See Essar Steel Ltd. v. United States*, 678 F.3d 1268, 1278 (Fed. Cir. 2012) ("The decision to reopen the record is best left to the agency, in this case Commerce.").

[43] As noted above, Jacobi separately argues that Commerce failed to compare the Thai and Philippine data sets to determine which of the two values for carbonized material yielded the most accurate dumping margin.  Jacobi Rule 56.2 Mem. at 32-33 (citing, *inter alia*, *Clearon Corp.*, 2015 WL 4978995, at *4).  *Clearon Corp.* addressed Commerce's evaluation of data considerations as part of its surrogate country selection

## V.     Irrecoverable VAT

### A.  The *Final Results* and Court's Review Thereof

In the Issues and Decision Memorandum, Commerce explained that

> [i]n a typical VAT system, companies do not incur VAT expense for
> exports; they receive on export a full rebate of the VAT they pay on
> purchases of inputs used in the production of exports ("input VAT"), and,
> in the case of domestic sales, the company can credit the [input VAT]
> against the VAT they collect from customers ["output VAT"].

I&D Mem. at 16.  In the PRC, however, "some portion of the input VAT that a company

pays on purchases of inputs used in the production of exports is not refunded."  *Id.*

Commerce referred to this unrefunded input VAT as "irrecoverable VAT."  *See id.* at 16-

17.  Commerce further explained that its adjustment for irrecoverable VAT consists of

two steps: "(1) determining the irrecoverable VAT on subject merchandise, and (2)

reducing U.S. price by the amount determined in step one."  *Id*. at 17.  Step one

consists of applying "(1) the FOB ['free on board'] value of the exported good . . . to the

difference between (2) the standard VAT levy rate and (3) the VAT rebate rate

applicable to exported goods."  *Id*.  "The first variable, export value, is unique to each

_____

methodology, not the selection of a particular surrogate value.  2015 WL 4978995, at
*4-5.  The court opined that when "the party proposing a non-listed country" as the
primary surrogate country "demonstrat[es] that no country on the surrogate country list
provides the scope of 'quality' data that [Commerce] requires in order to make a primary
surrogate country selection," the agency "must consider the quality of the data" from the
non-listed country relative to its "economic disparity."  *Id.*  To the extent that *Clearon
Corp.*'s instruction applies to surrogate value selection, the court defers the issue of
whether Commerce must compare or otherwise consider the Philippine *Cocommunity*
data as a *surrogate value* pending Commerce's reconsideration of the potential
aberrancy of the chosen Thai value.  *See Mittal Steel*, 31 CIT at 1135, 502 F. Supp. 2d
at 1308 (Commerce should consider data not from countries on the surrogate country
list when its chosen data is "demonstrably aberrational").

respondent while the rates in (2) and (3), as well as the formula for determining

irrecoverable VAT, are each explicitly set forth in Chinese law and regulations." *Id*.

In step one, Commerce "determined the irrecoverable VAT on subject

merchandise by first determining the amount of tax levied on inputs and raw materials

(used in the production of exports)." *Id*.  In other words, Commerce defined the

"standard VAT levy rate" by way of reference to the input VAT rate.  Because the PRC

levied a 17 percent VAT on inputs and raw materials used in the production of activated

carbon, for which there was no export rebate, Commerce concluded that "the

irrecoverable rate is equal to the full VAT percentage." *Id*.; *see also* Jacobi's Suppl.

Sect. C Resp. (Oct. 21, 2014) ("Jacobi Suppl. SCQR"), Ex. SC-54,[44] CJA Tab 2, CR

124, 133, RJA Tab 2, PR 157-58, ECF Nos. 86,114; Jacobi Suppl. SCQR, Ex. SC-55.[45]

With regard to step two, when Jacobi's entered values were less than an "estimated

customs value,"[46] Commerce decided to apply the irrecoverable VAT rate to the

"estimated customs value as the best proxy for an FOB China port value."  I&D Mem. at

18.

DJAC proposed, and Commerce rejected, a calculation methodology based on

"VAT paid on the sale of its product, not a VAT rebate on inputs."  *Id.* at 20 & n.80 (citing

---

[44] Exhibit SC-54 consists of an Order of the President of the PRC regarding the
application of VAT regulations to foreign enterprise.  Jacobi Suppl. SCQR, Ex. SC-54.
Pursuant thereto, the purchase of domestic or imported goods incurs 17 percent VAT.
*See* Jacobi Suppl. SCQR, Ex. SC-54 (Arts. 1, 2(1)).
[45] Exhibit SC-55 consists of a June 19, 2007 Circular of the Ministry of Finance and the
State Administration of Taxation of the People's Republic of China on Adjusting the Tax-
refund Rate for Some Export Commodities.  *See* Jacobi Suppl. SCQR, Ex. SC-55.  It
explains that activated carbon is ineligible for an export rebate.  *See id.*
[46] Commerce defined "estimated customs value" as an "ex-factory net U.S. price plus
foreign movement expenses."  I&D Mem. at 18.

Jacobi Suppl. SCQR, Ex. SC-56);[47] *see also id.* at 15 (summarizing DJAC's proposal).[48]

Commerce reasoned that the "irrecoverable VAT adjustment does not entail deducting

VAT paid on the sale of activated carbon, but rather the portion of VAT paid on inputs to

produce activated carbon that is not rebated by the PRC Government." *Id.* at 20.

DJAC's proposal relied on "a form of sales tax" that applies when the finished goods are

ineligible "for a VAT rebate upon exportation" and foreign sales of which are therefore

treated as domestic sales. *Id.* at 20 & nn.82-83 (citing Jacobi Suppl. SCQR at 28-30,

Ex. SC-56).

In briefing their original Rule 56.2 motions, Plaintiffs argued that Commerce

lacked authority to deduct irrecoverable VAT from Jacobi's CEP because it is not a

statutory "export tax or other charge," and Commerce's method of calculating the VAT

adjustment was not supported by substantial evidence. *See, e.g.*, Jacobi Rule 56.2

Mem. at 44-45; CATC Rule 56.2 Mem. at 18. As to Plaintiffs' substantial evidence

arguments, Jacobi challenged Commerce's application of the VAT adjustment to an

---

[47] Exhibit SC-56 consists of a "Notice from the State Administration of Taxation of the People's Republic of China Concerning the Refund (Exemption) of Tax of Exported Commodities" issued on July 12, 2006. *See* Jacobi Suppl. SCQR, Ex. SC-56. The notice states that exported goods that are ineligible for a refund or exemption of VAT will incur an "output tax payable" which "shall be calculated by regarding them as domestically sold goods or they shall be subject to value added tax." *Id.* Chinese law permits sellers of domestic goods to offset the input VAT incurred from the output VAT collected before remitting any payable tax amount to the Chinese government. *See id.*, Ex. SC-54 (Art. 4).

[48] At oral argument, the Government explained that DJAC's proposal entailed calculating the amount of VAT already included in its FOB value, rather than calculating an amount based on a rate applied to its FOB value. For example, a FOB value of $1,000 consists of $145.30 in VAT in addition to a sales price of $854.70; i.e., 854.70 multiplied by 0.17 equals 145.30, and 854.70 plus 145.30 equals 1,000. According to DJAC, therefore, Commerce should have used the lower figure of $854.70 as the base upon which it calculated VAT. *See* Oral Arg. at 5:45-8:21 (reflecting a time stamp from the recording).

estimated customs value rather than its entered values.  Jacobi Rule 56.2 Mem. at 45,

47-55.  CATC challenged Commerce's application of the VAT adjustment to Jacobi's

U.S. price, and not the lesser cost of the raw materials upon which Jacobi paid VAT.

CATC Rule 56.2 Mem. at 21-22.

    In *Jacobi (AR7) I*, the court found that the relevant statutory phrase was

ambiguous and Commerce properly may adjust for irrecoverable VAT.  222 F. Supp. 3d

at 1186-88.  The court concluded that Commerce could reasonably determine that an

input VAT that is unrefunded by reason of the finished product's exportation constituted,

at the very least, an "other charge" that is "imposed by the exporting country on the

exportation of the subject merchandise" because it remains recoverable (as a credit or

offset against output VAT) until the product is exported.  222 F. Supp. 3d at 1186-87;

*accord Fushun Jinly Petrochem. Carbon Co., Ltd. v. United States*, Slip Op 16-25, 2016

WL 1170876, at *11 (CIT Mar. 23, 2016); *Juancheng Kangtai Chem. Co., Ltd. v. United

States*, Slip Op. 17-3, 2017 WL 218910, at *12 (CIT Jan. 19, 2017); *Aristocraft of Am.,

LLC v. United States*, 41 CIT ___, ___, 269 F. Supp. 3d 1316, 1324-25 (2017); *but see

China Mfrs. Alliance, LLC v. United States*, 41 CIT ___, ___, 205 F. Supp. 3d 1325,

1346 (2017) (remanding because Commerce had failed to make a specific factual

finding regarding the "amount" of the "export tax, duty, or other charge" imposed by the

PRC as required by statute).[49]  The court further found that Commerce's determination

---

[49] The recent decision in *Quingdao Qihang Tyre Co., Ltd. v. United States*, Slip Op. 18-
35, 2018 WL 1635920 (CIT Apr. 4, 2018), holding that the statute is unambiguous and
does not permit Commerce to adjust for irrecoverable VAT does not lead the court to re-
examine this holding.  The holding in *Qingdao Qihang Tyre* was premised on its
understanding that Commerce was applying the export tax, duty or other charge
language to a domestic tax.  As discussed herein, in this case, Commerce is adjusting

with regard to the unreliability of Jacobi's entered values and its application of the VAT

adjustment to an estimated customs value was supported by substantial evidence.

*Jacobi (AR7) I*, 222 F. Supp. 3d at 1190-92.  The court, however, remanded

Commerce's VAT calculation because it was not supported by substantial evidence.  *Id.*

at 1192-94.  The court pointed to Commerce's identification of the irrecoverable VAT as

unrefunded "VAT paid on inputs and raw materials (used in the production of exports),"

*id.* at 1193 (citing I&D Mem. at 16-17, 20), and reasoned that Commerce's calculation of

irrecoverable VAT on the basis of the price of the finished good potentially overstated

the adjustment, *id.* at 1193-94.

## B. Commerce's Redetermination

On remand, Commerce again defined irrecoverable VAT as "VAT paid on inputs

used in the production of exports that is non-refundable."  Remand Results at 25.  It

framed the issue on remand as "the percentage of irrecoverable VAT included in

Jacobi's selling price to the United States," and "clarif[ied] that the amount of [input] VAT

that Jaocbi actually paid to the PRC . . . is irrelevant to [its] margin calculations."  *Id.* at

26; *see also id.* at 26-27 (noting that Commerce "is concerned with deducting the

amount of *irrecoverable* VAT *which was actually included in the selling price* of activated

carbon to the United States").

To that end, Commerce stated that Chinese law requires Jacobi to pay 17

percent VAT on inputs and exempts sales of activated carbon from any VAT rebate.  *Id.*

at 27 & nn.94-95 (citations omitted).  According to Commerce, however, the "input VAT

---

for an output VAT charged on the exportation of the merchandise.  *Qingdao Qihang
Tyre* is, therefore, distinguishable.

rate in itself ha[d] no bearing on [Commerce's] margin calculation, and . . . [was] *not* the

basis for why [it] adjusted U.S. price in the margin calculation program for Jacobi." *Id.* at

27.  Rather, Commerce now stated that it made the adjustment on the basis of the 17

percent *output* VAT included in Jacobi's U.S. price.  *Id.* at 27.  Commerce noted that

"Jacobi . . . reported that as a seller/exporter, the products it resells to domestic or

foreign buyers are subject to 17 percent [output] VAT, which is applied to its sales and

is included in the selling price to the United States."  *Id.* at 27 & nn.96-97 (citing Jacobi

Suppl. SCQR, Ex. SC-56).  The 17 percent "'output VAT' . . .  is included in Jacobi's

U.S. prices, and constitutes the 17 percent adjustment [Commerce] made to Jacobi's

margin calculation."  *Id.* at 27; *see also id.* at 28 (noting that Commerce "deducted the

entire 17 percent (irrecoverable VAT) from the U.S. price to arrive at a [tax neutral] U.S.

net price").  Jacobi now contends that Commerce has failed to address the court's

concerns.  Jacobi Opp'n Cmts at 18-19.

### C. Commerce's Redetermination as to the Irrecoverable VAT Adjustment is Remanded

For the reasons discussed below, the court is compelled to remand again the

VAT adjustment to Commerce so that the agency may reconsider the record evidence

and apply a methodology that is consistent both with the record evidence and with U.S.

law.  The Remand Results currently under review do not reasonably support the

application of the methodology as it is explained by the agency.

Commerce's revised explanation for its irrecoverable VAT adjustment differs in a

material respect from the explanation offered in support of the *Final Results*.  In the

Issues and Decision Memorandum, Commerce explained its irrecoverable VAT

calculation by way of reference to the 17 percent <u>input VAT</u> and the absence of an

export rebate; in the Remand Results, while Commerce continued to define

irrecoverable VAT in terms of the input VAT, it explained its methodology for adjusting

for irrecoverable VAT by reference to, and as based upon, the 17 percent <u>output VAT</u>

applicable to Jacobi's U.S. sales.  *Compare* I&D Mem. at 17, *with* Remand Results at

27-28.[50]  At oral argument, the court afforded the Government an opportunity to

reconcile this inconsistency; the Government did not and the court cannot provide such

a reconciliation for the agency.

    The statute permits Commerce to deduct from CEP "[1] the amount, if included in

such price, of [2] any export tax, duty, or other charge imposed by the exporting country

on the exportation of the subject merchandise to the United States."  19 U.S.C.

§ 1677a(c)(2)(B).  Commerce's redetermination relied on evidence that Jacobi's U.S.

price includes <u>output VAT</u>.  *See* Remand Results at 27.  In so doing, Commerce's

inconsistent explanations introduced uncertainty as to whether the adjustment is

intended to account for an unrefunded <u>input VAT</u> imposed on exported goods that could

be understood as an "other charge," or instead, an output VAT collected on these

exports by application of Chinese law, which could be considered an "export tax" under

U.S. law.  *See* 19 U.S.C. § 1677a(c)(2)(B); *Methodological Change*, 77 Fed. Reg. at

36,482 (providing for adjustments on the basis of "an export tax *or* VAT that is not fully

refunded upon exportation") (emphasis added); *Jacobi (AR7) I*, 222 F. Supp. 3d at

---

[50] In so doing, Commerce relied on the same law cited by DJAC as the basis for its adjustment.  *See* I&D Mem. at 15 & n.56 (citing Jacobi Suppl. SCQR, Ex. SC-56); *id.* at 20 n.80 (citing same); Remand Results at 27 n.96 (citing same).  The agency's calculation differs, however, in that it calculated the VAT adjustment by applying the 17 percent rate to the total U.S. price, Remand Results at 28, whereas DJAC proposed determining the adjustment on the basis of U.S. price minus an amount for output VAT, *supra* note 48.

1186-87.  Understanding the basis for Commerce's adjustment is crucial to the court's

ability to review the agency's determination.

For that reason, at oral argument, the court asked the Government to clarify the

statutory basis for the adjustment; in other words, to reconcile its calculation

methodology with its theory underlying the irrecoverable VAT adjustment.  *See, e.g.*,

Oral Arg. at 1:57:00-2:00:14 (inquiring whether the absence of a rebate for exported

activated carbon means that the adjustment accounts for a 17 percent export tax

corresponding to the output VAT as opposed to irrecoverable VAT corresponding to

unrefunded input VAT).[51]  The Government responded that the *Methodological Change*

contemplates irrecoverable input and output VAT; that neither were rebated in this case;

and that, therefore, both are included in Jacobi's U.S. price.  Oral Arg. at 2:00:15-

2:02:44).  The Government's response failed to reconcile the inconsistencies in the

Issues and Decision Memorandum and the Remand Results or otherwise clarify

Commerce's determination on the basis of the facts in this particular case.  The court

remands Commerce's redetermination for reconsideration or further explanation in

accordance with this discussion.  Commerce must also address the following issues on

remand:

To the extent that Commerce continues to justify the adjustment as accounting

for irrecoverable VAT defined as unrefunded input VAT, Commerce must address

record evidence demonstrating that Jacobi, in fact, recovers the input VAT it incurs by

---

[51] This discussion occurred during the portion of the argument dedicated to the Rule
56.2 motions filed regarding Commerce's determination in the eighth administrative
review of this proceeding (Consol. Court No. 16-185).  However, the Government stated
that there are no material differences regarding its VAT calculations between the
seventh and eighth administrative reviews.  Oral Arg. at 1:56:37-1:56:51.

the offset it takes before remitting the output VAT it collects.  *See* Jacobi Suppl. SCQR, Ex. SC-54; *id.*, Ex. SC-58, Suppl. Conf. RJA, CR 109, 119, ECF No. 119-1.  Commerce has contrasted the PRC's VAT regime with the "typical VAT system," in which companies can offset input VAT against VAT collected from its customers.  *See* Remand Results at 25-26.  The agency must, therefore, address this evidence suggesting Jacobi's ability to offset input VAT against output VAT collected from foreign customers, suggesting that the input VAT is not, in fact, irrecoverable.[52]  In addition, Commerce must explain why the amount of the export tax, duty, or other charge is properly determined on the basis of the FOB price of the output (or the estimated customs value) rather than the value of the inputs (or some other approach that seeks to determine the amount of input VAT actually paid to the PRC).

On the other hand, if Commerce asserts that the adjustment is based on an export tax due to Jacobi's collection of output VAT, Commerce must (a) address the

---

[52] Commerce noted that the "adjustment is not intended to account for the difference between Jacobi's VAT payments on input products to the PRC tax authority and output VAT payments Jacobi receives for its sales of activated carbon."  Remand Results at 28.  The court understands that § 1677a(c)(2)(B) permits adjustments on the basis of an amount of an "export tax, duty, or other charge" included in U.S. price, *see* 19 U.S.C. § 1677a(c)(2)(B), and that Jacobi's ability to offset its input VAT against its output VAT payable is not necessarily dispositive of whether any VAT is included in its U.S. price. Nevertheless, Commerce's treatment of Jacobi's particular VAT situation appears inconsistent with its characterization of irrecoverable VAT; *to wit*, Commerce's assertion that the "portion of the input VAT [that] . . . is not refunded" represents "a tax, duty or other charge imposed on exports that is *not imposed on domestic sales* (i.e., irrecoverable VAT)," Remand Results at 26, overlooks the fact that sales of activated carbon are ineligible for an export rebate and are, therefore, *treated as domestic sales*, Jacobi Suppl. SCQR, Ex. SC-56.  This fact appears to distinguish this case from certain others before the court.  *See Qingdao Qihang Tyre,* 2018 WL 1635920, at *4 (discussed *supra* note 49); *Aristocraft*, 269 F. Supp. 3d at 1324; *China Mfrs. Alliance*, 205 F. Supp. 3d at 1345; *Juancheng Kangtai*, 2017 WL 218910, at *13.  Accordingly, Commerce's second redetermination must address, with citations to substantial supporting evidence, why Jacobi's particular VAT situation merits the irrecoverable VAT adjustment.

record evidence regarding Jacobi's offset for input VAT paid on inputs taken against the output VAT collected, and (b) explain why the VAT adjustment is properly made on the basis of an estimated customs value instead of the FOB value on which the PRC assesses it.  In *Jacobi (AR7) I*, the court concluded that Commerce's reliance on an estimated customs value was reasonable and supported by substantial evidence.  222 F. Supp. 3d at 1191-92.[53]   While there may be legitimate questions about Jacobi's entered values, the adjustment, by definition, relates to "the <u>amount</u> . . . of any export tax, duty or other charge <u>imposed by</u>" the PRC on the exportation of the subject merchandise, 19 USC § 1677a(c)(2)(B) (emphasis added), and Commerce, in the *Methodological Change*, found that it "can measure a transfer of funds between [the PRC] and companies therein, regardless of the direction the money flows," and that because the "taxes [are] affirmatively imposed [by China, Commerce] presume[s] that they are also collected."  77 Fed. Reg. at 36,483.  Thus, if Commerce continues to disregard Jacobi's FOB values, it must explain why the reliability of Jacobi's entered values is pertinent when Commerce is attempting to determine the export VAT "imposed by" the PRC.  While an artificially low FOB value might lead Chinese authorities to impose lower taxes than are otherwise appropriate, Commerce must explain its basis for taking account of any such under-collection by China in the calculation of the antidumping duty margin.

Finally, consistent with its discussion of "included in the price" in the *Methodological Change*, 77 Fed. Reg. at 36,483, Commerce must address whether it is

---

[53] The court is free to reconsider its conclusion on this issue pending Commerce's second redetermination.  *See* USCIT Rule 54(b).

using gross or net prices to calculate the adjustment and, in so doing, address the evidentiary support for rejecting DJAC's proposed calculation methodology.

### CONCLUSION

In accordance with the foregoing, it is hereby

**ORDERED** that Commerce's *Final Results* are sustained with respect to the issue of economic comparability, as set forth in Discussion Section II above; it is further

**ORDERED** that Commerce's *Final Results* are remanded to further address the issue of significant production, as set forth in Discussion Section III above; it is further

**ORDERED** that Commerce's *Final Results* are remanded with respect to its surrogate value selections, as set forth in Discussion Section IV above; it is further

**ORDERED** that Commerce's *Final Results* are remanded to further address the issue of irrecoverable VAT, as set forth in Discussion Section V above; it is further

**ORDERED** that, in the event Commerce amends the antidumping margin assigned to Jacobi, Commerce reconsider the separate rate assigned to non-mandatory respondents; it is further

**ORDERED** that Commerce shall file its second remand results on or before July 18, 2018; it is further

**ORDERED** that the deadlines provided in USCIT Rule 56.2(h) shall govern thereafter; and it is further

**ORDERED** that any opposition or supportive comments must not exceed 6,000

words.


/s/      Mark A. Barnett
Mark A. Barnett, Judge

Dated:  April 19, 2018
         New York, New York