Slip Op. 19-27

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| JACOBI CARBONS AB AND JACOBI CARBONS, INC., <br>         Plaintiffs, <br><br> and <br><br> NINGXIA HUAHUI ACTIVATED CARBON CO., LTD., et al., <br>         Plaintiff-Intervenors, <br><br>    v. <br><br> UNITED STATES, <br>         Defendant, <br><br> and <br><br> CALGON CARBON CORP. AND CABOT NORIT AM., INC., <br>         Defendant-Intervenors. | Before: Mark A. Barnett, Judge <br> Consol. Court No. 15-00286 |

## OPINION AND ORDER

[The U.S. Department of Commerce's Second Remand Results are remanded with respect to the agency's surrogate country selection and sustained with respect to the agency's value-added tax adjustment.]

Dated:  March 4, 2019

Daniel L. Porter and Tung A. Nguyen, Curtis, Mallet-Prevost, Colt & Mosle LLP, of Washington, DC, for Plaintiffs Jacobi Carbons AB and Jacobi Carbons, Inc.

Gregory S. Menegaz, J. Kevin Horgan, and Alexandra H. Salzman, DeKieffer & Horgan, PLLC, of Washington, DC, for Plaintiff-Intervenors Carbon Activated Tianjin Co., Ltd., Jilin Bright Future Chemicals Co., Ltd., Ningxia Mineral and Chemical Ltd., Shanxi DMD Corp., Shanxi Industry Technology Trading Co., Ltd., Shanxi Sincere Industrial Co., Ltd., Tancarb Activated Carbon Co., Ltd., and Tianjin Maijin Industries Co., Ltd.

Antonia R. Soares, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, for Defendant United States.  With her on the brief were Joseph H. Hunt, Assistant Attorney General, Jeanne E. Davidson, Director, and Reginald T. Blades, Jr., Assistant Director.  Of counsel on the brief was Emma T. Hunter, Attorney, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, DC.

David A. Hartquist, R. Alan Luberda, John M. Herrmann, Melissa M. Brewer, and Kathleen M. Cusack, Kelley Drye & Warren LLP, of Washington, DC, for Defendant-Intervenors Calgon Carbon Corp. and Cabot Norit Americas, Inc.

Barnett, Judge:  This matter is before the court following the U.S. Department of Commerce's ("Commerce" or "the agency") second redetermination upon remand in this case.  See Final Results of Redetermination Pursuant to Court Remand ("2nd Remand Results"), ECF No. 133-1.

Plaintiffs Jacobi Carbons AB and Jacobi Carbons, Inc. (together, "Jacobi") and Plaintiff-Intervenors[1] (collectively, with Jacobi, "Plaintiffs") initiated these consolidated cases challenging several aspects of Commerce's final results in the seventh administrative review ("AR7") of the antidumping duty order on certain activated carbon from the People's Republic of China ("PRC" or "China").  See Certain Activated Carbon from the People's Republic of China, 80 Fed. Reg. 61,172 (Dep't Commerce Oct. 9,

---

[1] Plaintiff-Intervenors include: Ningxia Huahui Activated Carbon Co., Ltd. ("Huahui"); Carbon Activated Tianjin Co., Ltd., Jilin Bright Future Chemicals Company, Ltd., Ningxia Mineral and Chemical Limited, Shanxi DMD Corporation, Shanxi Industry Technology Trading Co., Ltd., Shanxi Sincere Industrial Co., Ltd., Tancarb Activated Co., Ltd., and Tianjin Maijin Industries Co., Ltd. (collectively, "CATC"); and Ningxia Guanghua Cherishmet Activated Carbon Co., Ltd., Beijing Pacific Activated Carbon Products Co., Ltd., Cherishmet Inc., and Datong Municipal Yunguang Activated Carbon Co., Ltd., (collectively, "Cherishmet").  The court consolidated cases filed by Huahui, CATC, and Cherishmet under lead Court No. 15-00286, filed by Jacobi.  See Order (Dec. 16, 2015), ECF No. 39.  Those parties had also intervened in this case.  See Order (Oct. 26, 2015), ECF No. 22; Order (Nov. 17, 2015), ECF No. 28; Order (Nov. 20, 2015), ECF No.33.  Accordingly, the court refers to those parties as "Plaintiff-Intervenors."

2015) (final results of antidumping duty admin. review; 2013-2014) ("*Final Results*"),

ECF No. 37-3, and accompanying Issues and Decision Mem., A-570-904 (Oct. 2, 2015)

("I&D Mem."), ECF No. 37-4.[2]  Plaintiffs challenged Commerce's (1) selection of

Thailand as the primary surrogate country, (2) selection of Thai surrogate values to

value financial ratios and carbonized material, and (3) reduction of Jacobi's constructed

export price ("CEP") by an amount for irrecoverable value added tax ("VAT").  *See, e.g.*,

Confidential Pls. Jacobi Carbons AB and Jacobi Carbons, Inc.'s Mot. for J. on the

Agency R. and Pls.' Br. in Supp. of their Mot. for J. on the Agency R. ("Jacobi Rule 56.2

Mem."), ECF No. 51.

On April 7, 2017, the court remanded Commerce's surrogate country selection

(specifically, its determinations regarding economic comparability generally and

significant production of comparable merchandise by Thailand in particular); sustained

Commerce's authority to deduct irrecoverable VAT from CEP while remanding its

calculation methodology as lacking substantial evidence; and deferred resolving

Plaintiffs' arguments regarding Thai surrogate values pending the results of

Commerce's remand redetermination.  *See Jacobi Carbons AB v. United States*

("*Jacobi (AR7) I*"), 41 CIT ___, 222 F. Supp. 3d 1159 (2017).

---

[2] The administrative record filed in connection with the *Final Results* is divided into a
Public Administrative Record ("PR"), ECF No. 37-1, and a Confidential Administrative
Record ("CR"), ECF No. 37-2.  The administrative record associated with the 2nd
Remand Results is contained in a Public Remand Record ("PRR"), ECF No. 134-3, and
a Confidential Remand Record, ECF No. 134-2.  Parties submitted public and
confidential joint appendices containing record documents cited in their briefs on the
2nd Remand Results.  *See* Public J.A. to Parties' Comments on Second Remand
Redetermination ("PRJA"), ECF No. 141; Confidential J.A. to Parties' Comments on
Second Remand Redetermination ("CRJA"), ECF No. 142.

On August 10, 2017, Commerce filed its first remand redetermination.  *See* Final

Results of Redetermination Pursuant to Court Remand ("1st Remand Results"), ECF

No. 105–1.  Following briefing and oral argument, on April 19, 2018, the court sustained

Commerce's economic comparability determination but again remanded the agency's

determination that Thailand is a significant producer of comparable merchandise and

irrecoverable VAT adjustment, as well as its surrogate value selections for financial

ratios and carbonized material.  *See Jacobi Carbons AB v. United States* ("*Jacobi (AR7)*

*II*"), 42 CIT ___, 313 F. Supp. 3d 1308 (2018).[3]

On October 24, 2018, Commerce filed its second remand redetermination.

Therein, Commerce affirmed its determination that Thailand is a significant producer of

comparable merchandise and its selection of Thai import data as the surrogate value for

carbonized material.  2nd Remand Results at 3-8, 15-20.  Commerce selected a

different Thai source to value financial ratios and reconsidered the basis for its VAT

adjustment while continuing to adjust Jacobi's constructed export price for VAT.  *See id.*

at 9-15, 20-32.  Commerce's redetermination increased Jacobi's weighted-average

dumping margin from $1.05 per kilogram to $1.76 per kilogram.  *See id.* at 53-54; *Final*

*Results*, 80 Fed. Reg. at 61,174.  Commerce assigned Jacobi's rate to the non-

individually-examined respondents eligible for a separate rate.  *See* 2nd Remand

Results 53-54.

Jacobi and CATC filed comments opposing the 2nd Remand Results.  *See* Pls.'

Comments on Commerce's Second Remand Determination ("Jacobi's Opp'n Cmts."),

---

[3] The court's opinions in *Jacobi (AR7) I* and *Jacobi (AR7) II* present background
information on this case, familiarity with which is presumed.

ECF No. 138; Consol. Pls. Carbon Activated Tianjin Co., Ltd., Jilin Bright Future

Chemicals Company, Ltd., Ningxia Mineral and Chemical Limited, Shanxi DMD

Corporation, Shanxi Industry Technology Trading Co., Ltd., Shanxi Sincere Industrial

Co., Ltd., Tancarb Activated Carbon Co., Ltd., and Tianjin Maijin Industries Co., Ltd.

Comments in Opp'n to U.S. Department of Commerce's Second Remand

Redetermination ("CATC's Opp'n Cmts."), ECF No. 137.  Defendant United States ("the

Government") and Defendant–Intervenors Calgon Carbon Corp. and Cabot Norit

Americas, Inc. ("Calgon") filed comments in support of the 2nd Remand Results.

*See* Def.'s Reply to Pls.' and Consol. Pls.' Respective Comments on the Second

Remand Redetermination ("Def.'s Reply Cmts."), ECF No. 140; Def.–Ints.' Comments in

Supp. of the Department of Commerce's Remand Redetermination ("Def–Ints.' Reply

Cmts."), ECF No. 139.

For the following reasons, the court remands Commerce's determination that

Thailand is a significant producer of comparable merchandise and directs Commerce to

reconsider its selection of a primary surrogate country.  Because Commerce relied on

its preference to use data from the primary surrogate country as a basis for selecting

the challenged surrogate values, *see* 2nd Remand Results at 13, 19, the court also

remands Commerce's surrogate value selections.  The court sustains Commerce's VAT

adjustment.

## JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction pursuant to § 516A(a)(2)(B)(iii) of the Tariff Act of 1930,

as amended, 19 U.S.C. § 1516a(a)(2)(B)(iii) (2012),[4] and 28 U.S.C. § 1581(c).

_____

[4] All further citations to the Tariff Act of 1930, as amended, are to Title 19 of the U.S.

The court will uphold an agency determination that is supported by substantial

evidence and otherwise in accordance with law.  19 U.S.C. § 1516a(b)(1)(B)(i).  The

court's review of Commerce's interpretation and implementation of a statutory scheme

is guided by *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S.

837 (1984).  *See Apex Frozen Foods Private Ltd. v. United States,* 862 F.3d 1322, 1329

(Fed. Cir. 2017).  First, the court must determine "whether Congress has directly spoken

to the precise question at issue."  *Id.* (quoting *Chevron,* 467 U.S. at 842).  If Congress's

intent is clear, "that is the end of the matter," and the court "must give effect to the

unambiguously expressed intent of Congress."  *Id.* (quoting *Chevron,* 467 U.S. at 842-

43).  Only "if the statute is silent or ambiguous," must the court determine whether the

agency's action "is based on a permissible construction of the statute."  *Id.* (quoting

*Chevron,* 467 U.S. at 843).  Additionally, "[t]he results of a redetermination pursuant to

court remand are also reviewed for compliance with the court's remand order."

*SolarWorld Ams., Inc. v. United States*, 41 CIT ___, ___, 273 F. Supp. 3d 1314, 1317

(2017) (internal quotation marks and citation omitted).

## DISCUSSION

I.    **Significant Producer of Comparable Merchandise**

   A. **Legal Framework**

An antidumping duty is "the amount by which the normal value exceeds the

export price (or the constructed export price) for the merchandise."  19 U.S.C. § 1673.

---

Code, and all references to the U.S. Code are to the 2012 edition, unless otherwise
stated.

When an antidumping duty proceeding involves a nonmarket economy country,

Commerce determines normal value by valuing the factors of production[5] in a surrogate

country, *see id.* § 1677b(c)(1), and those values are referred to as "surrogate values."

In selecting surrogate values, Commerce must use "the best available information" that

is, "to the extent possible," from a market economy country or countries that are

economically comparable to the nonmarket economy country and are "significant

producers of comparable merchandise." *Id.* § 1677b(c)(1), (4).  Commerce generally

values all factors of production in a single surrogate country.[6]

Commerce has adopted a four-step approach to selecting a primary surrogate

country.  Pursuant thereto:

> (1) the Office of Policy ("OP") assembles a list of potential surrogate
> countries that are at a comparable level of economic development to the
> [non-market economy] country; (2) Commerce identifies countries from the
> list with producers of comparable merchandise; (3) Commerce determines
> whether any of the countries which produce comparable merchandise are
> significant producers of that comparable merchandise; and (4) if more
> than one country satisfies steps (1)–(3), Commerce will select the country
> with the best factors data.

*Jiaxing Brother Fastener Co., Ltd. v. United States*, 822 F.3d 1289, 1293 (Fed. Cir.

2016) (citation omitted); *see also* Import Admin., U.S. Dep't of Commerce, Non-Market

Economy Surrogate Country Selection Process, Policy Bulletin 04.1 (2004), *available at*

---

[5] The factors of production include, but are not limited to: "(A) hours of labor required,
(B) quantities of raw materials employed, (C) amounts of energy and other utilities
consumed, and (D) representative capital cost, including depreciation."  19 U.S.C.
§ 1677b(c)(3).
[6] *See* 19 C.F.R. § 351.408(c)(2) (excepting labor).  *But see Antidumping Methodologies
in Proceedings Involving Non-Market Economies: Valuing the Factor of Production:
Labor*, 76 Fed. Reg. 36,092 (Dep't Commerce June 21, 2011) (expressing a preference
to value labor based on industry-specific labor rates from the primary surrogate
country).

http://enforcement.trade.gov/policy/bull04–1.html (last visited Feb. 27, 2019) ("Policy

Bulletin 04.1").

　　　Neither the statute nor Commerce's regulations define "significant

producer."  *See* 19 U.S.C. § 1677b; 19 C.F.R. § 351.408.  However, in its Policy Bulletin

04.1, Commerce described its practice for evaluating significant producing countries:

> [t]he extent to which a country is a *significant* producer should not be
> judged against the [subject non-market economy] country's production
> level or the comparative production of the five or six countries [that are
> considered potential surrogate countries].  Instead, a judgement [*sic*]
> should be made consistent with the characteristics of world production of,
> and trade in, comparable merchandise (subject to the availability of data
> on these characteristics).  Since these characteristics are specific to the
> merchandise in question, the standard for "significant producer" will vary
> from case to case.  For example, if . . . there are ten large producers and a
> variety of small producers, "significant producer" could be interpreted to
> mean one of the top ten. If, in the example above, there is also a middle-
> size group of producers, then "significant producer" could be interpreted
> as one of the top ten or middle group.  In another case, there may not be
> adequate data available from major producing countries.  In such a case,
> "significant producer" could mean a country that is a net exporter, even
> though the selected surrogate country may not be one of the world's top
> producers.

Policy Bulletin 04.1 at 3.  Because the term "significant producer" is otherwise undefined

and ambiguous, the court must assess whether Commerce's interpretation of significant

producer in this case is based on a permissible construction of the statute.  *Chevron*,

467 U.S. at 843; *Apex Frozen Foods*, 862 F.3d at 1329.  To effectuate judicial review,

Commerce must provide "a reasoned analysis or explanation for [its] decision" so the

court may "determine whether a particular decision is arbitrary, capricious, or an abuse

of discretion."  *Thai I-Mei Frozen Foods Co., Ltd. v. United States*, 616 F.3d 1300, 1304

(Fed. Cir. 2010) (citation omitted).

**B.  Commerce's Interpretation of "Significant Producer" in This Proceeding**

The 2nd Remand Results reflect Commerce's third effort to justify its

determination that Thailand is a significant producer of comparable merchandise.  In the

Issues and Decision Memorandum, Commerce identified Thailand as a significant

producer based on its total activated carbon export quantity.  I&D Mem. at 7.  The court

held that reliance on total exports without evidence that those exports influenced global

trade in activated carbon was not a permissible method of interpreting the term

"significant producer" or, thus, identifying significant producer countries.  *Jacobi (AR7) I*,

222 F. Supp. 3d at 1181 (citing *Chevron*, 467 U.S. at 843; *Fresh Garlic Producers Ass'n*

*v. United States*, 39 CIT ___, ___, 121 F. Supp. 3d 1313, 1338-39 (2015)).[7]  Pointing to

evidence that "Thailand's proportion of 2013 global exports . . . was just 1.4 [percent]

including the PRC[] and 2.6 [percent] excluding the PRC," the court concluded that

"Commerce has not explained the significance of Thailand's contribution to global

exports sufficiently well so as to enable the court to conclude that its determination that

Thailand is a 'significant producer' is supported by substantial evidence."  *Id.* at 1181

(citations omitted).  The court also rejected the Government's *post hoc* reliance on

Thailand's ranking of ninth out of twenty-seven activated carbon exporting countries

_____

[7] In *Fresh Garlic*, the court opined that

an interpretation of 'significant producer' countries as those whose
domestic production could influence or affect world trade would be a
permissible construction of the statute.  This follows from the plain
meaning of the word 'significant' as something 'having or likely to have
influence or effect.'  This definition, however, necessarily requires
comparing potential surrogate countries' production to world production of
the subject merchandise.

121 F. Supp. 3d at 1338–39 (citation omitted), *quoted in Jacobi (AR7) I*, 222 F. Supp.
3d at 1180.

absent evidence regarding "the significance of that ranking in terms of its effect on
global trade." *Id.* at 1181-82 (noting that "the top five exporters . . . collectively account
for more than 90 [percent] of global exports" and, "[t]hereafter, listed countries
contribute relatively little to global exports").

In its first remand redetermination, Commerce sought to rely on financial
statements from two Thai manufacturers of activated carbon evidencing some domestic
production of comparable merchandise and Thailand's net export quantity to conclude
that Thailand is a significant producer of comparable merchandise.  1st Remand
Results at 21-22.  The court rejected Commerce's first basis—domestic production—
because it lacked any analysis as to whether—or why—the amounts were significant,
thereby reading the word "significant" out of the statute.  *Jacobi (AR7) II*, 313 F. Supp.
3d at 1326.  The court further faulted Commerce's attempt to rely on net exports.  *Id.* at
1327-28.  While noting that "the court does not hold that the current record does not
support a permissible interpretation of significant producer on the basis of net exports,"
the court could not discern Commerce's reasons for so finding.  *Id.* at 1328.  Rather,
Commerce appeared to assume that net exports *per se* satisfied the significant
producer criterion, *see* 1st Remand Results at 21-22, which was contrary to
Commerce's internal guidance explaining that "'significant producer' *could* mean a
country that is a net exporter," Policy Bulletin 04.1 at 3 (emphasis added), and
legislative history indicating that "[t]he term 'significant producer' includes any country
that is a *significant* net exporter," H.R. Rep. No. 100–576, at 590 (1988) (Conf. Rep.),
*reprinted in* 1988 U.S.C.C.A.N. 1547, 1623 (emphasis added).

In its second remand redetermination, Commerce explained that it does not

measure the significance of a country's production according to whether that production

influences or effects world trade (or is likely to do so).  2nd Remand Results at 5-6.

Commerce instead interprets "significant" as meaning "a noticeably or measurably large

amount."  *Id.* at 6.  As a substitute for production, Commerce again relied on Thailand's

total export quantity and net export quantity, as well as Thailand's ranking as the ninth

largest global exporter of activated carbon among 24 reporting countries and Thailand's

ranking as the largest global exporter of activated carbon among the countries

Commerce considers to be at the same level of economic development as China.  *See*

*id.* at 5-8.

## C.  Parties' Contentions

Jacobi contends that Commerce has adopted an impermissible interpretation of

the term "significant" and has failed to point to substantial record evidence that Thailand

is a significant producer of the subject merchandise.  Jacobi's Opp'n Cmts. at 5-10.

Jacobi notes that the court has already rejected Commerce's reliance on Thailand's

total export ranking and asserts that Commerce has added nothing new to its analysis.

*Id.* at 8.  Jacobi also contends that Commerce's reliance on Thailand's export ranking

among the economically comparable countries is contrary to Commerce's internal policy

guidance.  *Id.*

CATC likewise contends that Commerce's redetermination "add[s] essentially

nothing" to the agency's prior analysis.  CATC's Opp'n Cmts. at 5; *see also id.* at 5-7.

CATC further contends that Commerce's interpretation of "significant" is "unreasonably

subjective."  *Id.* at 7.  According to CATC, Commerce's selection of a primary surrogate

country in this proceeding reflects a failure to consider the purpose of the analysis, which is to "find reliable surrogate country data that most accurately represents the purchasing and production situation of [Jacobi]." *Id.* at 8-9.

The Government and Calgon contend that Commerce has adopted a permissible construction of the term "significant" and its findings are supported by substantial evidence. Def.'s Reply Cmts. at 3-8; Def.-Ints.' Reply Cmts. at 8-11. They each point to *Juancheng Kangtai Chem. Co., Ltd. v. United States*, Slip Op. 17-3, 2017 WL 218910, at *4 (CIT Jan. 19, 2017), as support for Commerce's interpretation of "significant" as a "noticeably or measurably large amount." *See* Def.'s Reply Cmts. at 3-4; Def.-Ints.' Reply Cmts. at 9.

### D. Commerce's Determination is Remanded for Reconsideration

Upon consideration of the agency's second remand redetermination and the briefing to the court, Commerce's finding that Thailand is a significant producer must be remanded. Commerce has effectively divorced the term "significant" from the term "production" and applied its definition of "significant" without the context necessary to ensure that its determination is not arbitrary. Commerce has not supplied the court with a well-reasoned explanation supporting its consideration of total or net exports as a substitute for production. Overall, the agency has failed to interpret or apply the statutory criterion in its entirety and has not supported its determination that Thailand is a significant producer with substantial evidence.

With respect to total exports, Commerce asserted that the statute "does not require [the agency] to seek the largest overall global exporter in order to find significant production; it only requires a reasonable finding that a country's exports are significant."

2nd Remand Results at 6-7 & n.27 (citing 19 U.S.C. § 1677b(c)(4)(B)).  For this to be

reasonable, Commerce must explain why exports are a permissible substitute for

domestic production and substantiate the significance of a country's exports, taking into

account the record before it, including information that fairly detracts from the agency's

finding. [8]  Commerce did not do so.[9]

Commerce characterized Thailand's total export quantity as "noticeably or

measurably large."  2nd Remand Results at 35; *see also id.* at 37.  Commerce is within

its discretion to adopt that definition of "significant."  *See Juancheng Kangtai*, 2017 WL

218910, at *4 (holding that Commerce's corresponding interpretation of the term

"significant" merited *Chevron* deference).  Nevertheless, Commerce must supply the

court with some basis for reviewing the *application* of its chosen interpretation to the

factual record, so the court can ensure that Commerce's determination is not arbitrary.

*See, e.g.*, *Thai I-Mei Frozen Foods Co.*, 616 F.3d at 1304.  Numbers are not "large" or

---

[8]  As noted, the statute's legislative history and Commerce's internal guidance speak to the use of net exports—not total exports—as a potential measure of the significance of production.  H.R. Rep. 100–576, at 590; Policy Bulletin 04.1 at 3.  The use of net exports provides at least some assurance that a country's exports do not consist entirely of transshipped imports.

[9] Regarding its use of exports as a proxy for domestic production, Commerce cited to its use of total exports in an unrelated proceeding involving certain oil country tubular goods ("OCTG") from the Socialist Republic of Vietnam.  *See* 2nd Remand Results at 7 & n.28 (citing, *inter alia*, Decision Mem. for the Prelim. Results of Antidumping Duty Admin. Review, A-552-817 (Oct. 5, 2016) ("OCTG Prelim. Mem.") at 7, *available at* https://enforcement.trade.gov/frn/summary/vietnam/2016-24797-1.pdf (last visited Feb. 27, 2019).  In that decision, Commerce identified countries with *any* exports as significant producers while likewise failing to explain its use of that metric as a substitute for the statutory criterion of production.  *See* OCTG Prelim. Mem. at 7.  Commerce's citation to this decision, therefore, fails to support meaningfully its redetermination in this proceeding.

"significant" in a vacuum; in order to consider whether such descriptors reasonably apply, the numbers must be placed in context.

Commerce's Policy Bulletin recognizes the contextual nature of the significant producer determination: it prompts the agency to issue a decision "consistent with the characteristics of world production of, and trade in, comparable merchandise." *See* Policy Bulletin 04.1 at 3. The examples that follow direct Commerce to examine significance from the perspective of relative contributions to global production. *See id.* (noting, "[f]or example, [that] if there are just three producers of comparable merchandise in the world, then arguably any commercially meaningful production is significant"). The same holds true for export data. Here, however, Commerce has relied on rankings while avoiding any requisite contextual analysis.

Commerce noted that Thailand, with 7.8 million kilograms ("kg") of activated carbon exports, ranks ninth on a list of twenty-four global activated carbon exporters (or eighth excluding China). 2nd Remand Results at 6 & n.23 (citation omitted). According to Commerce, Thailand's "export quantity is large compared to other exporters" on the list. *See id.* at 6, 35. While Thailand's export quantity is larger than the countries ranked tenth to twenty-fourth, as the court previously explained in relation to this same evidence,

> [a]lthough Policy Bulletin 04.1 contemplates that in the event there are "ten large producers and a variety of small producers, 'significant producer' could be interpreted to mean one of the top ten," Policy Bulletin 04.1 at 3, *Commerce has not established that that is the situation here*. In fact, there appears to be no clear delineation between the top ten and remaining exporters; rather, the top five exporters (China, India, United States, the Philippines, and Indonesia) collectively account for more than 90 [percent] of global exports. . . . Thereafter, listed countries contribute relatively little to global exports.

*Jacobi (AR7) I*, 222 F. Supp. 3d at 1181 (emphasis added) (internal citation omitted). Without more, Commerce's identification of Thailand as a significant producer based on this ranking among exporters is arbitrary and lacks substantial evidence.

Commerce also relied on Thailand's ranking as the largest exporter among the countries that it considered to be at the same level of economic development as China. *See* 2nd Remand Results at 6.  Separately, however, Commerce acknowledged its policy of *not* determining significance relative to the comparative production of the potential surrogate countries.  *See id.* at 36 (citing Policy Bulletin 04.1).  Commerce's policy acknowledges that a country's level of economic development is irrelevant to whether that country's production (or exports) of a given product may be considered "significant."  Commerce is not irrevocably committed to this policy; however, its diametrically opposite approach in this case, absent any explanation, cannot be sustained.  Accordingly, Thailand's ranking among this group of countries is not substantial evidence that Thailand is a significant producer of comparable merchandise.

With respect to net exports, Commerce asserted that "[a] country's status as a net exporter supports a finding of significant production because, as noted above, we interpret 'significant' to mean a noticeably or measurably large amount."  *Id.* at 7. Precisely why Commerce considers this to be the case here is unclear.  While Commerce has defined "significant" as "noticeably or measurably large," Commerce has not explained why having net exports signifies significant production.  Commerce further asserted that "when a country is a net exporter, the assumption is that it produces more than it imports and consumes," *id.*; however, the extent to which this is relevant to finding significant production depends, in part, on the amount of domestic consumption.

Here, Commerce has failed to identify record evidence of Thailand's domestic

consumption, if there is any.  The pertinent question then, is whether significant

production may reasonably be inferred from Thailand's net export quantity for the

relevant period, which was 1,172,897 kg.  *See id.* at 7 & n.31 (citation omitted).

       To that end, Commerce asserted that record evidence enabled a comparison of

the net exports of Thailand, the Philippines, and Indonesia.  *Id.* at 7.  Commerce noted

that Thailand, the Philippines, and Indonesia had net export quantities of 1,172,897 kg,

60,662,341 kg, and 11,112,825 kg, respectively.  *Id.* at 7-8.  But without actually

analyzing the information, Commerce simply asserted that Policy Bulletin 04.1 provides

that being "a net exporter *satisfies* the statutory requirement," and declared all three

countries to be significant producers without addressing the disparities between their

net export quantities.  *Id.* at 8 (emphasis added).  In fact, the Policy Bulletin states that

although "'significant producer' *could* mean a country that is a net exporter," Commerce

should avoid "fixed standards" in favor of case-specific assessments dependent upon

the available data, indicating that an analysis of this data is required.  Policy Bulletin

04.1 at 3 (emphasis added).[10]  The court has previously rejected Commerce's

---

[10] In the absence of domestic consumption data, as noted above, the only evidence of Thailand's production volume is its net export quantity.  For that reason, the legislative history's recognition that evidence of *significant* net exports may provide evidence of *significant* production is reasonable.  H.R. Rep. 100–576, at 590.  Relying on net exports without any information about domestic consumption is equivalent to treating those net exports as representative of total production.  In *Jacobi (AR7) II*, the court faulted Commerce for relying on evidence of production without evaluating its significance because that approach "reads the word 'significant' out of the statute," in contravention of established principles of statutory interpretation.  313 F. Supp. 3d at 1326.  Commerce simply repeats the same mistake here.

conclusory reliance on net exports *per se* and is compelled to do so again here.  *Jacobi (AR7) II*, 313 F. Supp. 3d at 1327-28.[11]

Commerce has now had three opportunities to justify its selection of Thailand as the primary surrogate country and each time has failed to provide substantial evidence supporting its determination that Thailand is a significant producer of comparable merchandise.  In the 2nd Remand Results, Commerce circled back to some of the same reasoning the court previously rejected without addressing any of the concerns identified by the court.  Moreover, Commerce's errant reasoning repeatedly ignores its own statements of practice.  While Commerce is not bound by those statements of practice, it must explain its departures and has seemed unable.  Therefore, the court finds that the record does not support the selection of Thailand as a significant producer.  On remand, Commerce must identify a surrogate country, whether from its list of countries at the same level of economic development as the PRC or another country at a comparable level of economic development not on the list, which meets the statutory criteria and is supported by substantial evidence.  Because Commerce justified its selection of surrogate values for carbonized material and financial ratios substantially on the basis that they are from the primary surrogate country, *see* 2nd Remand Results at 13, 19, Commerce must revisit these surrogate values on remand.

---

[11] Commerce also concluded that the evidence upon which it relied to conclude that Thailand is a significant producer "suggests that Thailand bears an influence on the global trade in activated carbon."  2nd Remand Results at 8.  However, Commerce did not elaborate on why this is so, and its reasoning is not apparent.  "Commerce must explain the basis for its decisions; while its explanations do not have to be perfect, the path of Commerce's decision must be reasonably discernable to a reviewing court." *NMB Singapore Ltd. v. United States*, 557 F.3d 1316, 1319-20 (Fed. Cir. 2009) (citations omitted).

## II.    Value-Added Tax

### A.  The Application of Section 1677a(c)(2)(B) to Nonmarket Economies

When calculating export price and constructed export price, Commerce may deduct "the amount, if included in such price, of any export tax, duty, or other charge imposed by the exporting country on the exportation of the subject merchandise to the United States, other than an export tax, duty, or other charge described in section 1677(6)(C) of this title."[12]  19 U.S.C. § 1677a(c)(2)(B).  Such price adjustments must be "reasonably attributable to the subject merchandise."  19 C.F.R. § 351.401(c).

Prior to 2012, Commerce did not apply 19 U.S.C. § 1677a(c)(2)(B) in proceedings involving imports from nonmarket economy ("NME") countries.  Commerce reasoned that "pervasive government intervention in NMEs precluded proper valuation of taxes paid by NME respondents to NME governments."  *Methodological Change for Implementation of Section 772(c)(2)(B) of the Tariff Act of 1930, as Amended, In Certain Non–Market Economy Antidumping Proceedings*, 77 Fed. Reg. 36,481, 36,482 (Dep't Commerce June 19, 2012) ("*Methodological Change*") (citing *Pure Magnesium and Alloy Magnesium From the Russian Federation*, 60 Fed. Reg. 16,440 (Dep't Commerce Mar. 30, 1995) (notice of final determination of sales at less than fair value) ("*Pure Magnesium from Russia*")).  Commerce had taken the position that nonmarket economy countries are

> governed by a presumption of widespread intervention and influence in
> the economic activities of enterprises[ and a]n export tax charged for one
> purpose may be offset by government transfers provided for another
> purpose. . . . To make a deduction for export taxes imposed by a NME

---

[12] Section 1677(6)(C) concerns "export taxes, duties, or other charges levied on the export of merchandise to the United States specifically intended to offset the countervailable subsidy received" and is not relevant here.

> government would unreasonably isolate one part of the web of
> transactions between government and producer.

*Id.* (citation omitted).  Commerce's declination to apply section 1677a(c)(2)(B) in NME

proceedings accorded with its former practice of declining to countervail subsidies paid

by a NME government to a NME producer.  *See id.*  Commerce reasoned that

"[a]ttempts to isolate individual government interventions in this setting—whether they

be transfers from the government or from exporters to the government—make no

sense."  *Id.* (citation omitted).

As the countries that Commerce considered to be nonmarket economies

evolved, so did Commerce's practices.  In 2002, Commerce revoked Russia's status as

a NME country.  *See Silicon Metal From the Russian Federation*, 68 Fed. Reg. 6,885,

6,887 (Dep't Commerce Feb. 11, 2003) (notice of final determination of sales at less

than fair value) (citation omitted).  In 2007, Commerce determined that China (and

Vietnam), while still regarded as NME countries, had nevertheless become sufficiently

dissimilar from the centrally-planned economies of the Soviet-era such that Commerce

could determine whether those governments bestowed countervailable subsidies on

certain companies or industries.  *See Methodological Change*, 77 Fed. Reg. at 36,482;

Issues and Decision Mem. for the Final Determination in the Countervailing Duty

Investigation of Coated Free Sheet Paper from the People's Republic of China, C-570-

907 (Oct. 17, 2007) at Cmt. 1, *available at* https://enforcement.trade.govfrn/summary

/prc/E7-21046-1.pdf (last visited Feb. 27, 2019).[13]  In accordance with its determination

---

[13] Commerce's initial application of the countervailing duty laws to NME countries was
challenged in court and held unlawful.  *See GPX Int'l Tire Corp. v. United States*, 666
F.3d 732, 745 (Fed. Cir. 2011), *reh'g granted*, 678 F.3d 1308 (Fed. Cir. 2012).

that countervailable subsidies from China and Vietnam could be measured, Commerce

reconsidered whether taxes, duties and other charges paid by NME producers to those

NME governments could likewise be identified and measured.  *See Methodological*

*Change*, 77 Fed. Reg. at 36,482.

 In 2012, Commerce concluded that it could now identify and measure certain

taxes paid by Chinese producers to the Chinese government and announced that,

henceforth, it would consider whether the PRC "has imposed an export tax, duty, or

other charge upon export of the subject merchandise during the period of investigation

or the period of review," including, for example, "an export tax or VAT that is not fully

refunded upon exportation."  *Id.* at 36,482 (internal quotation marks omitted).  Thus,

when the PRC does so, and "the respondent was not exempted, [Commerce] will

reduce the respondent's export price and constructed export price accordingly, by the

amount of the tax, duty or charge paid, but not rebated."  *Id.* at 36,483.  When "the

export tax, VAT, duty, or other charge" is "a fixed percentage of the price," Commerce

announced that it would "adjust the export price or constructed export price downward

by the same percentage."  *Id.*  "[B]ecause these are taxes affirmatively imposed by the

Chinese . . . government[]," Commerce "presume[s] that they are also collected."  *Id.*

## B. Commerce's Application of the Statute to Chinese VAT

 Pursuant to the *Methodological Change*, for the *Final Results*, Commerce

reduced Jacobi's constructed export price by an amount it described as "irrecoverable

---

However, Congress subsequently amended the statute to confirm that Commerce was
authorized to apply the countervailing duty laws to nonmarket economy countries.  *See*
Application of Countervailing Duty Provisions to NonMarket Economy Countries, Pub. L.
No. 112–99, 126 Stat. 265 (2012); 19 U.S.C. §§ 1671(f), 1677f–1(f).

VAT."   I&D Mem. at 16-18.   According to Commerce, irrecoverable VAT constituted an

"export tax, duty, or other charge" because it represented the amount of VAT Jacobi

paid on inputs and raw materials used in the production of activated carbon ("input

VAT") that became nonrefundable when those inputs and raw materials were consumed

in the production of exported subject merchandise.  *Id*. at 16-17.[14]  Commerce

calculated irrecoverable VAT by multiplying the free on board ("FOB") value of the

subject merchandise by the difference between the standard VAT rate (here, 17

percent) and the applicable VAT rebate rate (here, zero).  *Id*. at 17.  When Jacobi's

entered values were less than an "estimated customs value," Commerce applied the

resulting 17 percent irrecoverable VAT rate to the estimated customs value as a proxy

for the FOB China port value.  *Id*. at 18.

        In *Jacobi (AR7) I*, the court found that section 1677a(c)(2)(B) was ambiguous.

222 F. Supp. 3d at 1186–87; *see also infra*, p. 28 (discussing the court's finding).

Because the statute is ambiguous, pursuant to *Chevron* prong two, Commerce could

reasonably determine that an input VAT that becomes nonrefundable when the finished

product is exported constitutes, at the very least, an "other charge" that is "imposed by

the exporting country on the exportation of the subject merchandise" because it remains

recoverable (as a credit or offset against output VAT) until the product is exported.

---

[14] Commerce explained that
>       [i]n a typical VAT system, companies do not incur VAT expense for
>       exports; they receive on export a full rebate of the VAT they pay on
>       purchases of inputs used in the production of exports, and, in the case of
>       domestic sales, the company can credit the [input VAT] against the VAT
>       they collect from customers ["output VAT"].

I&D Mem. at 16.  In the PRC, however, "some portion of the input VAT that a company
pays on purchases of inputs used in the production of exports is not refunded."  *Id.*

*Jacobi (AR7) I*, 222 F. Supp. 3d at 1186–87.  The court further found that Commerce's

determination that certain of Jacobi's entered values were unreliable was supported by

substantial evidence and thus affirmed its use of estimated customs values.  *Id.* at

1190–92.  The court, however, remanded Commerce's VAT calculation because the

agency's application of the irrecoverable VAT rate to the price of the finished good

potentially overstated an adjustment intended to account for unrefunded input VAT.  *Id.*

at 1192-94.

In its first remand redetermination, Commerce continued to characterize its

adjustment as accounting for irrecoverable VAT (i.e., unrefunded input VAT).  *See* 1st

Remand Results at 25-27.  As the basis for its adjustment, however, Commerce pointed

to the 17 percent output VAT rate applicable to Jacobi's foreign and domestic sales and

found that it was, thus, included in Jacobi's U.S. price.  *Id.* at 27.

The court again remanded the adjustment, this time because Commerce's

revised explanation introduced an inconsistency between the calculation methodology

(based on output VAT) and the theory underlying the adjustment (unrefunded input

VAT).  *Jacobi (AR7) II*, 313 F. Supp. 3d at 1341-44.  Pointing to the record on remand,

the court further instructed:

> [t]o the extent that Commerce continues to justify the adjustment as
> accounting for irrecoverable VAT defined as unrefunded <u>input VAT</u>,
> Commerce must address record evidence demonstrating that Jacobi, in
> fact, recovers the input VAT it incurs by the offset it takes before remitting
> the output VAT it collects. . . .
>
> On the other hand, if Commerce asserts that the adjustment is based on
> an export tax due to Jacobi's collection of output VAT, Commerce must (a)
> address the record evidence regarding Jacobi's offset for input VAT paid
> on inputs taken against the output VAT collected, and (b) explain why the
> VAT adjustment is properly made on the basis of an estimated customs
> value instead of the FOB value on which the PRC assesses it.

*Id.* at 1342-43 (internal citations omitted).

In a subsequent order, the court instructed Commerce to include in its redetermination consideration of *Aristocraft of Am., LLC v. United States*, 42 CIT ___, 331 F. Supp. 3d 1372 (2018), in which that court posed several questions for Commerce to address on remand regarding the evidentiary basis for the adjustment, *id.* at 1379. *See* Order (Aug. 22, 2018), ECF No. 132. Commerce's explanation for the adjustment for Chinese VAT discussed in *Aristocraft* differed significantly from the explanation offered in the 1st Remand Results.

In its second remand redetermination in this action, Commerce changed the basis for its adjustment from irrecoverable VAT (i.e. unrefunded input VAT) to the 17 percent output VAT imposed on foreign and domestic activated carbon sales. 2nd Remand Results at 22, 25-26. Commerce supported its revised explanation by way of reference to a more recent iteration of Chinese VAT law the agency had placed on the record of the second remand proceeding. *Id.* at 21 & n.98 (citing Notice of the Ministry of Finance and the State Administration of Taxation on the Policies of Value-added Tax and Consumption Tax Applicable to Exported Goods and Services ("2012 VAT Notice"), PRR 9, PRJA Tab 6). Commerce's revised explanation recognizes that Chinese VAT law treats products differently depending on their eligibility for an export VAT refund. *See id.* at 22-26.

Pursuant to that law, companies that produce exported goods that are *ineligible* for an export VAT rebate do not incur a reduction in the input VAT amount credited against the output VAT. *Id.* at 25-26. Export sales of such goods are treated as domestic sales and are, thus, subject to the collection of output VAT. *Id.* at 25 & n.106

(citing 2012 VAT Notice, Art. 7.2(1)).  In contrast, companies that produce exported

goods that are *eligibl*e for a VAT rebate incur "a reduction in or offset to the input VAT

that can be credited against output VAT" when the company calculates its net VAT

payable amount.  *Id.* at 23-24; *see also* 2012 VAT Notice, Art. 5.1(1).  Export sales of

such products are not subject to output VAT; instead, these companies incur a

reduction in the input VAT amount they may credit against the output VAT collected

solely on domestic sales.  *See* 2nd Remand Results at 25.  That reduction in the input

VAT credit represents "irrecoverable VAT."  *See id.* at 23-24.

 In accordance with the foregoing description of Chinese VAT law, Commerce

explained that activated carbon is one of the products that is ineligible for an export

rebate.  Consequently, Commerce found that producers of activated carbon do not incur

a reduction in the amount of input VAT creditable against output VAT.  *Id.* at 26 & n.112

(citation omitted).  Instead, export sales of activated carbon are treated in the same

manner as domestic sales and are subject to the collection of output VAT.  *Id.* at 25-26

& n.114 (citation omitted).  Commerce concluded that it previously erred in adjusting

Jacobi's constructed export price by an amount purportedly representing irrecoverable

VAT.  *Id.*  Commerce nevertheless retained the downward adjustment to Jacobi's U.S.

price to account for the 17 percent output VAT, which the agency concluded

represented an "export tax, duty, or other charge imposed by the exporting country on

the exportation of the subject merchandise to the United States" pursuant to section

1677a(c)(2)(B).  *Id.* at 26.  Commerce explained that deducting the output VAT from

export price ensured the calculation of a tax-neutral dumping margin because normal

value in a nonmarket economy proceeding is based on the factors of production, which

are VAT-exclusive.  *Id.* at 25 & n.108.

Commerce further noted that certain questions raised by the *Aristocraft* court

concerning the calculation of irrecoverable VAT were now irrelevant to Commerce's

adjustment in this case.  *Id.* at 26-28.  Additionally, in response to this court's instruction

that any assessment based on output VAT should include consideration of record

evidence regarding Jacobi's ability to offset the output VAT with input VAT, *see Jacobi*

*(AR7) II*, 313 F. Supp. 3d at 1343, the agency explained that "Commerce's adjustment

is not intended to account for the total amount of net VAT creditable," 2nd Remand

Results at 30.  Rather, pursuant to the *Methodological Change*, "when the 'export tax,

VAT, duty, or other charge [is] a fixed percentage,' Commerce 'will adjust the export

price or constructed export price downward by the same percentage.'"  *Id.* (citing

*Methodological Change*, 77 Fed. Reg. at 36,483).

Commerce calculated the VAT adjustment pursuant to the following formula set

forth in Chinese law:

output VAT = FOB * exchange rate / (1 + legal VAT rate) * legal VAT rate.

*Id.* at 31 & n.132 (citing Jacobi's Suppl. Sec. C Resp. (Oct. 21, 2014) ("Jacobi's Suppl.

§ CQR"), Ex. SC-56, CR 124, 133, PR 157-58, PRJA Tab 5; 2012 VAT Notice).

Commerce reconsidered its prior reliance on estimated customs values to calculate the

adjustment and instead used Jacobi's entered values because those "are the FOB

China port values used in the Chinese tax authorities' output VAT calculations."  *Id.* at

31 & n.133 (citing Jacobi's Suppl. § CQR at 30); *see also id.* at 32.  Commerce thus

adjusted Jacobi's U.S. price downwards by the output VAT amount calculated using the above formula and Jacobi's entered values.  *Id.* at 32.

Commerce further explained that because Jacobi's sales of subject merchandise are subject to output VAT, Jacobi's U.S. price "necessarily include[s]" that amount.  *Id.* at 30.  In response to Jacobi's argument that Commerce had not shown its sales price to include output VAT because the invoice on the record of the remand proceeding does not reflect the collection of output VAT, *see id.* at 50, 51 & n.191 (citation omitted), Commerce pointed to Jacobi's questionnaire response explaining that its sales to foreign and domestic buyers are subject to 17 percent output VAT, *id.* at 51 & n.192 (citing Jacobi's Suppl. § CQR at 30, Ex. SC-56), and Jacobi's calculation of its net VAT payable that includes amounts representing the collection of output VAT for each POR month, *id.* at 51 & n.193 (citing Jacobi's Suppl. § CQR, Ex. SC-58, CRJA Tab 12); *see also id.* at 52.[15]

### C.  Commerce's Authority to Deduct Output VAT from U.S. Price

Jacobi contends that "Commerce's revised reasoning still fails to satisfy the statutory requirement for an adjustment" pursuant to section 1677a(c)(2)(B).  Jacobi's Opp'n Cmts. at 23.  Jacobi does not, however, develop any particular argument that output VAT does not fulfill the statutory criteria of an "export tax, duty, or other charge imposed by the exporting country on the exportation of the subject merchandise to the United States."  Nevertheless, the court recognizes that since it issued *Jacobi AR7 I*, two opinions from the court have called into question Commerce's legal authority to

---

[15] The court recognizes that Jacobi reported that its sales to the United States "*are subject to*" the collection of output VAT, but did not explicitly state that its sales prices include output VAT.  *See* Jacobi's Suppl. § CQR at 30 (emphasis added).

adjust export price or constructed export price to account for VAT (whether irrecoverable or not) pursuant to 19 U.S.C. § 1677a(c)(2)(B). *See Qingdao Qihang Tyre Co., Ltd. v. United States*, 42 CIT ___, ___, 308 F. Supp. 3d 1329, 1338-47 (2018); *China Mfrs. Alliance, LLC v. United States*, Slip Op. 19-7, 2019 WL 221237, at *4-8 (CIT Jan. 16, 2019). The court does not find those opinions persuasive and declines to follow them.

In *Qingdao* and *China Manufacturers*, the court, upon reviewing the statute in its current form and as enacted prior to the adoption of the Uruguay Round Agreements Act ("URAA"),[16] concluded, pursuant to *Chevron* prong one, that section 1677a(c)(2)(B) is unambiguous and does not permit Commerce to adjust export price or constructed export price for VAT imposed on export sales indirectly through an input VAT that becomes irrecoverable or, by extension, directly through an output VAT. *Qingdao*, 308 F. Supp. 3d at 1338-42, 1346; *China Mfrs.*, 2019 WL 221237, at *4-8. The court characterized VAT as a domestic tax that is distinct from an export tax imposed on the exportation of finished goods. *See Qingdao*, 308 F. Supp. 3d at 1339, 1341, 1345; *China Mfrs.*, 2019 WL 221237, at *6. The court reasoned that an "export tax, duty, or other charge" is "limited to one that is 'imposed by the exporting country on the exportation of the subject merchandise to the United States,'" *Qingdao*, 308 F. Supp. 3d at 1343 (quoting 19 U.S.C. § 1677a(c)(2)(B)) and is, thus, "by definition" not included "in the home-market price," *id.*; *see also China Mfrs.*, 2019 WL 221237, at *4.

---

[16] On December 8, 1994, Congress enacted the URAA, including section 1677a in its current form. *See* Uruguay Round Agreements Act, Pub. L. No. 103–465, § 223, 108 Stat. 4809, 4876 (1994).

Previously, when considering Commerce's irrecoverable VAT theory for the

adjustment, this court held that "the catchall phrase 'other charge' captures any financial

obligation *provided* it is 'imposed by the exporting country on the exportation of the

subject merchandise,' regardless of whether the imposing country explicitly labels the

charge as one pertaining to exports." *Jacobi (AR 7) I*, 222 F. Supp. 3d at 1186-87

(emphasis added).  In other words, the court considered "other charge" inherently

ambiguous and Commerce reasonably interpreted the phrase to encompass

irrecoverable VAT.

Upon Commerce's further consideration of the record and recognition that, with

regard to activated carbon, China simply imposes an output VAT on domestic <u>and</u>

<u>export</u> sales, the issue is now whether Commerce may apply the statute, 19 U.S.C.

§ 1677a(c)(2)(B), to a VAT that is equally applicable to domestic and export sales.  This

court determines that section 1677a(c)(2)(B)'s reference to "export tax[es], dut[ies], or

other charge[s] imposed by the exporting country on the exportation of the subject

merchandise" is ambiguous as to whether the statute applies to such assessments

imposed <u>solely</u> upon export sales or assessments imposed upon sales <u>at the time of</u>

<u>export</u>, regardless of whether the assessment is also applied to domestic sales.  *But cf.*

*Qingdao*, 308 F. Supp. 3d at 1343; *China Mfrs.*, 2019 WL 221237, at *4.

The notion that the imposition of a tax, duty or other charge that is generally

applicable to both domestic and export sales does not alone preclude it from providing

the basis for an adjustment pursuant to section 1677a(c)(2)(B) finds support in the U.S.

Supreme Court's Export Clause jurisprudence.  The Export Clause provides: "No Tax or

Duty shall be laid on Articles exported from any State."  U.S. Const., Art. 1, § 9, cl. 5.  In

*United States v. International Business Machines Corp.* ("*IBM*"), the Court held that the

Export Clause bars the imposition of a generally applicable federal tax on goods in

export transit, even if the tax is nondiscriminatory and equally applicable to non-export

transactions.  517 U.S. 843, 845, 863 (1996); *see also United States v. U.S. Shoe

Corp.*, 523 U.S. 360, 363, 370 (1998) (holding that a harbor maintenance tax collected

from exporters, importers, and domestic shippers and imposed at the time of loading for

exports and unloading for other shipments violated the Export Clause as applied to

exports).  While the context in which those cases arose is arguably distinct,

notwithstanding any such distinctions, *IBM* and *U.S. Shoe* support the proposition that a

statutory reference to an export tax, duty, or other charge imposed upon exportation

may include such a tax, duty or other charge also imposed on domestic sales.

The court now turns to consideration of whether Commerce's interpretation of

section 1677a(c)(2)(B) was reasonable when applied to China's output VAT in this case.

Here, Commerce interpreted section 1677a(c)(2)(B) to permit a reduction to EP/CEP in

order to achieve a tax neutral comparison between EP/CEP and normal value, *see* 2nd

Remand Results at 25 & n.108, and such an interpretation, as discussed more fully

below, was reasonable.

As an initial matter, it is important to bear in mind that here, normal value is *not*

based on home-market (i.e., domestic) sales prices, but is based on the respondent's

factors of production and corresponding surrogate values, which are determined on a

tax-exclusive basis.[17]   In such a case, the principle that dumping margin calculations

should be tax-neutral supports Commerce's adjustment.[18]

> The Federal Circuit recognized more than two decades ago:

> Buried in the language of statute and case law, and obscured by the fog of
> litigation, is a simple policy issue: whether Congress, in the Tariff Act of
> 1930 (the Act), precluded Commerce from determining dumping margins
> in a tax-neutral fashion.

*Federal Mogul Corp. v. United States*, 63 F.3d 1572, 1577 (Fed. Cir. 1995).   The

question, then, is whether Congress, when it did not substantively alter section 1677a in

the URAA,[19] intended to prohibit Commerce from using that provision to achieve tax

neutrality in nonmarket economy cases?   This court can find no such intention.

---

[17] In a proceeding involving a market economy country, a comparable tax-neutral comparison would be achieved by reducing the normal value for "taxes imposed directly upon the foreign like product . . . which have been rebated, or which have not been collected, on the subject merchandise, but only to the extent that such taxes are added to or included in the price of the foreign like product."   19 U.S.C. § 1677b(a)(6)(B)(iii).

[18] Indeed, the *Qingdao* court recognized that Congress intended for Commerce to deduct export taxes from U.S. price in order to "achieve a tax-neutral comparison [with] normal value" in a market economy proceeding precisely because an export tax is not included in the home-market or comparison market price used to calculate normal value.   308 F. Supp. 3d at 1342-43.   So too here, output VAT is not included in the surrogate values used to calculate normal value and, thus, notwithstanding the facts that output VAT is assessed on domestic sales of activated carbon and this is a nonmarket economy proceeding, the same principle of tax neutrality supports Commerce's deduction of output VAT from U.S. price.

[19] The Statement of Administrative Action accompanying the URAA explained that although Congress gave new labels to "purchase price" and "exporter's sale price," now "export price" and "constructed export price," respectively, the adjustments to those prices pursuant to section 1677a were unchanged.   *See Qingdao*, 308 F. Supp. 3d at 1339-40 (citing Uruguay Round Agreements Act, Statement of Administrative Action , H.R. Doc. No. 103–316, vol. 1, at 822–23 (1994), *reprinted in* 1994 U.S.C.C.A.N. 4040, 4163) ("SAA").   Congress likewise renamed "foreign market value" to "normal value." SAA at 820, 1994 U.S.C.C.A.N. at 4161.   The SAA is the authoritative interpretation of the statute. 19 U.S.C. § 3512(d); *RHP Bearings Ltd. v. United States*, 288 F.3d 1334, 1345 n.7 (Fed. Cir. 2002).

First, the pre-URAA version of the statute clearly permitted Commerce to make tax-neutral dumping calculations.  Whether it was through adjustments to foreign market value or purchase price/exporter's sales price, *Federal Mogul* confirms that "one thing is clear[:] . . . in administering the Act, [Commerce] over the years has pursued a policy of attempting to make the tax adjustment called for by the Act tax-neutral."  63 F.3d at 1580 (further holding that nothing in the pre-URAA version of section 1677a precluded Commerce from achieving tax-neutrality in its administration of the provision requiring an upward adjustment to U.S. price to account for taxes included in the home market sales price and rebated or exempted in the context of exports sales).[20]  Commerce's policy accords with the principle that differences in sales prices due to differential tax treatment between the home market and export market "does not constitute unfair pricing behavior" but, rather, "is a difference created by forces outside the control of the competitor, and does not involve the idea behind the antidumping act," which is to prevent unfair competition from dumping.  *Id.* at 1575 (citation omitted).

Second, the suggestion that Congress, by providing for adjustments to normal value or EP/CEP, is legislating adjustments to increase or decrease the margin of dumping is unsupported.  *But cf., e.g.*, *Qingdao*, 308 F. Supp. 3d at 1341, 1343 (discussing congressional intent to impact the dumping margin through certain adjustments).  To the contrary, Congress, when it enacted the URAA, intended to ensure that Commerce could continue to make the adjustments to normal value and

---

[20] At least as early as 1991, Commerce adjusted export price to enable a tax-neutral comparison to foreign market value.  *See* U.S. Dep't Commerce, Int'l Trade Admin., Import Admin., Antidumping Manual Chapter 7, pp. 8-10 (1991).  As noted, the URAA did not affect any substantive change to these adjustments.  *See supra*, note 19.

EP/CEP necessary in order to place both prices, to the extent possible, on the same basis, permitting a "fair, 'apples-to-apples' comparison." *Maverick Tube Corp. v. United States*, 861 F.3d 1269, 1274 (Fed. Cir. 2017) (quoting *Torrington Co. v. United States*, 68 F.3d 1347, 1352 (Fed. Cir. 1995)); *see also* SAA at 827, 1994 U.S.C.C.A.N. at 4166 (noting that a new statutory provision regarding deductions from normal value to account for indirect taxes represents a change from the pre-URAA statute that accounted for indirect taxes through an upward adjustment to export price, which change "is intended to ensure that dumping margins will be tax-neutral").  Typically, these adjustments lead to ex-factory prices, packed in the same manner, and on the same tax basis.  *See* SAA at 827.

Third, as discussed above, there is no indication that before 2012, Commerce (or Congress) considered section 1677a to be inapplicable in NME cases.  *See Methodological Change*, 77 Fed. Reg. at 36,482; *Pure Magnesium from Russia*, 60 Fed. Reg. at 16,448 (noting that, in NME cases, "pecuniary aspects of internal transactions are considered meaningless and thus ignored").  Rather, Commerce considered itself unable to apply the provision in NME cases because "pervasive government intervention . . . precluded proper valuation of taxes paid by NME respondents to NME governments." *Methodological Change*, 77 Fed. Reg. at 36,482.  Thus, while it may be the case that, all other things being equal, a dumping margin calculated before Commerce's policy shift would be lower than a margin calculated inclusive of an adjustment pursuant to section 1677a(c)(2)(B), there is nothing to indicate that the latter is not in accordance with law.  Instead, the latter margin calculation simply includes an additional data point that Commerce was unable to include in the former.

Finally, returning to the "policy issue" identified in *Federal Mogul*, adjusting

EP/CEP for VAT imposed on export sales allows Commerce to calculate a tax-neutral

dumping margin when normal value is calculated exclusive of VAT.  In this case, as

discussed in more detail below, the constructed export price reported by Jacobi includes

17 percent output VAT imposed by the Chinese government, whereas the normal value,

to which it is to be compared, is determined using surrogate values that are tax-

exclusive.  *See* 2nd Remand Results at 25 & n.108.  To interpret section 1677a(c)(2)(B)

as unambiguously barring Commerce from adjusting EP/CEP for these taxes when

comparing those prices to a tax-exclusive normal value would be to require that it

understate the margin of dumping.  The court finds no support for such a requirement in

the language of the statute.  Thus, Commerce's conclusion that China's output VAT is

an "export tax, duty, or other charge imposed by the exporting country on the

exportation of the subject merchandise" is a permissible interpretation of section

1677a(c)(2)(B), 2nd Remand Results at 26, and the court now turns to Jacobi's

arguments that the adjustment is unsupported by substantial evidence.

### D.  Commerce's Adjustment is Supported by Substantial Evidence

Jacobi contends there is not substantial evidence to support Commerce's

determination that Jacobi's U.S. price includes 17 percent output VAT.  *See* Jacobi's

Opp'n Cmts. at 24-25, 27.  According to Jacobi, the existence of a "legal requirement" to

collect output VAT on its U.S. sales is not evidence that it includes an amount for output

VAT in its sales prices to the United States.  *Id.* at 26.  Jacobi points to its sales

documentation submitted on the record and notes the lack of any reference to output

VAT.  *See id.* at 24 (citing Jacobi's Sec. A Questionnaire Resp. (July 24, 2014)

("Jacobi's § AQR"), Ex. A-16, CR 21, CRJA Tab 11).  Jacobi further contends that

Commerce has failed to address the court's "question regarding Jacobi's ability to offset

paid input VAT against the output VAT due."  *Id.* at 23.  Jacobi also contends that

*Aristocraft* remains relevant and Commerce erred in failing to address the opinion.  *See*

*id.* at 26.[21]

The Government contends that Jacobi's reporting that its U.S. sales were subject

to the collection of 17 percent output VAT represents substantial evidence that output

VAT was included in its U.S. prices.  Def.'s Reply Cmts. at 22.  The Government further

contends that Commerce properly discounted the relevance of Jacobi's ability to offset

input VAT from output VAT and its calculation of a net VAT payable amount because

Commerce's adjustment to Jacobi's constructed export prices is not intended to account

for the VAT amount Jacobi paid to the Chinese government, but rather, the amount of

VAT included in U.S. price.  *Id.* at 22-23.

Calgon contends that because "the cost of output VAT falls on the buyer of the

good, not on the [seller]," it "is necessarily included in Jacobi's price."  Def.-Ints.' Reply

Cmts. at 22 (quoting 2nd Remand Results at 23).  Calgon further contends that

Commerce adequately addressed the court's questions regarding the relationship

between input VAT and output VAT and the relevance of the *Aristocraft* opinion.  *Id.* at

22-23.

The court sustains Commerce's VAT adjustment.  The absence of a line item for

output VAT on Jacobi's sales documents is not dispositive and the record supports

Commerce's determination that Jacobi's export prices include output VAT.  *See*

---

[21] CATC did not comment on this issue.

*Matsushita Elec. Indus. Co. v. United States,* 750 F.2d 927, 933 (Fed. Cir. 1984) (the

possibility of drawing two inconsistent conclusions from the evidence does not preclude

the agency's finding from being supported by substantial evidence) (citing *Consolo v.*

*Fed. Mar. Comm'n*, 383 U.S. 607, 619–20 (1966)).

Here, Jacobi concedes that its U.S. sales were subject to the collection of 17

percent output VAT pursuant to the 2012 VAT Notice.  *See* Jacobi's Opp'n Cmts. at 26;

Jacobi's Suppl. § CQR at 30; 2012 VAT Notice, Art. 7.2(1).  Jacobi suggests, however,

that it calculates the net VAT payable amount *as if* it collected output VAT on U.S.

sales, but that it does not actually collect output VAT on those sales.  *See* Jacobi's

Opp'n Cmts. at 26.  In making this claim, Jacobi points to no affirmative evidence

demonstrating that the FOB China port value reflected in its sales documents is output

VAT-exclusive.  *See* Jacobi's § AQR, Ex. A-16 at ECF p. 13.  The record reasonably

supports Commerce's conclusion that Jacobi's U.S. prices included output VAT—

regardless of whether Jacobi itemized that charge in its sales documents.

Additionally, contrary to Jacobi's arguments, *see* Jacobi's Opp'n Cmts. at 25,

Commerce did not impermissibly base its adjustment on the contemporaneous Chinese

law while ignoring evidence of Jacobi's net VAT payment.  The statute directs

Commerce to make adjustments based on certain amounts included in U.S. price, not

amounts remitted to the subject nonmarket economy government.[22]  *See* 19 U.S.C.

§ 1677a(c)(2)(B).  Jacobi also faults Commerce for never requesting a U.S. sales-

---

[22] The court also notes that Jacobi's argument that it "only <u>pays</u> the Chinese
government the 'net' VAT amount," Jacobi's Opp'n Cmts. at 25, is inaccurate.  While the
net VAT payment may represent Jacobi's direct VAT payment to the Chinese
government, Jacobi is simply reducing the output VAT it collected by the input VAT it
has already paid to the Chinese government, albeit indirectly via its purchases of inputs.

specific VAT reconciliation.  *See* Jacobi's Opp'n Cmts. at 25.  However, as noted, the reconciliation document it submitted appears to include output VAT collected in connection with Jacobi's U.S. sales.  *See* Jacobi's Suppl. § CQR, Ex. SC-58.  The lack of a U.S. sales-specific reconciliation does not undermine Commerce's determination.

In sum, Commerce's redetermination on this issue complies with the court's remand instructions set forth in *Jacobi (AR7) II* and the agency's deduction of output VAT from Jacobi's constructed export price is lawful and supported by substantial evidence.

### CONCLUSION AND ORDER

In accordance with the foregoing, it is hereby

**ORDERED** that Commerce's 2nd Remand Results are remanded for Commerce to reconsider its surrogate country selection as well as the surrogate values for carbonized material and financial ratios, as set forth in Discussion Section I above; it is further

**ORDERED** that Commerce's 2nd Remand Results are sustained with respect to the agency's VAT adjustment, as set forth in Discussion Section II above; it is further

**ORDERED** that, in the event Commerce amends the antidumping margin assigned to Jacobi on remand, Commerce reconsider the separate rate assigned to non-mandatory respondents; it is further

**ORDERED** that Commerce shall file its third remand results on or before June 3, 2019; it is further

**ORDERED** that the deadlines provided in USCIT Rule 56.2(h) shall govern thereafter; and it is further

**ORDERED** that any opposition or supportive comments must not exceed 6,000 words.

/s/  Mark A. Barnett
Mark A. Barnett, Judge

Dated: March 4, 2019
   New York, New York