Slip Op. 19-159

# UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| JACOBI CARBONS AB AND JACOBI CARBONS, INC., <br><br> Plaintiffs, <br><br> and, <br><br> NINGXIA HUAHUI ACTIVATED CARBON CO., LTD., ET AL., <br><br> Plaintiff-Intervenors, <br><br> v. <br><br> UNITED STATES, <br><br> Defendant, <br><br> and, <br><br> CALGON CARBON CORPORATION AND CABOT NORIT AMERICAS, INC., <br><br> Defendant-Intervenors. | Before: Mark A. Barnett, Judge <br> Consol. Court No. 15-00286 |

## OPINION AND ORDER

[The U.S. Department of Commerce's third remand results are sustained.]

Dated: December 17, 2019

Daniel L. Porter and Tung A. Nguyen, Curtis, Mallet-Prevost, Colt & Mosle LLP, of Washington, DC, for Plaintiffs Jacobi Carbons AB and Jacobi Carbons, Inc.

Gregory S. Menegaz, J. Kevin Horgan, and Alexandra H. Salzman, DeKieffer & Horgan, PLLC, of Washington, DC, for Plaintiff-Intervenors Carbon Activated Tianjin Co., Ltd., Jilin Bright Future Chemicals Co., Ltd., Ningxia Mineral and Chemical Ltd., Shanxi DMD Corp., Shanxi Industry Technology Trading Co., Ltd., Shanxi Sincere Industrial Co., Ltd., Tancarb Activated Carbon Co., Ltd., and Tianjin Maijin Industries Co., Ltd.

Antonia R. Soares, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, for Defendant United States. With her on the brief were Joseph H. Hunt, Assistant Attorney General, Jeanne E. Davidson, Director, and Reginald T. Blades, Jr., Assistant Director. Of counsel on the brief was Emma T. Hunter, Attorney, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, DC.

David A. Hartquist, R. Alan Luberda, John M. Herrmann, and Melissa M. Brewer, Kelley Drye & Warren LLP, of Washington, DC, for Defendant-Intervenors Calgon Carbon Corp. and Cabot Norit Americas, Inc.

　　Barnett, Judge: This matter is before the court following the U.S. Department of Commerce's ("Commerce" or "the agency") third redetermination upon remand in this case. *See* Final Results of Redetermination Pursuant to Court Remand ("Third Remand Redetermination"), ECF No. 147-1. Plaintiffs Jacobi Carbons AB and Jacobi Carbons, Inc. (together, "Jacobi") and Plaintiff-Intervenors[1] (collectively, with Jacobi, "Plaintiffs") initiated this case challenging Commerce's final results in the seventh administrative review ("AR 7") of the antidumping duty order on certain activated carbon from the People's Republic of China ("PRC" or "China"). *See Certain Activated Carbon From the People's Republic of China*, 80 Fed. Reg. 61,172 (Dep't Commerce Oct. 9, 2015) (final

---

[1] Plaintiff-Intervenors include: Ningxia Huahui Activated Carbon Co., Ltd. ("Huahui"); Carbon Activated Tianjin Co., Ltd., Jilin Bright Future Chemicals Company, Ltd., Ningxia Mineral and Chemical Limited, Shanxi DMD Corporation, Shanxi Industry Technology Trading Co., Ltd., Shanxi Sincere Industrial Co., Ltd., Tancarb Activated Co., Ltd., and Tianjin Maijin Industries Co., Ltd. (collectively, "CATC"); and Ningxia Guanghua Cherishmet Activated Carbon Co., Ltd., Beijing Pacific Activated Carbon Products Co., Ltd., Cherishmet Inc., and Datong Municipal Yunguang Activated Carbon Co., Ltd., (collectively, "Cherishmet"). The court consolidated cases filed by Huahui, CATC, and Cherishmet under lead Court No. 15-00286, filed by Jacobi. *See* Order (Dec. 16, 2015), ECF No. 39. Those parties had also intervened in this case. *See* Order (Oct. 26, 2015), ECF No. 22; Order (Nov. 17, 2015), ECF No. 28; Order (Nov. 20, 2015), ECF No.33. Accordingly, the court refers to those parties as "Plaintiff-Intervenors."

Consol. Court No. 15-00286                                                                                          Page 3

results of antidumping duty admin. review; 2013–2014) ("*Final Results*"), ECF No. 37-3, and accompanying Issues and Decision Mem., A-570-904 (Oct. 2, 2015) ("I&D Mem."), ECF No. 37-4.[2]

On April 7, 2017, the court remanded Commerce's original determination. *See Jacobi Carbons AB v. United States* ("*Jacobi (AR7) I*"), 41 CIT ___, 222 F. Supp. 3d 1159 (2017). On August 10, 2017, Commerce filed its first remand redetermination. *See* Final Results of Redetermination Pursuant to Court Remand, ECF No. 105-1. On April 19, 2018, the court sustained the first remand redetermination, in part, but remanded the agency's surrogate country selection, surrogate value selections, and value added tax adjustment. *See Jacobi Carbons AB v. United States* ("*Jacobi (AR7) II*"), 42 CIT ___, 313 F. Supp. 3d 1308 (2018).

On October 24, 2018, Commerce filed its second remand redetermination. *See* Final Results of Redetermination Pursuant to Court Remand ("Second Remand Redetermination"), ECF No. 133-1. On March 4, 2019, the court sustained the Second Remand Redetermination, in part, and remanded the agency's selection of Thailand as the primary surrogate country, holding that substantial evidence did not support Commerce's determination that Thailand is a significant producer of comparable

---

[2] The administrative record filed in connection with the *Final Results* is divided into a Public Administrative Record ("PR"), ECF No. 37-1, and a Confidential Administrative Record ("CR"), ECF No. 37-2. The administrative record associated with the Third Remand Results is contained in a Public Remand Record, ECF No. 148-2, and a Confidential Remand Record, ECF No. 148-8. Parties submitted public and confidential joint appendices containing record documents cited in their briefs on the Third Remand Redetermination. *See* Public J.A. to Parties' Comments on Third Remand Redetermination ("PJA"), ECF No. 154; Confidential J.A. to Parties' Comments on Third Remand Redetermination ("CJA"), ECF No. 155.

Consol. Court No. 15-00286                                                                                          Page 4

merchandise.  *See Jacobi Carbons AB v. United States* ("*Jacobi (AR7) III*"), 43 CIT ___, ___, 365 F. Supp. 3d 1323, 1331–34, 1342–44 (2019).[3]

On June 17, 2019, Commerce filed the Third Remand Redetermination.  Therein, under protest,[4] Commerce changed its primary surrogate country selection from Thailand to Indonesia.  Third Remand Redetermination 5–12.  Commerce used Indonesian data for all surrogate values with the exception of the surrogate financial ratios.  *Id.* at 11–12.  For the financial ratios, Commerce used the financial statements of a company in the Philippines, Premium AC Corporation.  *See Id*. at 12, 20–21.

Before the court, no Party challenges Commerce's selection of Indonesia as the primary surrogate country or its selection of Premium AC Corporation's financial statements for the financial ratios.  *Id*. at 11–12, 20–21.  However, Plaintiffs do challenge Commerce's selection of Indonesian Global Trade Atlas ("GTA") data from Harmonized Tariff Schedule ("HTS") heading 2701.11, "Anthracite Coal, Whether Or Not Pulverized, But Not Agglomerated," as the surrogate value for anthracite coal.  *See* Jacobi's Comment on Commerce's *Third* Remand Redetermination ("Jacobi's Opp'n Cmts."), ECF No. 149; [CATC's] Comments in Opp'n to U.S. Dep't of Commerce's Third Remand Redetermination ("CATC's Opp'n Cmts."), ECF No. 150.  Defendant United States ("the Government") and Defendant-Intervenors Calgon Carbon Corporation and

---

[3] The court's opinions in *Jacobi (AR7) I*, *Jacobi (AR7) II*, and *Jacobi (AR7) III* present background information on this case, familiarity with which is presumed.

[4] By making the determination under protest, Third Remand Redetermination at 2 & n.6, Commerce preserves its right to appeal, *see Meridian Prods. v. United States*, 890 F.3d 1272, 1276 n.3 (Fed. Cir. 2018) (citing *Viraj Grp., Ltd. v. United States*, 343 F.3d 1371, 1376 (Fed. Cir. 2003)).

Cabot Norit Americas, Inc. (collectively "Defendant-Intervenors") filed comments in support of the Third Remand Redetermination. Def.'s Reply to Pls.' and Consol. Pls.' Respective Comments on the Third Remand Redetermination ("Gov't's Resp."), ECF No. 153; Def.-Ints.' Comments in Supp. of the Dep't of Commerce's Third Remand Redetermination ("Def.-Ints.' Resp."), ECF No. 152.

As discussed below, the court finds that Commerce's selection of the Indonesian GTA data as the surrogate value for anthracite coal is supported by substantial evidence and, accordingly, sustains the Third Remand Redetermination.

## JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction pursuant to § 516A(a)(2)(B)(iii) of the Tariff Act of 1930, as amended, 19 U.S.C. § 1516a(a)(2)(B)(iii)(2012),[5] and 28 U.S.C. § 1581(c)(2012).

The court will uphold an agency determination that is supported by substantial evidence and otherwise in accordance with law. 19 U.S.C. § 1516a(b)(1)(B)(i). Additionally, "[t]he results of a redetermination pursuant to court remand are also reviewed for compliance with the court's remand order." *SolarWorld Ams., Inc. v. United States*, 41 CIT ___, ___, 273 F. Supp. 3d 1314, 1317 (2017) (internal quotation marks and citation omitted).

---

[5] All citations to the Tariff Act of 1930, as amended, are to Title 19 of the U.S. Code, and all references to the United States Code are to the 2012 edition, unless otherwise stated.

DISCUSSION

**I. Legal Framework**

An antidumping duty is "the amount by which the normal value exceeds the export price (or the constructed export price) for the merchandise." 19 U.S.C. § 1673. When an antidumping duty proceeding involves a nonmarket economy country, Commerce determines normal value by valuing the factors of production[6] in a surrogate country, *see id.* § 1677b(c)(1), and those values are referred to as "surrogate values." In selecting surrogate values, Commerce must use "the best available information" that is, "to the extent possible," from a market economy country or countries that are economically comparable to the nonmarket economy country and "significant producers of comparable merchandise." *Id.* § 1677b(c)(1), (4); *see also* 19 C.F.R. § 351.408(c) (governing the information Commerce will use to value factors of production).

The phrase "best available information" is not defined in the statute; consequently, Commerce has broad discretion to determine what value(s) satisfy that requirement. *See, e.g.*, *QVD Food Co., Ltd. v. United States*, 658 F.3d 1318, 1323 (Fed. Cir. 2011) (citations omitted). In making its selection, Commerce is not required to duplicate the precise experience of the manufacturer in the non-market economy ("NME") country, but instead must identify the surrogate value that "most accurately represents the fair market value" of the relevant factor of production. *Nation Ford Chem. Co. v. United States*, 166 F.3d 1373, 1377 (citation and internal quotation marks

---

[6] The factors of production include but are not limited to: "(A) hours of labor required, (B) quantities of raw materials employed, (C) amounts of energy and other utilities consumed, and (D) representative capital cost, including depreciation." 19 U.S.C. § 1677b(c)(3).

Consol. Court No. 15-00286                                                    Page 7

omitted). In selecting among available surrogate values, Commerce's practice is to reject a proposed surrogate value if it determines that the value is aberrational compared to other market values on the record. *Canadian Solar Int'l Ltd. v. United States*, 43 CIT ___, ___, 378 F. Supp. 3d 1292, 1306 n.14 (2019); *see also* Third Remand Redetermination at 15 (explaining Commerce's practice in determining whether a value is aberrational).

## II. The Specificity of The Indonesian GTA Data Under HTS 2701.11

### A. Commerce's Determination

In the Third Remand Redetermination, Commerce selected Indonesian GTA data for HTS 2701.11 to value anthracite coal, the main input in activated carbon. Third Remand Redetermination at 5, 14–20. Commerce selected HTS 2701.11 data because the agency used data for this HTS number in previous segments of this review to value anthracite coal. *Id.* at 18. Commerce explained that there was no evidence to suggest that Indonesian GTA data for HS 2701.11 was "not specific to the anthracite coal used by Jacobi's suppliers." *Id.* at 19. Commerce considered whether to use inflated Philippine GTA data from the fifth administrative review ("AR 5") to value the anthracite coal but declined to do so because contemporaneous data was available. *Id.* at 18–19 & n.84 (citing, *inter alia*, *Calgon Carbon Corp. v. United States*, Slip Op. 17-6, 2017 WL 384685 (CIT Jan. 27, 2017)). Commerce also declined to rely on the U.S. Energy Information Administration ("EIA") data to value anthracite coal because Commerce had "usable data from countries with" gross national income ("GNI") "more comparable to that of China with which to value the anthracite coal." *Id*. at 17–18.

### B. Parties' Contentions

Jacobi argues that Commerce's decision to value anthracite coal using Indonesian GTA data for HTS 2701.11 is not supported by substantial evidence because: (1) U.S. EIA data is more specific to Jacobi's anthracite coal input; (2) alternatively, the Philippine GTA data from AR 5 is more specific than the Indonesian surrogate value; and (3) HTS 2701.11 is a "broad basket" category of anthracite coal that may not reflect Jacobi's production experience. *See* Jacobi's Opp'n Cmts. at 4–8, 12–14.

In response, the Government and Defendant-Intervenors contend that Commerce has a "statutory directive" to select data from a country that is economically comparable to the NME country before considering data from non-economically comparable countries. Gov't's Resp. at 18 (quoting *Calgon Carbon Corp. v. United States*, 40 CIT ___, ___, 190 F. Supp. 3d 1224, 1233 (2016)); Def.-Ints.' Resp. at 14. They argue that the record demonstrates that the United States is not economically comparable to China. Gov't's Resp. at 17 (citing Third Remand Redetermination at 17); Def.-Ints.' Resp. at 13 (same).

The Government also avers that the inflated Philippine AR 5 data would not be an appropriate surrogate value because Commerce had viable contemporaneous data from the primary surrogate country. Gov't's Resp. at 19–20; *see also* Def.-Ints.' Resp. at 13. The Government further argues that there is no evidence that the data include imports of anthracite coal different from that inputs used for Jacobi's production. Gov't's

Consol. Court No. 15-00286 Page 9

Resp. at 10–12, 17–20 (citing, *inter alia*, Third Remand Redetermination at 19); *see also* Def.-Ints.' Resp. at 11–12.

### C. Commerce Reasonably Found the Indonesian Surrogate Value to be Specific

Before Commerce will consider values from countries that are not on its list of potential surrogate countries (*e.g.*, the U.S. EIA data), or non-contemporaneous data (*e.g.*, the Philippine AR 5 data), a respondent must demonstrate that no country on Commerce's list "provides the scope of quality data that [Commerce] requires." *Calgon Carbon*, 190 F. Supp. 3d at 1234 (internal quotation marks and citation omitted). Thus, the burden is on Jacobi to demonstrate that Commerce's surrogate value is not specific to the factor of production in question. *See Blue Field (Sichuan) Food Indus. Co., Ltd. v. United States*, 37 CIT ___, ___, 949 F. Supp. 2d 1311, 1328 (2013). Jacobi failed to meet this burden.

While HTS 2701.11 is a basket category such that the data reported thereunder could include products distinct from the type of anthracite coal consumed for Jacobi's production, that hypothetical possibility, alone, is insufficient to indicate that the Indonesian data are not specific to Jacobi's anthracite coal. *See Calgon Carbon*, 190 F. Supp. 3d at 1235 ("The mere fact that the Thai data are derived from a basket category, i.e., HTS code 2701.11 'Anthracite Coal, Not Agglomerated,' on its own does not demonstrate that the Thai data are not specific."). Indeed, Jacobi has offered no evidence to support its claim that the Indonesian data actually included distinct types of anthracite coal.

  Having rejected Jacobi's argument that the Indonesian GTA data was not sufficiently specific to the type of anthracite coal at issue, Commerce appropriately declined to rely on the U.S. EIA data because it came from a country that was not economically comparable to China (i.e., the United States). Third Remand Redetermination at 17–18. Commerce is statutorily obligated to "use, to the extent possible, information from countries 'at a level of economic development comparable to that of the nonmarket economy country.'" *Peer Bearing Co.-Changshan v. United States*, 36 CIT 1700, 1724, 884 F. Supp. 2d 1313, 1335 (2012) (quoting 19 U.S.C. § 1677b(c)(4)).

  Commerce also properly declined to rely on the Philippine AR 5 data. *See* Third Remand Redetermination at 18–19. Commerce gives "considerable weight to contemporaneity . . . when comparing contemporaneous surrogate values with non-contemporaneous market economy purchases." *Home Meridian Int'l, Inc. v. United States*, 772 F.3d 1289, 1296 (Fed. Cir. 2014). Commerce rejected the Philippine data because it had contemporaneous data for HTS 2701.11 from Indonesia and there was no evidence that the data was not representative of the type of anthracite coal Commerce sought to value.[7] *See* Third Remand Redetermination at 18–19; *Calgon*

---

[7] Plaintiffs also argue that Commerce should have relied on the Philippine AR 5 or the U.S. EIA because the Indonesian surrogate value is aberrant. *See* Jacobi's Opp'n Cmts. at 11–12; CATC's Opp'n Cmts. at 4–5. As discussed *infra*, the court is not persuaded that the Indonesian surrogate value is aberrant, and thus, Commerce was not obligated to rely data from a non-comparable country, 19 U.S.C. § 1677b(c)(4), or non-contemporaneous data, *Home Meridian*, 772 F.3d at 1296.

*Carbon*, 190 F. Supp. 3d at 1231–32 (explaining that Commerce did not abuse its discretion in declining to rely on non-contemporaneous data).

### III. Quantity and Value of the Indonesian Anthracite Coal

#### A. Commercially Significant Quantity

##### *1. Commerce's Determination*

As indicated, Commerce valued anthracite coal using the Indonesian GTA data for HTS 2701.11. That value was based on 1,523 metric tons ("MT") of imported coal. Third Remand Redetermination at 18. Jacobi had argued that because the Indonesian GTA data are based on an amount that is "far less" than the amount of anthracite coal consumed by Jacobi's suppliers during the POR, the import quantity underlying the Indonesian surrogate value was not commercially significant. *Id.* at 12–13. Commerce rejected Jacobi's argument, explaining that "Jacobi has not provided any information which suggests that the anthracite import quantity is a sample of anthracite coal or otherwise not a commercial quantity purchased, sold or entered for consumption in the Indonesian economy."[8] *Id.* at 18.

##### *2. Parties' Contentions*

Before the court, Jacobi renews its argument that the Indonesian surrogate value is derived from a quantity of anthracite coal that is not "commercially significant" because its suppliers consumed more than 66,000 MT during the POR, which is over 44 times the Indonesian quantity. Jacobi's Opp'n Cmts. at 3 (citing *Jacobi Carbons AB v.*

---

[8] In addressing whether the Indonesian surrogate value is aberrant, Commerce noted that the Philippines (196 kilograms) and Samoa (12 MT) import volumes were not "commercially significant." *See* Third Remand Redetermination at 16 & nn. 66, 67.

United States ("*Jacobi (AR8) I*"), 42 CIT \_\_\_, \_\_\_, 313 F. Supp. 3d 1344, 1361–62 (2018)).

The Government responds that whether the Indonesian surrogate value is based on a "commercially significant" amount cannot be established solely by comparing the quantity imported by Indonesia and the quantity consumed by Jacobi's suppliers. Gov't's Resp. at 8–9; *see also* Def.-Ints.' Resp. at 10–11. Defendant-Intervenors assert that the quantitative difference is due to the "size and capability of China's activated carbon industry" but does not otherwise indicate that the value Commerce selected was commercially insignificant. Def.-Ints.' Resp. at 10. Defendant-Intervenors also point out that the standard shipment volume used to allocate inland freight and brokerage surrogate values is 10 MT and suggest that because the Indonesian import quantity could fill more than 150 such containers, it should be regarded as a commercially significant quantity. *Id*. at 11.

### 3. Commerce Reasonably Found that the Indonesian Surrogate Value is Based on a Commercially Significant Quantity

Substantial evidence supports Commerce's decision to rely on the Indonesian import quantity to determine the surrogate value for anthracite coal. Commerce provided a reasoned explanation for relying on the Indonesian import quantity, explaining that Jacobi provided no evidence that the Indonesian imports consisted of samples or otherwise were not commercial entries for consumption. Third Remand Redetermination at 18.

Before the court, Jacobi does not assert that Commerce overlooked its suppliers' production experience; rather, Jacobi argues that the disparity between the two

amounts is sufficiently large as to render the Indonesian data unrepresentative. However, the Indonesian data need not replicate Jacobi's production experience to be considered the best information available.[9] See *Nation Ford*, 166 F.3d at 1377.

In the absence of any record basis to question the commercial significance of the Indonesian import quantity, the court finds that Jacobi's identification of the disparity between those imports and its suppliers' production experience, standing alone, is insufficient to disturb the agency's finding. "[I]t is not the court's place to re-weigh the evidence or to suggest that another alterative was the only appropriate choice." *JMC Steel Grp. v. United States*, 38 CIT ___, ___, 24 F. Supp. 3d 1290, 1313 (2014) (citation omitted).

**B. Non-Aberrational**

  ***1. Commerce's Determination***

In the Third Remand Redetermination, Commerce used the average unit value for Indonesian imports of anthracite coal from the Indonesian GTA data for HTS 2701.11. Third Remand Redetermination at 14. Commerce also examined average unit values for anthracite coal imports into other countries at the same or a comparable

---

[9] The court notes that the Government argues that 1,523 MT of anthracite coal is a commercially significant amount because it is more than 10 times the amount of carbonized material the court questioned as commercially significant in *Jacobi (AR8) I*, 313 F. Supp. 3d at 1362. Gov't's Resp. at 10; *see also* Def.-Ints.' Resp. at 10. The court declines to give any weight to this argument, however, because (a) the court came to no conclusion regarding the commercial significance of the Thai quantity of carbonized material (instead noting that Commerce failed to provide an adequate explanation for its finding that this quantity was commercially significant, *Jacobi (AR8) I*, 313 F. Supp. 3d at 1361–62); (b) the Government pointed to no record evidence of a relationship in terms of commercial significance between carbonized material and anthracite coal; and (c) the Government's argument is entirely *post hoc*.

Consol. Court No. 15-00286                                                                                          Page 14

level of economic development as China and, for benchmarking purposes, discussed historical data and data from non-economically comparable countries. *Id.* at 14–17.  In addition, Commerce averaged all of the anthracite coal values on the record (excluding Indonesia, the Philippines, and Samoa, but including the U.S. EIA data), for comparison purposes. *Id.* at 17.

     Commerce concluded that the Indonesian GTA data are not aberrational because: (1) the fact that the Indonesian value is higher than other values "alone does not necessarily indicate that the [data] are distorted or misrepresentative," *Id.* at 14; *see also id.* at 17; and (2) although data shows that the Indonesian surrogate value is higher than the anthracite coal surrogate value in previous reviews, each administrative review "is a separate exercise of Commerce's authority and allows for different conclusions based on different facts in the record," *Id.* at 15 & n.64 (citation omitted).

     ***2. Parties' Contentions***

     Plaintiffs argue that the Indonesian surrogate value for anthracite coal is aberrant in light of export price data from the top exporters of anthracite coal (Russia, the United States, South Africa, and Ukraine) in 2013 and 2014.[10]  *See* Jacobi's Opp'n Cmts. at 9–

---

[10] Jacobi derived the price-per-metric-ton for anthracite coal from the export data by dividing total price paid for anthracite coal by the total import quantity for a given year in a particular country.  Those prices are as follow: (a) for 2013—South Africa: $119.79/MT; Ukraine $95.15/MT; United States: $113.535/MT; and (b) for 2014—South Africa: $102.26/MT; Ukraine $84.24/MT; United States $130.93/MT.  Second Surrogate Value Submission by Datong Juqiang Activated Carbon Co., Ltd. (Mar. 31, 2015) ("DJAC Second SV Submission") at Exs. 3B, ECF No. 154 pp. 80, 82, 84–85, 88–90, PR 322, PJA Tab 15.  The Russian export price for 2014, $119.56/MT, is derived from the total monthly prices for anthracite coal from July 2013 to March 2014, divided by the number of months in which prices are recorded.  *See id.* at Ex. 3C, ECF No. 154 p. 103.

10 (citing DJAC Second SV Submission at Exs. 3B, 3C); CATC's Opp'n Cmts. at 4 (same). Plaintiffs also argue that in the past six administrative reviews of this order, Commerce has determined the surrogate value for anthracite coal to be between $48.65/MT and $239.07/MT. *See* Jacobi's Opp'n Cmts. at 9; CATC Opp'n Cmts. at 3–4. Plaintiffs claim there is no evidence that the market price for anthracite coal has suddenly increased so as to explain the Indonesian import value, which is significantly higher than the surrogate values in the past six reviews. Jacobi's Opp'n Cmts. at 10.

The Government responds that the Indonesian import value is not aberrant as evidenced by Commerce's consideration of a wide range of benchmark values, including some from countries that are not at a level of economic development comparable to China. Gov't's Resp. at 15–16; *see also* Def.-Ints.' Resp. at 7–9. The Government contends that Commerce did not disregard the historical values from previous segments of this review; rather, Commerce determined that those values did not establish that the current Indonesian value was aberrant. Gov't's Resp. at 16; *see also* Def.-Ints.' Resp. at 7–8. Thus, the Government contends that Plaintiffs invite the court to reweigh the evidence. Gov't's Resp. at 15.

### 3. Commerce's Selection of the Indonesian Import Value is Supported by Substantial Evidence

Substantial evidence supports Commerce's reliance on the Indonesian import value for anthracite coal as non-aberrant. While the Indonesian value may be the highest potential surrogate value on the record,[11] this fact alone does not compel the

---

[11] Commerce did not consider the higher values in the Philippine data to be reliable because it was based on a commercially insignificant quantity. Third Remand Redetermination at 16 & n.67.

conclusion that the Indonesian value is aberrational. *See Baoding Mantong Fine Chemistry Co. v. United States*, 41 CIT \_\_\_, \_\_\_, 222 F. Supp. 3d 1231, 1248 (2017) ("Still, while the AUV for the imports in Indonesia was the highest for the countries with the largest, non-insignificant volumes, the court cannot conclude that Commerce was required to find on this record that the data for Indonesia . . . were aberrational."). At most, the higher Indonesian value requires Commerce to "examine the data and provide a reasoned explanation as to why the data it chooses is reliable and non-distortive." *Mittal Steel Galati S.A. v. United States*, 31 CIT 1121, 1135, 502 F. Supp. 2d 1295, 1308 (2007).

Commerce addressed this consideration by comparing the Indonesian import value to average unit values from other potential surrogate countries both at the same level of economic development and at a comparable level of economic development to China. Third Remand Redetermination at 15–17. While Commerce recognized that the Indonesian import values were higher, citing determinations in other administrative reviews, Commerce explained that it had previously accepted much larger differences from a benchmark figure as non-aberrant. *Id.* at 16 & nn.68, 69 (citations omitted).

The court acknowledges that Commerce likely could have come out either way on this—finding the figure to be non-aberrant, as it did, or determining that it was too high to utilize in this review. Nevertheless, the court cannot conclude that, on this record, substantial evidence did not support Commerce's decision that this contemporaneous import value available from its primary surrogate country was not too high to be utilized. This would appear to be precisely the type of judgment call in which

Consol. Court No. 15-00286                                                                                              Page 17

the court should not reweigh the evidence, particularly in light of the agency's expertise and consideration of that evidence, including that which fairly detracted from its decision. *Downhole Pipe & Equip., L.P. v. United States*, 776 F.3d 1369, 1376–77 (Fed. Cir. 2015) (explaining that the court's task is not to reweigh the evidence); *Matsushita Elec. Indus. Co., Ltd. v. United States*, 750 F.2d 927, 933 (Fed. Cir. 1984) (that a plaintiff can point to evidence that detracts from the agency's conclusion or that there is a possibility of drawing two inconsistent conclusions from the evidence does not preclude the agency's finding from being supported by substantial evidence). That a reasonable mind could disagree with the agency also does not detract from the validity of Commerce's determination. *See Zhejiang DunAn Hetian Metal Co. v. United States*, 652 F.3d 1333, 1341 (Fed. Cir. 2011) ("This court's duty is not to evaluate whether the information Commerce used was the best available, but rather whether a reasonable mind could conclude that Commerce chose the best available information." (citation and internal quotation marks omitted)).

      Finally, Commerce's failure to address directly the export data cited by Jacobi does not fairly detract from the agency's conclusion. The export prices cited by Jacobi were precisely within the range of values that Commerce considered in its aberrancy discussion. *See* Third Remand Redetermination at 16–17 (for benchmarking purposes, considering the U.S. EIA data ($87.22/MT) and the South African value ($145.57/MT)). Thus, the absence of an explicit discussion of the export prices as such does not detract from Commerce's conclusion. *See Hitachi Metals, Ltd. v. United States*, 42 CIT ___,

___, 350 F. Supp. 3d 1325, 1340 (2018) (finding that the International Trade Commission's failure to explicitly respond to an argument did not require a remand).

For the reasons stated above, the court finds that substantial evidence supports Commerce's determination that the Indonesian data are reliable as the surrogate value for anthracite coal.

## CONCLUSION

In accordance with the foregoing, it is hereby

**ORDERED** that Commerce's Third Remand Results are sustained. Judgment will enter accordingly.

/s/     Mark A. Barnett     
Mark A. Barnett, Judge

Dated: December 17, 2019     
New York, New York